**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
GREENVILLE DIVISION**

| | |
|---|---|
| **O.R.**, by and through his parents, Cheryl Rogers and Greg Rogers, on behalf of himself and those similarly situated; | |
| **CHERYL ROGERS**; | |
| **GREG ROGERS**; | |
| **E.G.**, by and through her mother, Amber Galea, on behalf of herself and those similarly situated; | |
| **M.G** by and through her mother, Amber Galea; and | |
| **W.M.**, by and through his mother, Kersey Clark; | |
| *Plaintiffs*, | Case No. |
| v. | |
| **GREENVILLE COUNTY, SOUTH CAROLINA**; | |
| **BEVERLY JAMES**, in her official capacity as Executive Director of the Greenville County Library System; and | **Complaint for Declaratory Judgment, Injunctive Relief, and Nominal Damages** |
| **KAREN ALLEN**, in her official capacity as Youth Services Manager of the Greenville County Library System, | |
| *Defendants*. | |

**PRELIMINARY STATEMENT**

1.      For the last two years, the Greenville County Library System ("Greenville Library" or the "Library") has been systematically purging all positive portrayals of transgender or gender non-conforming people from the County's library shelves.

2.      Much of this crusade has focused on the juvenile and young adult sections. Under newly adopted amendments, library policies now *require* the removal of all materials from the juvenile and young adult sections of the library that contain "illustrations, themes, or story lines [that] affirm, portray, or discuss changing the appearance of a minor's gender in ways inconsistent with the minor's biological sex" or with "illustrations, themes, or storylines that celebrate, portray, or affirm gender transitioning." As a Library Board member explained it: "the presence of a transgender character in a book . . . is grounds for relocating it to the adult section."

3.      According to Library Board members, these policies do not rest on neutral curation criteria, but on members' discriminatory view that materials condoning gender transition are "trash" and that the "idea" of "transgenderism" is a "dangerous thing" and part of "a radical agenda" that the library has "every right . . . to take an ethical and moral stand" against. Despite the First Amendment concerns raised by two Board members, the Library Board voted against consulting with legal counsel before enacting the policies.

4.      As part of its "ethical and moral stand" against transgender people, the Library has removed many critically acclaimed titles from the juvenile and young adult sections, and has thereby created unnecessary hurdles for anyone under 18 years old to read them. Removed titles include: *Julián is a Mermaid* by Jessica Love (an award-winning children's picture book about a young boy who wishes to dress up like a mermaid), *Ana on the Edge* by A.J. Sass (an award-winning book about a twelve-year-old nonbinary figure skater), and *Red: A Crayon's Story* by Michael Hall (an award-winning picture book about a blue crayon that was mistakenly labeled as "red"). Meanwhile, books that advocate against gender transition—such as the Christian-themed book, *God made Boys and Girls* by Marty Machowski—remain available in the juvenile section.

5.      Beyond adopting an explicitly discriminatory policy for juvenile and young adult books, the Library also enforces a widespread custom and practice of discriminating against the collection, retention, and display of library materials—including books for adults—that positively portray LGBTQ people. Under that unwritten policy, Defendants have secretly removed dozens of LGBTQ titles from the Library collection for both children and adults,

disproportionately refused requests by library patrons to order new LGBTQ materials, and granted over fifty requests from the Greenville County Republican Women's Club to remove LGBTQ materials. Defendants have also ordered librarians to remove book displays that feature LGBTQ materials, cancelled library events that involve LGBTQ individuals or themes, and removed promotional materials for a LGBTQ book club.

6.    According to reporting by the *Greenville News*, Defendants' crusade against LGBTQ library materials has created a "culture of fear" amongst Greenville County librarians and caused the staff turnover rate to nearly double.

7.    Defendants' policies and actions violate the United States Constitution. The First Amendment protects the right to receive information in public libraries, and it prohibits Defendants from "contract[ing] the spectrum of available knowledge" to achieve their own viewpoint-based "moral agenda." *Sund v. City of Wichita Falls, Tex.*, 121 F. Supp. 2d 530, 547–48, 549 n.19 (N.D. Tex. 2000). Likewise, the Equal Protection Clause prohibits Defendants, as state actors, from using library policies to enforce their "moral and ethical stand" against transgender people. *See Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 610–13 (4th Cir. 2020) (noting the dignitary harms associated with discrimination and holding that laws singling out transgender people must survive intermediate scrutiny).

8.    Plaintiffs are members of the Greenville community, including some who identify as LGBTQ, who seek to read library materials positively portraying LGBTQ people, without discriminatory barriers impeding their ability to do so. By discriminatorily suppressing Plaintiffs' access to these materials on the basis of Defendants' animus towards gender transition and transgender people, Defendants have violated—and continue to violate—Plaintiffs' rights under the First and Fourteenth Amendments, causing ongoing and irreparable harm.

## PARTIES

9.    **Plaintiff O.R.** is 17 years old and brings his claims by and through his parents, **Plaintiffs Cheryl Rogers and Greg Rogers**. All three Plaintiffs in the Rogers family—O.R.,

Cheryl, and Greg—are residents of Greenville County, South Carolina and are patrons of the Greenville County Library System. **Plaintiff O.R.** brings his Equal Protection claims on behalf of himself and those similarly situated—namely, all minor, transgender library patrons who lack adult library cards.

10.     **Plaintiffs E.G. and M.G.** bring their claims by and through their mother, Amber Galea. E.G. and M.G. are, respectively, 11- and 12-year-old residents of Greenville County, South Carolina, where they live with their mother, Amber Galea. **Plaintiff E.G.** brings her Equal Protection claims on behalf of herself and those similarly situated—namely, all individuals with adult, Greenville County library cards who identify as LGBTQ.

11.     **Plaintiff W.M.** brings his claims by and through his mother, Kersey Clark. W.M. is a 9-year-old resident of Greenville County, South Carolina, where he lives with his mother, Kersey Clark.

12.     **Defendant Greenville County**, South Carolina ("Greenville County" or the "County") is a "body politic and corporate," with the power to sue and be sued. S.C. Code § 4-1-10(1).

13.     Greenville County operates a public library system, the Greenville County Library System ("Greenville Library" or the "Library"), as a "continuing function of county government." S.C. Code § 4-9-35(A). The Library is controlled and managed by a board of trustees ("the Board") appointed by the Greenville County Council. S.C. Code § 4-9-35(B).

14.     The Board currently consists of eleven members: Brian Aufmuth, Kenneth Baxter, Gene Beckner, Elizabeth Collins, Stephanie Cunningham, S. Allan Hill, James Hoard, Tommy Hughes, Marcia Moston, Kristen Odom, and Joe Poore.

15.     Pursuant to state statute, the Board is empowered to "[t]ake any actions deemed necessary and proper by the board to establish, equip, operate and maintain an effective library system within limits of approved appropriations of county council," S.C. Code § 4-9-36(9), to "[p]rovide and make available to the residents of the county books and library materials," S.C. Code § 4-9-37(a), and to "[a]dopt regulations necessary to insure effective operation,

maintenance and security of the property of the library system." S.C. Code § 4-9-37(b). Pursuant to Greenville Library's Collection Development and Maintenance Policy (the "Collection Policy") (attached as Exhibit A),[1] the Board "determines the Collection Development and Maintenance Policy and is the final authority in matters concerning its application." Ex. A.

16.    **Defendant Beverly James** is sued in her official capacity as the Executive Director of Greenville Library. Pursuant to the Collection Policy, the Board "delegates responsibility for collection development and maintenance to the Executive Director and Library staff" including "collection development specialists" like the Youth Services Manager. The Board also "may authorize the Executive Director to make adjustments to the [Collection] policy based on budget, physical space, or other special concerns." Ex. A.

17.    **Defendant Karen Allen** is sued in her official capacity as the Youth Services Manager of Greenville Library. As Youth Services Manager, she is responsible for selecting materials to add to the Youth and Juvenile Collections, which includes interpreting and enforcing the Collection Policy as to both the Juvenile and Young Adult Collections of the Library.

## JURISDICTION AND VENUE

18.    This Court has subject-matter jurisdiction pursuant 28 U.S.C. § 1331 (general federal question jurisdiction) and § 1343 (civil rights actions) because Plaintiffs' claims arise under the First and Fourteenth Amendments of the United States Constitution. This Court has jurisdiction to issue declaratory relief under 28 U.S.C. §§ 2201 and 2202.

19.    Venue is proper in this district under 28 U.S.C. § 1391 because Defendants reside in this district and the action arose in this district.

20.    Venue is proper in the Greenville division under Local rule 3.01 because a substantial portion of the events or omissions giving rise to the claims occurred in this division.

---

[1] Exhibit A reflects the Collection Policy as amended in August 2024. The Board subsequently amended the Collection Policy in February 2025, changing the name of the "Young Adult Collection" to the "Teen Collection" and adding a policy regarding materials' inclusion in the adult collection based on target age ranges.

## FACTUAL ALLEGATIONS

**I.    The Greenville Library acknowledges the need for, and claims to follow, non-discriminatory library-collection policies.**

21.    Greenville County is the most populous county in South Carolina. The library system is a "continuing function of county government." S.C. Code § 4-9-35(A).

22.    In general, Greenville Library holds itself out as adhering to traditional, nondiscriminatory principles of library collection.

23.    The stated mission of Greenville Library is "[t]o champion literacy, inspire learning, and foster community connection," its vision is "[t]o be Greenville County's first choice for exploration, discovery, and information," and it "remains dedicated to providing free access to materials, experiences, and resources to communities throughout Greenville County." Greenville County Library System, *About Us*, available at https://www.greenvillelibrary.org/about-us.

24.    Since 1999, the Board has adhered to an official Collection Development and Maintenance Policy ("the Collection Policy") which "provides direction to Library staff in the collection development and maintenance process as well as information for the public on the philosophy and rationale used to make collection development and maintenance decisions." Ex. A.

25.    The Collection Policy defines "collection development and maintenance" as "the ongoing process of evaluating materials available for purchase or licensing and making decisions about adding, deleting, and retaining materials in the Library collections." *Id.*

26.    The Collection Policy describes a philosophy that "strives to support an informed community by providing access to the world of ideas and information," and a "responsibility to acquire, as available, material presenting a wide variety of views and opinions on current and historical issues." *Id.* The Collection Policy proclaims that the "Library will neither promote nor censor any particular religious, moral, philosophical or political conviction or opinion" and that "[m]aterial will not be excluded because of the race or nationality or the religious, social, or

political views of the author, publisher, or creator." *Id.* It also states that "[t]he Library recognizes that many materials are controversial and that any given item may offend some. Only individuals can determine what is most appropriate for their needs." *Id.*

27.    With respect to its larger collection philosophy regarding material for children, the Collection Policy states that "[a]lthough the Library recognizes the need to be sensitive to the categorization of material that may be deemed inappropriate for some ages of children, parents and legal guardians have the responsibility for their children's use of library materials and are encouraged to define what material or information is consistent with their personal and family beliefs; only they can apply those values for themselves and their children." *Id.*

28.    The Collection Policy lists the following "General Criteria" in its "Factors Considered in Material Selection":

- Reputation and qualifications of the creators, publisher or producer
- Community needs, interests, demands, and standards
- Importance as a document of the times
- Literary, artistic, and technical values
- Relationship to the existing collection
- Availability in other area libraries
- Suitability of physical form for library use
- Recommendations in reviews
- Durability
- Price
- Suitability of subject and style for intended audience
- Judgment of work as a whole
- Availability of equipment required for examination and use
- Publication date
- Availability for purchase

29.    The Collection Policy also lists the following as "Content Criteria":

- Comprehensiveness and depth of treatment

- Accuracy of content

- Authority, skill, competence, and purpose of author/producer

- Objectivity

- Clarity

- Technical quality

- Vitality and originality

- Artistic presentation

- Effective characterization

- Sustained interest

- Relevance and use of the information

- Authenticity of history of social setting

30.    The Greenville Library's stated principles are consistent with "best practices" standards promulgated by the American Library Association (ALA), which are undergirded by a philosophy that "all libraries are forums for information and ideas," and that "intellectual freedom," or "the right of library users to read, seek information, and speak freely as guaranteed by the First Amendment," "is one of the core values of the library profession."

31.    With respect to "controversial topics," ALA states that "[i]t is the responsibility of all libraries to serve every member of their designated communities. It is not the responsibility of a library to promote one point of view over another. This requires that libraries collect material that represents majority beliefs as well as minority beliefs. The [ALA]'s Library Bill of Rights and Freedom to Read Statement provide ethical guidance to librarians on these issues. In providing access to a diversity of materials, some material may be offensive and/or controversial to some patrons. Libraries cannot reject and remove a resource because an individual or a group has found the material objectionable. Libraries must provide access to material that may be controversial to some patrons, while also providing a process by which individuals or groups may formally request reconsideration of material they find offensive or inaccurate."

32.     ALA's Library Bill of Rights states that "Books and other library resources should be provided for the interest, information, and enlightenment of all people of the community the library serves. Materials should not be excluded because of the origin, background, or views of those contributing to their creation," and further, that "Libraries should provide materials and information presenting all points of view on current and historical issues. Materials should not be proscribed or removed because of partisan or doctrinal disapproval."

**II.     The Greenville Library Board adopted formal policies that discriminate against LGBTQ-related library materials and impede library patrons' access to such materials.**

33.     By 2023 and 2024, treatment of transgender people had become a wedge political issue, both nationally and in South Carolina. Against that political background, the Library Board abandoned its commitment to "neither promote nor censor any particular religious, moral, philosophical or political conviction or opinion." Entering the political fray "to take an ethical and moral stand" against transgender people, the Library Board replaced its traditional and neutral policies with two new discriminatory policies that censored access to information and ideas that the Library Board wished to suppress. The Library Board started by focusing on books for young children and then moved on to books for young adults.

A.     The Board Banishes Books with Transgender Characters and Themes from the Juvenile Section (0-12 year-olds)

1.     *A patron requests to remove* Melissa *from Greenville Library collection.*

34.     In early 2024, a library patron requested that the Library remove a book, *George* (later republished as *Melissa*), from the Library collection.

35.     *Melissa* is a children's novel, targeting ages 8 to 12, originally published in 2015. It is about a 10-year-old transgender girl who struggles with how to show her true self to the world. The *School Library Journal* calls it "[a] required purchase for any collection that serves a middle grade population," *Kirkus Reviews* calls it "warm, funny, and inspiring," and *BookPage* says that "readers going through a similar experience will feel that they are no longer alone, and

cisgender (non-transgender) readers may gain understanding and empathy." Among its numerous accolades are inclusion on *Kirkus*'s "Best Middle Grade Books" list, *Publishers Weekly*'s "Best Middle Grade Books," and ALA's Notable Children's Book List.

36.    Under the Library's policies, library patrons may request that material in the Library's collections be "reconsidered" (*i.e.*, removed), by submitting a *Request for Reconsideration of Library Material* form ("Reconsideration Form"). The Reconsideration Form directs the Requester to indicate whether they (a) believe the material being objected to violates the Collection Policy or (b) do not know if the material violates the Collection Policy, but find certain content objectionable; and to provide examples of the violative or objectionable content in either case. The form then asks what action the patron would prefer the Library take regarding the material in question.

37.    The individual requesting that *Melissa* be removed from the Library's collection ("the complainant"), wrote on the Reconsideration Form that they objected "to the author describing gender dysphoria, or rejecting one's God-given sex, as normal and good." The complainant also stated that the book "normaliz[ed] behavior [that] rejects God's given sex," which the complainant described as "harmful, causing many adverse consequences." The complainant commented that "sex is a biological reality, and the suppression of this truth leads to significant confusion, instability, and disruptive behavior."

38.    Pursuant to the Library's Reconsideration of Library Material Regulations (attached as Exhibit B), requests or "reconsideration forms" are evaluated by the Library Collection Development Committee, who must evaluate the item in question by (a) reading, viewing, and/or listening to the item, specifically considering the Requester's written concerns and the Collection Policy; (b) consulting reviews and recommended lists to determine the opinions of experts, critics, and others; and (c) meeting to discuss the requester's concern(s) and deciding whether the item meets selection criteria and its classification is in compliance with the Collection Policy. Based on this evaluation, the Collection Development Committee must then

formulate a recommendation regarding the item's classification and retention in the collection. Ex. B.

39.    In its original response to the complainant, the Library denied the request to remove the book because it had continued to be borrowed since being added to the Library collection in 2016. The response letter also cited the Collection Policy's philosophy that "only individuals can determine what is most appropriate for their needs."

       2.    *The Materials Committee votes to move* Melissa *and advance a new discriminatory policy for children's books.*

40.    The complainant then appealed to the Board's Library Materials Committee ("the Materials Committee"), indicating a belief that Library policy required that "inappropriate material [be] restricted from children and removed," and stating that Executive Director James's reliance on the book being borrowed did "not substantiate that it is considered appropriate or that leadership maintain it in their collections."

41.    On February 16, 2024, the' Materials Committee—consisting of Board members Marcia Moston (Committee Chair), Gene Beckner, Elizabeth Collins, and Tommy Hughes, with non-committee Board members Brian Aufmuth and James Hoard also present—met with two items on its agenda: (1) a Request to review a book, *George*, later republished as *Melissa*, from the Library collection and (2) the Collection Policy.

42.    Board member Elizabeth Collins moved to recommend to the full board that *Melissa* be removed from the library collection, "both physical copies and the electronic resources." She gave her reasoning for this motion, indicating her agreement with the complainant that the book should be removed on the basis that it "describes gender dysphoria and rejects that biological sex is normal and good," thereby "promot[ing] confusion and destructive behavior." She opined that the book "talks about children's genitalia, it teaches that parents are not safe, and it normalizes the idea of biological males dominating in women's roles, and it talks about medical transitioning and puberty blockers for minors."

43. Board member Brian Aufmuth (not a member of the Materials Committee, but present) pointed out his view that the appeal from the complainant "seem[ed] to be religious based" and his concern "about censoring of materials based on a religious perspective."

44. Committee member Gene Beckner responded that his proposal of moving the book to "Parenting and Early Childhood" was because he "want[ed] to have the library recognize the primary source of education for their children is their parents, and so allowing a parent to make that decision for their child to have this book or not have this book." He continued that "there [were] a lot of things in this book that a nine-or ten-year-old is not going to fully comprehend and doesn't fully comprehend the consequences of some of these decisions."

45. "Parenting and Early Childhood" (PEC) refers to a specific section within the adult collection of the library, which only exists at half of the Library's twelve locations, and from which minors with juvenile or young adult library cards cannot check out books. Before it became a repository for books banished from the juvenile and young adult sections, the PEC collection housed materials intended *for parents and guardians*.

46. Aufmuth responded to member Beckner's proposal with the suggestion that, prior to the full Board vote, the Board should consult with an attorney, such as the county attorney.

47. Moston responded by stating that the issue with the book was "the presentation that [being transgender] is normal and good" and "also the normalizing of . . . something that . . has potentially dangerous consequences."

48. Moston then took the Committee vote to move *George* (*Melissa*) to the PEC section, from which minors cannot check out books. The four Committee members unanimously voted in favor of moving the book.

49. The Committee then moved to the second agenda item: a proposal to revise the Collection Policy to require that *all* books for children with depictions of transgender characters be placed in the adult section of the library from which children cannot check out books.

50. Moston stated that the Library lacked a policy for books containing transgender characters or themes "because . . . it's a relatively new explosion." She noted that this was the

first challenge to a book "based around the idea of gender identity," but that she "expect[ed] that there [were] more challenges coming," and the library needed to "have a policy in place, so we have something to measure things by."

51.     Moston presented the proposed policy to the Committee, which was ultimately passed 4-0 after several minor changes. The proposed policy would add the following language to the Juvenile Collection Policy:

> The library recognizes parents are the primary source of education for their children and that they have a fundamental right and responsibility to direct the upbringing and education of children under their control, including issues of moral, social, physical, civic, and spiritual development.

> To that end, materials targeting audiences aged 0-12 in which the illustrations, themes, or story lines affirm, portray, or discuss changing the appearance of a minor's gender in ways inconsistent with the minor's biological sex, will be located in the Parenting and Early Childhood (PEC) collection, including:

> - Social transitioning: Pronouns or dress inconsistent with biological sex.
> - Medical or surgical procedures: Puberty blocking drugs, cross-sex hormones, or surgical procedures for the purpose of affirming gender transitioning.
> - Gender fluidity: The possibility of changing genders at will or being no gender at all.

52.     During the committee discussion, Aufmuth suggested removing the "Social transitioning" and "Gender fluidity" bullet points, indicating that the language was "vague," "overly broad," and "could be loosely interpreted" to include "materials that you're not intending to capture," using *To Kill a Mockingbird* as an example, based on the character Scout being "dressed like a boy most of the time."

53.     Moston responded that "nobody wakes up one morning and decides to go and have their breasts cut off or to have any kind of genital surgery. This is a process." She described Oli London, a "detransitioner" whose "introduction to pronouns" allegedly "brought into his mind the idea that . . . you can change your sex; that it's possible to be someone else." Moston

indicated her belief that "children's literature that embeds these ideas as though they were a fact into the stories" is "dangerous."

54.    Aufmuth repeated his concern that the policy as written may create a situation where "the umbrella is too big," and certain books not intended to be targeted would have to be moved under the policy.

55.    After some discussion, Collins conceded that the policy may well be overinclusive relative to its goals, but indicated her belief that the issue was "so serious," that she "would rather [the Library] err on the side of our net being too wide and catching some books that maybe shouldn't have gotten moved to PEC." She continued that she "would rather *To Kill a Mockingbird* end up in PEC than . . . signaling accidentally through our juvenile section that we think this is appropriate for children to learn on their own." She reiterated that she would "rather cast too wide a net now than too small a net."

56.    Once the vote was called, the Committee voted 4-0 to add the proposed language, which would go to the full Board the following week for more discussion.

       3.    *The Library Board votes on and passes the new discriminatory policy for children's books.*

57.    On February 26, 2024, the full Library Board of Trustees convened, with all eleven board members participating (Kenneth Baxter, Gene Beckner, Elizabeth Collins, Stephanie Cunningham, S. Allan Hill, James Hoard, Tommy Hughes, Marcia Moston, Kristen Odom, and Joe Poore all participated in person, while Brian Aufmuth participated by phone). Greenville Library Executive Director (Defendant) Beverly James was also present and participated in the discussion.

58.    Board Chair S. Allan Hill facilitated the Board meeting, beginning with a discussion of whether to endorse the Materials Committee's decision to move *Melissa* to the adult section of the library. Ten out of the eleven board members voted to uphold the Materials Committee's decision to move the book. The one dissenting vote was from Board Member Hoard, who wanted to remove *Melissa* from the library entirely Hoard stated his position on

*Melissa* as follows: "I think it's trash. We're a taxpayer-funded facility and it's not the taxpayer's duty to subsidize trash."

59.    After the vote on *Melissa*, Chair Hill explained why he thought the Board should adopt the new policy proposed by the Materials Committee. Chair Hill stated, "we realized that there's nothing in our policy because you know, before ten years ago, I can't even remember the first time I heard about kids talking about being a different gender. It hasn't been more than ten years ago. But we never had to have a policy specifically regarding transgender-type books in the children's section. And so . . . we became aware of that because of this appeal."

60.    Hill later continued, "My now adult kids say, 'Why do you have to have a policy?' I say, 'Well, a few years ago, we had people with good sense. We didn't have to have a policy that said that you didn't need to have transgender books, books about how do we make ourselves transgender, in the children's section. But now we do. So, the fact that this book was there and that there wasn't anything specific on it brought that to light. And so, we have a committee recommendation regarding that situation."

61.    Board member Marcia Moston then spoke in favor of the new policy and read the proposed text into the record:

> The library recognizes parents are the primary source of education for their children and that they have a fundamental right and responsibility to direct the upbringing and education of children under their control, including issues of moral, social, physical, civic, and spiritual development.
>
> To that end, materials targeting audiences aged 0-12 in which the illustrations, themes, or story lines affirm, portray, or discuss changing the appearance of a minor's gender in ways inconsistent with the minor's biological sex, will be located in the Parenting and Early Childhood (PEC) collection, including:
>
> - Social transitioning: Pronouns or dress inconsistent with biological sex.
>
> - Medical or surgical procedures: Puberty blocking drugs, cross-sex hormones, or surgical procedures for the purpose of affirming gender transitioning.
>
> - Gender fluidity: The possibility of changing genders at will or being no gender at all.

62.    Board member Hughes pointed out that the term "dress" was "vague," which Board member Poore agreed to, stating "I think we do have some vagueness here. What is dress inconsistent with biological sex? Can we add a definition of that? Like, is that, is that only, is that a male, is that males wearing dresses?" He also pointed out that it could be applied to instances where kids raid the closet and dress up, which he "d[id]n't think anybody's after."

63.    Moston replied that "this policy is specific to gender identity issues, and not tomboy or imagination or play dressing. The policy is about changing your, that you are dressing for the purpose of identifying as a girl." She stated further, "I think even doing keyword searches on these books . . . some of these books pop up very quickly because it is specific to gender identity."

64.    Based on Poore's concerns around the vagueness of "dress inconsistent with biological sex," Board member Kristen Odom suggested adding language to clarify that "we're specifically regarding affirming gender transition."

65.    Based on this suggestion and discussion, Odom moved to add "for the purpose of affirming gender transition" to the first and last bullet points in the policy language.

66.    This motion was voted on by voice vote, with only Member James Hoard voting against it, as he believed "we're going down a rabbit hole of trying to be too perfect, and it's just unnecessary."

67.    Chair Hill then moved to the motion to add this amended language to the Collection Policy.

68.    Board member Brian Aufmuth asked (over speakerphone) how many Library locations had PEC collections, to which Beverly James replied, "There's six. Not every location has one."

69.    Greenville Library has twelve physical locations in total.

70.    Member Odom asked whether it was possible for every branch to have one, to which Executive Director James responded, "Well, there's space issues that have to be

considered. It may mean that we would transfer a book that doesn't have a PEC collection at the moment, then we would transfer that book to another location that does."

71.     Chair Hill then called a voice vote on the amended policy. All eleven board members voted in favor of the policy, which ultimately added the following provision to the Juvenile Section of the Collection Policy:

> The library recognizes parents are the primary source of education for their children and that they have a fundamental right and responsibility to direct the upbringing and education of children under their control, including issues of moral, social, physical, civic, and spiritual development.

> To that end, materials targeting audiences aged 0-12 in which the illustrations, themes, or story lines affirm, portray, or discuss changing the appearance of a minor's gender in ways inconsistent with the minor's biological sex, will be located in the Parenting and Early Childhood (PEC) collection, including:

> - Social transitioning: Pronouns or dress inconsistent with biological sex for the purpose of affirming gender transitioning.

> - Medical or surgical procedures: Puberty blocking drugs, cross-sex hormones, or surgical procedures for the purpose of affirming gender transitioning.

> - Gender fluidity: The possibility of changing genders at will or being no gender at all for the purpose of affirming gender transitioning.

72.     Following the vote, Chair Hill addressed a previously raised concern, stating "I don't see this change in the policy as calling out staff to scour through all the books. I think the public, general public, is going to do that job for us as they find books that violate this policy."

73.     Member Moston stated that "they're just simple keyboard search that doesn't require very much, and they're specifically described as gender identity or transgender, so right there, you know, that's the main topic."

74.     Just prior to moving on, Chair Hill addressed the complainant who had appealed the denial of his challenge to *Melissa*, stating "I think the gentleman who filed the appeal is here today for the votes in question. Thank you for your diligence."

75. During the public comment portion of the meeting, ten members of the public spoke, each being given three minutes for comment. Of those ten members of the public, six spoke out against the censorship being imposed by the Library.

  B. <u>The Board Banishes Books with Transgender Characters and Themes from the Young Adult Section (13-17 year-olds)</u>

76. On August 16, 2024, the Board's Library Materials Committee met to consider another new policy proposal. This second proposal targeted the books available for young adults, reading:

> The Library System recognizes that parents/legal guardians have a fundamental right to be involved in all aspects of their minor children's lives, especially in matters as life changing as gender identification.

> Therefore, materials targeting audiences aged 13-17 with characters who have transitioned or are in the process of transitioning from a gender that corresponds to their biological sex to a different gender will be located in the Adult Collection.

> This includes materials with illustrations, themes, or storylines that celebrate, portray, or affirm gender transitioning, whether changes are social (names, pronouns) or physical.

77. In a meeting that took a total of thirteen minutes, the Committee voted to advance the proposed language to the full Board.

78. On August 26, 2024, the full Board met to consider the new policy for young adult books.

79. Chair Hill and Member Moston both expressed their belief that this policy brought the Collection Policy in line with South Carolina law prohibiting anyone under 18 from receiving gender transition-related care. When Member Poore pointed out that "state law doesn't prevent using a pronoun," Moston replied that "using the pronouns is the first step of social transitioning."

80. Poore continued to raise First Amendment concerns with the policy amendment, specifically raising that the prohibition on any portrayal of transgender characters was overbroad. Poore questioned Marcia Moston's understanding of the policy, stating "The way I read this, is

that if a book has a transgender character in it, of any type, in the book—not like it is a book about the character, it could be somebody's friend . . . —that book now becomes adult material. Is that, am I understand the policy correctly?" Moston responded, "Yes."

81.    Poore argued that the policy whereby "the presence of a transgender character in a book, in any case, is grounds for relocating it to the adult section" seemed to be "discriminatory . . . and also just unnecessary."

82.    Moston disagreed with the characterization of the policy as discriminatory, stating that the policy was "about putting ideas in the library, putting ideas in kids' minds that may not have already been there," which she characterized as "a dangerous thing" for which the library had "every right . . . to take an ethical and moral stand" against, by "putting it in an area where parents who don't mind can give permission, parents who do mind can expect their young adult collection to . . . not expose their children to such a radical agenda."

83.    Poore indicated that he agreed with the position that "we don't want material in the kids' section encouraging lifelong consequential decisions," but that "it is a different thing to say, 'we do not want to allow any book in the kids section that has a human being in it that is transgender.'" Poore questioned whether the Board had "a First Amendment lawyer look at this, because I'm pretty sure we probably haven't." He later described his belief that "trying to move books specifically because they promote or affirm or introduce gender transition ideology" was acceptable, because "[c]hanging their genitals falls under graphic sexuality," whereas this policy was "overly broad and discriminatory."

84.    Chair Hill emphasized that "with regard to this situation, it is not safe for [13- to 17-year-olds] to get ideas, because it's not a good idea to encourage transgenderism with regard to 13- to 17-year-olds. And there's a state law, in fact, in effect, that says basically the same thing."

85.    Member James Hoard argued that the debate was about "what shelf is this book going to be placed on," so the continued debate was unnecessary.

86.     Member Aufmuth responded that the policy was in fact "restricting access to content," and raised the First Amendment concern, stating, "there's legal cases that talk of speech that is neither obscene as to use nor subject to some other legitimate proscription cannot be suppressed solely to protect the young from ideas or images that a legislative body thinks unsuitable for them," and that the Board should seek "legal counsel to review this policy."

87.     Aufmuth continued, "There are a lot of things in books in the young adult section that are dangerous to children, just as or more dangerous than transgender ideology." For example, he pointed out books about drugs and alcohol, as well as suicide, which he characterized as "a far greater threat to mental health to our youth than transgenderism," as well as "a lot of other topics," such as "gun violence" and the "trauma of kids going through school shootings," "broken families and divorce." He concluded, "There are a lot of topics that are dangerous to children and that parents might not want their children exposed to. We can't regulate and move all topics that might be dangerous [or have a] negative impact to the adult section. We can't target one group just because we don't like that group."

88.     Poore again tried to point out that this was "a form of restriction," even if parents could permit their children to have unrestricted library cards, and likened the policy to "think[ing] women should all stay home; they shouldn't work in the workforce" and then "tak[ing] away any book that portrays a woman working in the workforce" and not allowing it in that section of the library.

89.     Poore tried to get an answer as to whether the policy amendment had been reviewed by outside counsel, but the Board voted to move the policy to a vote, suspending further debate.

90.     Upon a voice vote, the Board passed the motion, with Poore and Aufmuth being the only members to vote against it.

91.     Following an unrelated update from the Executive Director, Member Aufmuth introduced a motion to ask the Director to ask for "a First Amendment lawyer to take a look at

our Collections, Development, and Maintenance Policy to determine whether we are in compliance constitutionally."

92.    That motion failed, with four votes in favor, and seven votes against.

93.    At no point during the February 2024 or August 2024 Board meetings did any Board member or Library patron identify a specific harm that had resulted from the targeted books being on the juvenile or young adult bookshelves. In fact, no Board member or Library patron identified any outcome whatsoever of an actual child being exposed to targeted materials. Rather, the only harms discussed were theoretical fears of "putting ideas in kids' minds that may not have already been there."

### III.    Defendants also enforce and condone a widespread custom and practice of discriminating against and censoring LGBTQ-related library materials.

94.    Beyond the 2024 amendments to the Collection Policy, the Library also enforces a widespread custom and practice of discriminating against the collection, retention, and display of LGBTQ library materials, including with respect to books for adults.

95.    *First*, the Library systematically ignores procurement requests for LGBTQ-related materials and fails to obtain new LGBTQ-related titles for the Juvenile Collection, the Young Adult collection, or Adult collection.

96.    Library patrons can use the "Suggest a Title" forms on the Library website to request new library materials. These requests are generally approved, so long as they comply with the general curation criteria.

97.    Defendants discriminate against requests for LGBTQ-related materials. Despite dozens of library patrons submitting requests for LGBTQ-related titles using "Suggest a Title" forms on the Library website, the Library denies these requests and has disproportionately failed to fulfill requests for LGBTQ-related titles as compared to other requests. In 2023, zero books containing LGBTQ characters were purchased for the Juvenile Collection, and less than 1% of the books purchased for the Young Adult collection contained LGBTQ stories.

98.    *Second*, the Library has removed dozens of LGBTQ titles from its collection—including adult, young adult, and juvenile titles—with no explanation.

99.    Between January 2023 and October 2023, thirty-six adult LGBTQ-related titles were removed entirely from the Library system: *The Man on the Third Floor* by Anne Bernays, *A Thin Bright Line* by Lucy Jane Bledsoe, *My Avant-Garde Education: A Memoir* by Bernard Cooper, *Coming Out Spiritually: The Next Step* by Christian de la Huerta, *Soon to Be a Major Motion Picture* by Warren Dunford, *Not Dark Yet* by Berit Ellingsen, *Willa & Hesper* by Amy Feltman, *Fire Year* by Jason K. Friedman, *We Were Witches* by Ariel Gore, *Less is Lost* by Andrew Sean Greer, *Homintern: How Gay Culture Liberated the Modern World* by Gregory Woods, *Hide* by Matthew Griffin, *Always* by Nicola Griffith, *Split Screen* by Brent Hartinger, *The Line of Beauty* by Allan Hollinghurst, *Blind Sight* by Meg Howrey, *Honor Betrayed: Sexual Abuse in America's Military* by Dr. Mic Hunter, *The Last Illusion* by Porochista Khakpour, *Skin Hunger* by Eli Lang, *Escaping Indigo* by Eli Lang, *Common Murder: The Second Lindsay Gordon Mystery* by Val McDermid, *No Other World* by Rahul Mehta, *Murder Under the Fig Tree* by Kate Jessica Raphael, *Hot Rocks* by Lev Raphael, *Mother India* by Tova Reich, *Say Say Say* by Lila Savage, *I Heart Oklahoma!* By Roy Scranton, *Now is the Hour* by Tom Spanbauer, *Milk* by Darcey Steinke, *Delta Belles* by Penelope J. Stokes, *Someone Killed His Boyfriend* by David Stukas, *The Lauras* by Sara Taylor, *Pedal to the Metal* by Jesse J. Thoma, *Sergio Y* by Alexander Vidal Porto, *The Lucky Star* by William T. Vollmann, and *Bad Boy* by Elliot Wake.

100.    Upon information and belief, numerous additional LGBTQ-related adult titles have been removed from the Library system since October 2023.

101.    Between January 2023 and October 2023, twenty-three juvenile and young adult titles have been also removed entirely from the Library system: *LGBTQ Families: The Ultimate Teen Guide* by Eva Apelquist, *I am J* by Cris Beam, *Starting from Here* by Lisa Jenn Bigelow, *The Miseducation of Cameron Post* by Emily Danforth (in CD audiobook), *Same-Sex Parents* by Holly Duhig, *Sound* by Alexandra Dunan, *Moonstruck Magic to Brew* by Grace Ellis, *Tell Me Again How a Crush Should Feel* by Sara Farizan, *The Great American Whatever* by Tim

Federle, *Tattoo Atlas* by Tim Floreen, *Willful Machines* by Tim Floreen, *The Stonewall Riots* by Laurie Collier Hillstrom, *The You I've Never Known* by Ellen Hopkins (in CD audiobook), *Black Wings Beating* by Alex London, *All Out* by Saundra Mitchell, *Classmates = Dou Kyu Sei* by Asumiko Nakamura, *The Truth Is* by NoNieqa Ramos (in e-book), *Lizard Radio* by Pat Schmatz, *Drag Teen: A Tale of Angst and Wigs* by Jeffery Self, *Stick* by Andrew Smith, *My Friends and Me* by Stephanie Stansbie, *Six Impossible Things* by Fiona Wood, and *Same-Cell Organism* by Sumomo Yumeka.

102.    Upon information and belief, numerous additional LGBTQ-related juvenile and young adult titles have been removed from the Library system since October 2023.

103.    *Third*, the Library has also adopted a widespread practice of moving LGBTQ titles from the Juvenile and Young Adult sections to the Adult section even when those books do not depict transgender people or gender transition.

104.    Despite LGBTQ-related materials consisting of less than one-quarter of one percent of the Library's collection, the Library encourages employees to use routine maintenance procedures to thin the LGBTQ collection down even more. This includes library employees using "weeding"—a practice meant to be a routine removal of books in disrepair, books that are outdated or that contain incorrect information, and items that have never had interest from the public (with few or no check-outs)—to pretextually discard LGBTQ titles, including books purchased within the past five years.

105.    Each of these practices is enforced and promulgated by Defendant Allen (with respect to the Juvenile and Young Adult collections) and Defendant James (with respect to the collection as a whole).

106.    These practices are consistent with the many public statements and actions of Defendants reflecting deep and longstanding hostility to LGBTQ themes over the course of many years.

107.    For example, in February 2019, a former librarian Jonathan Newton was forced out of his job of seventeen years for "insubordination" after refusing to succumb to a request

from Executive Director Beverly James to cancel a planned "Drag Queen Story Hour" at the Five Forks branch of the Library.

108.    On June 22, 2022, Pride Month displays at several Library branches were ordered to be taken down, and then subsequently allowed to return the next day following public backlash. Later reporting revealed that the decision to respond to the Pride displays was made between Board Chair S. Allan Hill and Executive Director Beverly James, and that former Library access manager Teresa Lanford was instructed to call each of the twelve branches and to read the following script: "The Library Board has received complaints about Pride displays in GCLS facilities. The Library Board Chair has directed Bev to have the displays taken down. Please remove any Pride-related displays in your location by the end of today. Thank you." Access and Discovery Manager Brian Morrison told Lanford it was necessary that the information was relayed over the phone, rather than over email or letter, in order to minimize evidence. Based on this incident, one former Board member, Laura Baker, resigned on July 5, 2022, and called on James and Hill to resign.

109.    At the September 2022 Board meeting, former Library Communications Director Daneen Schatzle reported being "asked to remove a TV slide promoting the LGBTQ book club" at one Library branch. She stated to the Board that it was the first time in her twelve years at the Library that she was asked to remove a TV slide, which was "a normal part of our publicity and marketing." Schatzle resigned from her position at the Library in October 2022.

110.    At the same Board meeting, former manager of the Travelers Rest library branch Nathan Schmaltz and others reported feeling directly harassed and intimidated by Board Chair Hill, who had visited the branch on September 21, 2022 to directly complain about an LGBTQ book display, reportedly demanding over and over "Do you see why people don't like this? Do you see? Do you see?"

111.    In April 2023, the Board enacted a policy that required branches to ask for permission to put up displays if they promoted certain regulated materials, and in October 2023 voted to pass a new policy (attached as Exhibit C) that eradicated themed displays altogether,

aside from those "related to paid holidays observed by both the Greenville County Government and the Greenville County Library System." (Ex. C). The policy gives the Executive Director or a designee authority to "remove any material from a display if he/she determines the material is overly political, provocative, inappropriate, or not relevant to the respective holiday."

112.    In October 2023, the *Greenville News* reported on the ongoing "culture of fear" amplified by Hill and the rest of the Board, as the jump in yearly turnover rate at the Greenville Library from 12% in 2018 to 20.4% in 2022.

**IV.    The Library's discriminatory policies and practices have harmed, and will continue to harm, Plaintiffs and putative class members.**

    A.    <u>O.R. and his parents, Cheryl Rogers and Greg Rogers</u>

113.    Plaintiff O.R. is 17 years old and was born and raised in Greenville County. He is the youngest of five children born to Cheryl and Greg Rogers.

114.    The Rogers family has lived in Greenville County since 2001, when they moved from Ohio.

115.    Cheryl and Greg, along with all five of their children, have been patrons of the Greenville County Library System since moving to Greenville.

116.    O.R. came out as transgender to his parents in 2022.

117.    At first, because Cheryl and Greg did not know any transgender people, they were apprehensive about this news.

118.    Seeking support, Cheryl decided to read books about how to help and support a transgender child.

119.    Cheryl and Greg became members of Greenville's chapter of PFLAG, which describes itself as "the nation's largest organization dedicated to supporting, educating, and advocating for LGBTQ+ people and those who love them."

120.    After becoming involved with PFLAG, Cheryl read books with LGBTQ characters herself, which familiarized LGBTQ relationships and identities for her and provided invaluable perspective on her child's experience. She wanted to immerse herself in the

community and did so primarily through literature. She was also interested in the books O.R. was reading, and they were able to share the experience of reading those books together.

121.    O.R. loves reading and wants to be a writer. He feels that reading opens up entirely new universes for him, exposing him to new perspectives that he can relate to, no matter how different the character may be from himself.

122.    O.R. is particularly interested in reading books with transgender and other LGBTQ characters. When O.R. first came out as transgender, reading LGBTQ-related books helped him feel less invisible, and like his experience was valid.

123.    As a teenager, O.R. often goes to the library and checks out books by himself.

124.    Because O.R. has a young adult library card, he cannot check out books from the adult sections of the library, including the Parenting and Early Childhood or Adult sections.

125.    Cheryl and Greg believe that O.R. should be able to have privacy over the books he chooses to read, without having to ask for his parents to check books out for him using their adult cards, as long as the books are generally targeting his age group.

126.    Cheryl and Greg do not wish to give O.R. access to the entire adult collection but believe he should be able to check out age-appropriate books and materials with transgender characters that he is no longer able to access due to the Library's policies.

127.    O.R., and Cheryl and Greg, all believe that reading provides essential representation for individuals' identities, can provide the strength to say who you are, and to feel secure being yourself. But because of the Library's policies and practices, O.R. is restricted from full and free access to books that positively reflect his identity and experience. These policies limit O.R.'s ability to read the books he wants to read.

128.    Cheryl and Greg also wish to be able to access the full array of LGBTQ-related books, including titles the Library has quietly removed from its shelves with no explanation.

129.    O.R. feels denigrated and stigmatized by Defendants' anti-LGBTQ attitudes and practices. The Library's policies and practices send a message to O.R. that his identity is

shameful and should not be discussed in public, and to O.R.'s parents that families like theirs are not acceptable in Greenville County.

130.     When O.R. is unable to find a book he wants to read in the Young Adult section (whether because it was banished to the PEC section or removed from the library altogether), it makes him feel as if he's not seen, and like his identity is seen as vulgar or inappropriate by his community. It is similarly ostracizing that the Library would rather eradicate all themed displays than positively portray his community or existence. He also worries about the transgender and other LGBTQ children who may not have as supportive of families as his, and how it must feel for them. He wants to be treated as human by his community and wants the same for everyone else.

B.     E.G. and M.G.

131.     E.G. and M.G. are twelve and eleven years old, respectively. They live in Greenville County with their mother, Amber Galea.

132.     The entire Galea family are patrons of the Greenville County Library System. Amber got both E.G. and M.G. library cards when each of them turned 5 years old, the earliest age possible.

133.     M.G. has a juvenile library card, meaning she is only permitted by Library policy to check out books located in the juvenile section. E.G. has an unrestricted minor card.

134.     E.G. identifies as queer, while M.G. does not.

135.     During their most recent visit to the Hughes branch of the Library, there were several books E.G. and M.G. were interested in that were only located in the Parenting and Early Childhood section of the library, rather than the Juvenile section where M.G. and E.G. normally like to browse for books for their age group. These titles included *Hocus and Pocus and the Spell for Home* by A.R. Capetta, *The Cardboard Kingdom* by Chad Sell, *Red: A Crayon's Story* by Michael Hall, *Riding Freedom* by Pam Muñoz Ryan, and *Snapdragon* by Kat Leyh.

136.    Both E.G. and M.G. wish to be able to read books about queer and transgender characters their age in the juvenile section of the library. They feel like some of their favorite books have been disappearing, and they do not understand why.

137.    Although E.G. has an unrestricted minor library card (meaning she can check out any book in the library), she finds it frustrating to walk all over the library to find books targeting her age, simply because those books have characters in the LGBTQ community and other people who identify as outside societal norms. She feels indignant that these books aren't in the same section as other children's books.

138.    M.G. feels similarly. She is particularly interested in children's graphic novels like *Cardboard Kingdom* and *Snapdragon*. During her last visit, M.G. tried to check out *Snapdragon* using her library card and was unable to do so. The experience made her feel that the library was trying to hide these books from her and from other kids her age.

139.    Amber similarly wants her children to be able to check out any books they would like in the age-appropriate sections of the library, without having to use their parents' adult library cards (or granting them permission to have adult cards themselves) to do so.

140.    Amber seeks to provide an accepting environment for her children, which includes providing access to LGBTQ-affirming books and films to her children.

141.    Amber feels like the Greenville community does not want her family there, and that the Library's policies reinforce that impression.

C.    W.M.

142.    Plaintiff W.M. is 9 years old and was born and raised in Greenville County, where he lives with his mother, Kersey Clark.

143.    Kersey has lived in Greenville County since 2004. She currently works as an office manager for an electrical service company. Previously, Kersey worked in various positions throughout the Greenville County Library System, including in circulation, processing, and tech services.

144.    Kersey and W.M. are patrons of the Greenville County Library System.

145.    W.M. has a juvenile card, meaning he is only able to check out books in the juvenile section, for books targeted at children under the age of thirteen.

146.    W.M. does not currently identify as LGBTQ, but Kersey wants him to have access to a diverse array of books and materials, including with LGBTQ themes, so he can explore his own identity without needing permission from her. However, Kersey does not wish to give W.C. access to the entire adult collection of the library in order to do so.

147.    W.M. believes moving books out of the juvenile section because they feature LGBTQ characters is unfair. He is interested in books that have been moved to the adult section under Greenville's policy, including the *Magnus Chase* series by Rick Riordan—a fantasy trilogy targeted at readers aged 9-11 that is part of the *Percy Jackson* universe and features a genderfluid character.

148.    Since witnessing the influence of anti-LGBTQ policies and practices in the Library, Kersey and W.M. sometimes choose to drive further, out of the county, to the Spartanburg County public library, in order to access more materials than those available in the Greenville Library's juvenile section.

**V.    Class Allegations**

149.    Plaintiffs O.R. and E.G., by and through their respective parents, bring their Fourteenth Amendment claims as class actions on behalf of themselves and all others similarly situated under Fed. R. Civ. P. 23(b)(2).

150.    O.R., a 17-year-old transgender boy, represents the Juvenile & Young Adult Class of "all minor, transgender library patrons who lack adult library cards."

151.    The Juvenile & Young Adult Class is sufficiently numerous such that "joinder of all class members is impractical." Fed. R. Civ. P. 23(a)(1). The Williams Institute estimates that there are about 3,700 transgender youth in South Carolina between the ages of 13 and 17. A significant portion of those live in Greenville, which is South Carolina's largest county.

152.    O.R.'s claims are common to, and typical of, the <u>Juvenile & Young Adult Class</u>. Like all putative members of the Juvenile & Young Adult Class, O.R. suffers a continuing dignitary and stigmatic harm from Defendants' widespread, discriminatory, and animus-driven practices of, *inter alia*, removing dozens of books containing LGBTQ characters or themes, discriminatorily refusing requests for new library materials, and prohibiting display of LGBTQ events or clubs.

153.    O.R., like all putative members of the <u>Juvenile & Young Adult Class</u>, also suffers both a concrete impediment to accessing library materials containing transgender characters or themes, as well as a continuing dignitary and stigmatic harm from Defendants' formal policies requiring the banishment of all books depicting transgender characters or themes from the juvenile and young adult sections to the Parenting and Early Childhood (PEC) section.

154.    E.G., a 12-year-old girl that identifies as queer, represents the <u>Unrestricted Library Card Class</u> of "all LGBTQ-identifying library patrons who have adult or juvenile non-restricted library cards."

155.    The <u>Unrestricted Library Card Class</u> is sufficiently numerous such that joinder would be impractical. Greenville Library has approximately 191,500 registered borrowers, and it is estimated that around 3.5% of South Carolina residents identify as LGBTQ.

156.    E.G.'s claims are common to, and typical of, the <u>Unrestricted Library Card Class</u>. E.G., like all putative members of the <u>Unrestricted Library Card Class</u>, has no restrictions on her library card yet suffers a continuing dignitary and stigmatic harm from Defendants' widespread, discriminatory, and animus-driven practices of, *inter alia*, completely removing dozens of books containing LGBTQ characters or themes, discriminatorily refusing requests for new library materials featuring LGBTQ characters or themes, and prohibiting the display of LGBTQ-related events or clubs.

157.    O.R. and E.G. can both fairly and adequately represent the interests of their respective classes. Neither has claims that conflict with the interests or claims of other putative class members.

158.    Undersigned counsel are seasoned litigators with relevant experience litigating class claims on behalf of transgender plaintiffs, both in this District and across the country.

## CLAIMS FOR RELIEF

### Count One

**Violation of the First Amendment: Anti-Trans-Character Collection Policy**
**42 U.S.C. § 1983**

159.    Plaintiffs incorporate by reference every allegation in the preceding paragraphs as if set forth fully here.

160.    On its face, and as applied, the Board's February 2024 and August 2024 Collection Policy amendments violate the First Amendment rights of Plaintiffs and other minors who wish to access books portraying gender transition and transgender people in a positive light, free from the government's viewpoint-based discrimination.

161.    The Greenville Library holds itself out as a space for patrons to explore ideas and discover new works and perspectives. It purports to adhere to viewpoint-neutral and nondiscriminatory principles of library curation. Yet the February 2024 and August 2024 Collection Policy amendments are ideologically based on their faces and were not adopted based on viewpoint-neutral and nondiscriminatory principles of library curation. Instead, the February 2024 and August 2024 Collection Policy amendments were adopted based on a majority of the Board members' personal, political, moral, and religious opposition to gender transition and their desire to suppress the viewpoints and ideas contained in such portrayals.

162.    It is a "central tenet of the First Amendment" that "the government must remain neutral in the marketplace of ideas." *FCC v. Pacifica Found.*, 438 U.S. 726, 745–46 (1978). Viewpoint discrimination—*i.e.*, a policy that targets "particular views taken by speakers on a subject," *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995)—is "poison to a free society," *Iancu v. Brunetti*, 588 U.S. 388, 399 (2019) (Alito, J., concurring), and is *per se* unconstitutional, *Members of City Council of L.A. v. Taxpayers for Vincent*, 466 U.S. 789, 804 (1984) (collecting cases).

163.    Through the adoption of the February 2024 and August 2024 Collection Policy amendments, a majority of the Board unconstitutionally sought to "drive certain ideas or viewpoints"—namely, the acceptance of LGBTQ, and particularly transgender, individuals— "from the marketplace," *Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569, 587 (1998) (quotation marks and citation omitted), and "prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion," *Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico*, 457 U.S. 853, 872 (1982) (plurality op.) (quoting *W.B. Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943)). As a result, the Juvenile (February 2024) and Young Adult (August 2024) Collection Policy amendments are *per se* unconstitutional and infringe on Plaintiffs' right to receive information under the First Amendment, as applicable to the states under the Fourteenth Amendment.

164.    Pursuant to 42 U.S.C. § 1983, and *Monell v. Department of Social Services*, 436 U.S. 659 (1978), Defendant Greenville County is liable for the violation of Plaintiffs' First Amendment rights because the Board has final policymaking authority for the County with respect to adopting and promulgating a Collection Policy and the Board acted under color of state law.

165.    Defendants Beverly James and Karen Allen, in their official capacities, are state actors responsible for enforcing the discriminatory Juvenile (February 2024) and Young Adult (August 2024) Collection Policy amendments. Pursuant to 42 U.S.C. § 1983, and *Ex parte Young*, 209 U.S. 123 (1908), prospective declaratory and injunctive relief is properly entered against them.

## Count Two

**Violation of the Fourteenth Amendment: Anti-Trans-Character Collection Policy
42 U.S.C. § 1983**

166.    The Board's Juvenile (February 2024) and Young Adult (August 2024) Collection Policies facially classify materials for exclusion based on sex and transgender status.

167. Because the challenged Collection Policies discriminate on the basis of sex and transgender status, they trigger heightened scrutiny under the Equal Protection Clause. *See Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 610–12 (4th Cir. 2020).

168. The Policies' explicit classifications subject LGBTQ children and their parents to unequal treatment by preventing them from accessing library materials positively reflecting themselves and their families. By design, the exclusion also inflicts a dignitary injury on LGBTQ individuals by treating identities and experiences of LGBTQ children and their parents as unacceptable and unworthy of inclusion in public space.

169. To survive heightened scrutiny, Defendants must show that the challenged policies are "substantially related" to an "important interest." *Grimm*, 972 F.3d at 613. The challenged policies cannot survive heightened scrutiny—or any standard of scrutiny—because the discrimination is rooted in animus, which is not a legitimate interest.

170. Pursuant to 42 U.S.C. § 1983, and *Monell v. Department of Social Services*, 436 U.S. 659 (1978), Defendant Greenville County is liable for the violation of Plaintiffs' Fourteenth Amendment Rights because the Board has final policymaking authority for the County with respect to adopting and promulgating a Collection Policy and the Board acted under color of state law.

171. Defendants Beverly James and Karen Allen, in their official capacities, are state actors responsible for enforcing the discriminatory Juvenile (February 2024) and Young Adult (August 2024) Collection Policy amendments. Pursuant to 42 U.S.C. § 1983, and *Ex parte Young*, 209 U.S. 123 (1908), prospective declaratory and injunctive relief is properly entered against them.

## Count Three

### Violation of the First Amendment: Widespread Custom & Practices
### 42 U.S.C. § 1983

172. The Library's widespread custom and practice of suppressing, excluding, relocating, and removing LGBTQ-related materials from the Greenville Library violates the First

Amendment rights of Plaintiffs who seek to access information and materials that include LGBTQ people and their stories.

173.    As evident by the Library's crackdowns on LGBTQ-affirming speech, events, and materials, these practices are not based on legitimate or content-neutral curatorial decisions, but rather on Defendants' personal opposition to LGBTQ-supportive materials and their desire to suppress the viewpoints contained in such materials.

174.    As with the policy amendments, these practices seek to "drive certain ideas or viewpoints"—namely, the acceptance of LGBTQ, and particularly transgender, individuals— "from the marketplace," *Finley*, 524 U.S. at 587, and "prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion." *Pico*, 457 U.S. at 872. As a result, the Library's custom and practice of discriminating against LGBTQ materials constitute rank viewpoint discrimination, is *per se* unconstitutional, and injure Plaintiffs' right to receive information under the First Amendment.

175.    Pursuant to 42 U.S.C. § 1983, and *Monell v. Department of Social Services*, 436 U.S. 659 (1978), Defendant Greenville County is liable for the violation of Plaintiffs' First Amendment Rights because the anti-LGBTQ practices of the Library Board and leadership are so "persistent and widespread" as to constitute a "custom or usage with the force of law." *Lytle v. Doyle*, 326 F.3d 463, 471 (4th Cir. 2003).

176.    Pursuant to 42 U.S.C. § 1983, and *Ex parte Young*, 209 U.S. 123 (1908), Defendants Beverly James and Karen Allen, in their official capacities, are state actors and subject to injunctive and declaratory relief for enforcing this persistent custom and practice under color of state law.

### Count Four

### Violation of the Fourteenth Amendment: Widespread Custom & Practices
### 42 U.S.C. § 1983

177.    The Library's widespread anti-LGBTQ practices likewise subject LGBTQ library patrons to unequal treatment by infringing on their ability to access library materials positively

reflecting themselves and families and inflict a dignitary harm and unconstitutional stigma by treating identities and experiences of LGBTQ people as unacceptable and unworthy of inclusion in public space.

178.    These discriminatory practices are subject to heightened scrutiny under the Equal Protection Clause and, to survive scrutiny, must be substantially related to an important governmental interest. The custom of suppressing these materials on the basis of their LGBTQ-supportive content cannot be justified under heightened scrutiny—or any standard of scrutiny—because the discrimination is rooted in animus and not rationally related to a legitimate governmental interest.

179.    Pursuant to 42 U.S.C. § 1983, and *Monell v. Department of Social Services*, 436 U.S. 659 (1978), Defendant Greenville County is liable for the violation of Plaintiffs' Fourteenth Amendment Rights because the anti-LGBTQ practices of the Library Board and leadership are so "persistent and widespread" as to constitute a "custom or usage with the force of law." *Lytle v. Doyle*, 326 F.3d 463, 471 (4th Cir. 2003).

180.    Pursuant to 42 U.S.C. § 1983, and *Ex parte Young*, 209 U.S. 123 (1908), Defendants Beverly James and Karen Allen, in their official capacities, are state actors and subject to injunctive and declaratory relief for enforcing this persistent custom under color of state law.

## REQUEST FOR RELIEF

Plaintiffs respectfully request an order and judgment:

    i.    Certifying the Juvenile & Young Adult Class and the Unrestricted Library Card Class under Rule 23(b)(2) of the Federal Rules of Civil Procedure;

    ii.    Declaring that:

        a.    Defendants' Juvenile (February 2024) Collection Policy amendment violates the First and Fourteenth Amendments;

      b.   Defendants' Young Adult (August 2024) Collection Policy amendment violates the First and Fourteenth Amendments; and

      c.   Defendants' pattern and practice of discriminating against library materials that positively portray LGBTQ characters or themes violate the First and Fourteenth Amendments;

   iii.   Permanently enjoining Defendants from enforcing:

      a.   The amended Juvenile Collection Policy;

      b.   The amended Young Adult Collection Policy; and

      c.   Defendants' widespread custom and practice of discriminating against the collection, retention, and display of LGBTQ library materials;

   iv.   Awarding Plaintiffs nominal damages against Defendant Greenville County in the amount of $1.00 for each violation of Plaintiffs' constitutional rights;

   v.   Awarding Plaintiffs reasonable costs and attorneys' fees pursuant to 42 U.S.C. § 1988 and other applicable laws; and

   vi.   Granting Plaintiffs such other relief as this Court deems just and proper.

Dated: March 26, 2025

**ACLU OF SOUTH CAROLINA**

/s/ *Allen Chaney*

Allen Chaney
Fed. Id. No. 13181
P.O. Box 1668
Columbia, SC 29202
T: (864) 372-6881

**AMERICAN CIVIL LIBERTIES UNION FOUNDATION**

Shana Knizhnik*
Joshua Block*
125 Broad Street, Floor 18
New York, NY 10004
T: (212) 549-2500
E: sknizhnik@aclu.org
   jblock@aclu.org

*Application for Admission Pro Hac Vice Forthcoming*