**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
GREENVILLE DIVISION**

| | |
|---|---|
| O.R., by and through his parents, Cheryl Rogers and Greg Rogers, on behalf of himself and those similarly situated;<br><br>CHERYL ROGERS;<br><br>GREG ROGERS;<br><br>E.G., by and through her mother, Amber Galea, on behalf of herself and those similarly situated;<br><br>M.G., by and through her mother, Amber Galea; and<br><br>W.M., by and through his mother, Kersey Clark;,<br><br>                *Plaintiffs*,<br><br>v.<br><br>GREENVILLE COUNTY, SOUTH CAROLINA;<br><br>GREENVILLE COUNTY LIBRARY SYSTEM;<br><br>BEVERLY JAMES, in her official capacity as Executive Director of the Greenville County Library System; and<br><br>KAREN ALLEN, in her official capacity as Youth Services Manager of the Greenville County Library System,<br><br>                *Defendants*. | C/A No. 6:25-cv-02599-DCC |

**MOTION TO DISMISS**

Oral argument requested

| WILSON JONES CARTER & BAXLEY, P.A. | NELSON MULLINS RILEY & SCARBOROUGH LLP |
|---|---|
| Charles F. Turner, Jr.<br>Fed. ID No. 05849<br>cfturner@wjcblaw.com<br>325 Rocky Slope Rd., Suite 201<br>Greenville, South Carolina 29607<br>(864) 672-3711 | Miles E. Coleman<br>Fed. ID No. 11594<br>miles.coleman@nelsonmullins.com<br>2 West Washington Street, Suite 400<br>Greenville, SC 29601<br>(864) 373-2300 |

*Attorneys for Greenville County Library System; Beverly James, in her official capacity
as Executive Director of the Greenville County Library System; and Karen Allen, in her
official capacity as Youth Services Manager of the Greenville County Library System*

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES.................................................................................................................iii

INTRODUCTION..............................................................................................................................1

FACTUAL BACKGROUND...................................................................................................................3

STANDARD OF REVIEW ....................................................................................................................5

ARGUMENT.....................................................................................................................................6

I.       The case should be dismissed because Plaintiffs lack standing................................6

         A.       Plaintiffs O.R., Cheryl Rogers, and Greg Rogers (O.R.'s parents)
                  lack standing to assert their First Amendment claims. ................................8

         B.       Plaintiff E.G. lacks standing to assert her First Amendment claims. .........9

         C.       Plaintiff M.G. lacks standing to asset her First Amendment claims..........10

         D.       Plaintiff W.M. lacks standing to assert his First Amendment claims........12

         E.       Plaintiffs all lack standing to assert claims based on alleged
                  widespread custom and practice of discrimination (Counts Three and
                  Four)..........................................................................................................12

         F.       Plaintiffs all lack standing to assert their Equal Protection claims............13

II.      Plaintiffs fail to state viable First Amendment claims...........................................15

         A.       The so-called right to receive information does not obligate the
                  government itself to provide (or keep providing) information that a
                  plaintiff desires...........................................................................................15

         B.       Defendants' selection, curation, and placement of library materials is
                  government speech that is not subject to the Free Speech Clause.............18

                  1.       Case law. ..........................................................................................19

                  2.       Forum analysis. ................................................................................22

                  3.       The *Shurtleff* factors. ........................................................................23

         C.       Even under the plurality opinion by Justice Brennan in *Pico*—a
                  standard that neither this Court, the Fourth Circuit, nor the Supreme
                  Court has ever adopted—the Defendants have not violated the First
                  Amendment.................................................................................................25

III.     Plaintiffs fail to state viable Equal Protection claims............................................28

         A.       Reframing a failed First Amendment claim as an Equal Protection
                  claim can't create a viable cause of action where none exists..................28

         B.     Plaintiffs' equal protection claims fail because the Collection Policy treats all similarly situated patrons of the Greenville Library System equally. ................................................................................................. 29

IV.    Defendants James and Allen are entitled to qualified immunity. ........................... 32

V.    Plaintiffs' class allegations and their anticipated request for class certification are not yet before the Court, and, in any event, lack merit. ................ 34

CONCLUSION. ................................................................................................................................. 35

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*ACLU of Fla., Inc. v. Miami-Dade Cnty. Sch. Bd.*,
  557 F.3d 1177 (11th Cir. 2009) .......................................................................................7, 8, 26

*ACLU of N. Carolina v. Tennyson*,
  815 F.3d 183 (4th Cir. 2016) ...............................................................................................21

*Am. Civil Liberties Union v. Mote*,
  423 F.3d 438 (4th Cir. 2005) ...............................................................................................22

*Anderson v. Creighton*,
  483 U.S. 635 (1987)..............................................................................................................33

*Ark. Educ. Television Comm'n v. Forbes*,
  523 U.S. 666 (1998)..............................................................................................................19

*Ashcroft v. al-Kidd*,
  563 U.S. 731 (2011)..............................................................................................................33

*Bazen v. Bazen*,
  837 S.E.2d 23 (S.C. 2019) ...................................................................................................11

*Bell Atlantic Corp. v. Twombly*,
  550 U.S. 544 (2007)................................................................................................................6

*Bellotti v. Baird*,
  443 U.S. 622 (1979)..............................................................................................................11

*Bd. of Ed., Island Trees Union Free Sch. Dist. No. 26 v. Pico*,
  457 U.S. 853 (1982)....................................................................................................25, 26, 27

*Bostic v. Schaefer*,
  760 F.3d 352 (4th Cir. 2014) ...............................................................................................13

*Bryant v. Food Lion, Inc.*,
  774 F. Supp. 1484 (D.S.C. 1991)..........................................................................................35

*Bryant v. Gates*,
  532 F.3d 888 (D.C. Cir. 2008) (Kavanaugh, J., concurring) .................................................20

*Bryant v. Muth*,
  994 F.2d 1082 (4th Cir. 1993) ..............................................................................................33

*Child Evangelism Fellowship of MD, Inc. v. Montgomery Cnty. Pub. Sch.*,
457 F.3d 376 (4th Cir. 2006) ...................................................................................................22

*Chiras v. Miller*,
432 F.3d 606 (5th Cir. 2005) ...................................................................................................34

*City of Pleasant Grove v. Summum*,
555 U.S. 460 (2009).......................................................................................18, 19, 20, 22, 23

*Cooper v. Sheehan*,
735 F.3d 153 (4th Cir. 2013) ...................................................................................................33

*Corbitt v. Sec'y of the Alabama L. Enf't Agency*,
115 F.4th 1335 (11th Cir. 2024) ..............................................................................................31

*Doe v. Obama*,
631 F.3d 157 (4th Cir. 2011) ...........................................................................................6, 7, 35

*Eastern Shore Mkts., Inc. v. J.D. Assocs. Ltd. Pshp.*,
213 F.3d 175 (4th Cir. 2000) .....................................................................................................6

*Edwards v. City of Goldsboro*,
178 F.3d231 (4th Cir. 1999) ....................................................................................................28

*Feminist Majority Found. v. Hurley*,
911 F.3d 674 (4th Cir. 2018) ...................................................................................................33

*Food & Drug Admin. v. All. for Hippocratic Med.*,
602 U.S. 367 (2024)......................................................................................................13, 14, 27

*Franklin v. City of Charlotte*,
64 F.4th 519 (4th Cir. 2023) ....................................................................................................33

*Freedom from Religion Found., Inc. v. City of Warren, Mich.*,
707 F.3d 686 (6th Cir. 2013) .............................................................................................15, 22

*Ginsberg v. New York*,
390 U.S. 629 (1968).................................................................................................................11

*Gore v. Lee*,
107 F.4th 548 (6th Cir. 2024) ..................................................................................................31

*Grimm v. Gloucester Cnty. Sch. Bd.*,
972 F.3d 586 (4th Cir. 2020) .............................................................................................30, 31

*Hurley v. Irish–Amer. Gay, Lesbian and Bisexual Grp. of Bos., Inc.*,
515 U.S. 557 (1995)..................................................................................................................19

*Ill. Dunesland Pres. Soc'y v. Ill. Dep't of Natural Res.*,
    584 F.3d 719 (7th Cir. 2009) .................................................................22

*Katyle v. Penn Nat. Gaming, Inc.*,
    637 F.3d 462 (4th Cir. 2011) ...................................................................6

*Kreimer v. Bureau of Police for Town of Morristown*,
    958 F.2d 1242 (3d Cir. 1992)..................................................................16

*Laird v. Tatum*,
    408 U.S. 1 (1972)....................................................................................12

*Lamont v. Postmaster Gen. of U.S.*,
    381 U.S. 301 (1965)................................................................................15

*Lee v. York Cnty. Sch. Div.*,
    418 F. Supp. 2d 816 (E.D. Va. 2006) .....................................................28

*Little v. Llano Cnty.*,
    138 F.4th 834 (5th Cir. 2025) (en banc) ...................2, 17, 18, 19, 20, 23, 24, 25, 34

*Lujan v. Defenders of Wildlife*,
    504 U.S. 555 (1992)..........................................................................6, 7, 8

*Mahmoud v. Taylor*,
    605 U.S. __, No. 24-297 (June 27, 2025) ...............................................27

*Manuel v. Wells Fargo Bank, Nat. Ass'n*,
    123 F. Supp. 3d 810 (E.D. Va. 2015) .....................................................35

*Martin v. City of Struthers*,
    319 U.S. 141 (1943)................................................................................15

*Massachusetts Bd. of Retirement v. Murgia*,
    427 U.S. 307 (1976)................................................................................29

*McGriff v. City of Miami Beach*,
    84 F.4th 1330 (11th Cir. 2023) ..........................................................22, 23

*Meyer v. Nebraska*,
    262 U.S. 390 (1923)................................................................................27

*Moody v. NetChoice, LLC*,
    603 U.S. 707 (2024)................................................................................19

*Morrison v. Garraghty*,
    239 F.3d 648 (4th Cir. 2001) ..................................................................30

*Mr. Dee's Inc. v. Inmar, Inc.*,
127 F.4th 925 (4th Cir. 2025) .................................................................................................34

*Muir v. Ala. Educ. Television Comm'n*,
688 F.2d 1033 (5th Cir. 1982) (*en banc*) (plurality opinion of Hill, J.)..................................26

*Ne. Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville*,
508 U.S. 656 (1993)..............................................................................................................13

*Neinast v. Bd. of Tr. of the Columbus Metro. Libr.*,
346 F.3d 585 (6th Cir. 2003) .................................................................................................16

*Newton v. LePage*,
700 F.3d 595 (1st Cir. 2012)..............................................................................................21, 22

*Oppenheimer Fund, Inc. v. Sanders*,
437 U.S. 340 (1978)..............................................................................................................35

*Orin v. Barclay*,
272 F.3d 1207 (9th Cir. 2001) ...............................................................................................28

*Page v. Lexington Cnty. Sch. Dist.*,
No. 3:06-249-CMC, 2007 WL 2123784 (D.S.C. July 20, 2007).............................................34

*Pahls v. Thomas*,
718 F.3d 1210 (10th Cir. 2013) .............................................................................................16

*Pearson v. Callahan*,
555 U.S. 223 (2009)...............................................................................................................33

*People for the Ethical Treatment of Animals v. Gittens*,
414 F.3d 23 (D.C. Cir. 2005).......................................................................................20, 22, 34

*Perry Educ. Ass'n v. Perry Local Educators Ass'n*,
460 U.S. 37 (1983).................................................................................................................22

*Pers. Adm'r of Massachusetts v. Feeney*,
442 U.S. 256 (1979)...............................................................................................................30

*Phillips v. LCI Int'l, Inc.*,
190 F.3d 609 (4th Cir. 1999) ...................................................................................................3

*Pierce v. Society of Sisters*,
268 U.S. 510 (1925)...............................................................................................................27

*Pinkley, Inc. v. City of Fredrick*,
191 F.3d 394 (4th Cir. 1999) ....................................................................................................5

*Presidents Council, District 25 v. Community School Board No. 25,*
     457 F.2d 289 (2nd Cir. 1972) ................................................................................34

*Richmond, Fredericksburg & Potomac R.R. v. United States,*
     945 F.2d 765 (4th Cir. 1991) ...................................................................................5

*Shurtleff v. City of Boton.,*
     596 U.S. 243 (2022) ...............................................................18, 19, 22, 23, 24, 25

*Stafford v. Bojangles' Restaurants, Inc.,*
     123 F.4th 671 (4th Cir. 2024) ...............................................................................34

*Sutliffe v. Epping Sch. Dist.,*
     584 F.3d 314 (1st Cir. 2009) .................................................................................21

*Tenn. Conf. of NAACP v. Lee,*
     -- F.4th --, No. 24-5546, 2025 WL 1587965 (6th Cir. June 5, 2025) ........................9

*Thomas v. Collins,*
     323 U.S. 516 (1945) ..............................................................................................15

*Toledo Area AFL-CIO Council v. Pizza,*
     154 F.3d 307 (6th Cir. 1998) .................................................................................16

*TransUnion LLC v. Ramirez,*
     594 U.S. 413 (2021) ................................................................................................7

*Troxel v. Granville,*
     530 U.S. 57 (2000) (Scalia, J. dissenting) .............................................................27

*United States v. Am. Libr. Ass'n, Inc.,*
     539 U.S. 194 (2003) ...............................................................................20, 21, 23, 34

*United States v. Skrmetti,*
     605 U.S. __, No. 23-477 (2025) ........................................................................31, 32

*Valley Forge Christian Coll. v. Ams. United for Separation of Church & State,*
     *Inc.*, 454 U.S. 464 (1982) ......................................................................................9

*Vista-Graphics, Inc. v. Virginia Dep't of Transportation,*
     682 F. App'x 231 (4th Cir. 2017) ..........................................................................21

*Warth v. Seldin,*
     422 U.S. 490 (1975) ...........................................................................................5, 14

*Wells v. City & Cnty. of Denver,*
     257 F.3d 1132 (10th Cir. 2001) .............................................................................22

*White Tail Park, Inc. v. Stroube*,
  413 F.3d 451 (4th Cir. 2005) ...................................................................................3

*Willis v. Town of Marshall*,
  426 F.3d 251 (4th Cir. 2005) ...........................................................................16, 17

**Rules**

Fed. R. Civ. P. 12(b)(1)..............................................................................1, 3, 5, 6, 35

Fed. R. Civ. P. 12(b)(6)....................................................................................1, 6, 35

Fed. R. Civ. P. 23 ...................................................................................................34

Fed. R. Civ. P. 23(b)(2)...........................................................................................34

Local R. Civ. P. 7.04 D..............................................................................................1

**Statutes**

S.C. Code Ann. § 4-9-36(3)........................................................................................3

S.C. Code Ann. § 16-23-30(A)(3) ............................................................................11

S.C. Code Ann. § 16-23-30(B) .................................................................................11

S.C. Code Ann. § 65-5-340.......................................................................................11

S.C. Code Ann. § 65-5-350.......................................................................................11

S.C. Code § 20-1-250................................................................................................11

**Other Authorities**

Bradley A. Smith, *Money Talks: Speech, Corruption, Equality, and Campaign
  Finance*, 86 GEO. L.J 45, 67 (1997)........................................................................16

Erik Ugland, *Demarcating the Right to Gather News: A Sequential Interpretation
  of the First Amendment*, 3 DUKE J. CONST. LAW & PUB. POL'Y 113, 140 (2008)....................16

Lillian R. Bevier, *Specious Arguments, Intractable Dilemmas,* 94 COLUM. L. REV.
  1258, 1277 (1994).....................................................................................................16

Ronald D. Rotunda & John E. Nowak, TREATISE ON CONSTITUTIONAL LAW:
  SUBSTANCE AND PROCEDURE § 18.39 (5th ed. 2013).................................................28

WRIGHT & MILLER'S FEDERAL PRACTICE & PROCEDURE § 1785 (3d ed. 2025) ..........................35

Greenville County Library System (the "Library"), Beverly James, in her official capacity as Executive Director of the Greenville County Library System, and Karen Allen, in her official capacity as Youth Services Manager of the Greenville County Library System (and, together with the Library and Ms. James, the "Defendants") move under Fed. R. Civ. P. 12(b)(1) and 12(b)(6) to dismiss the Plaintiffs' suit because the Plaintiffs lack standing and they have failed to state causes of action on which relief can be granted.[1]

## INTRODUCTION

Plaintiffs ask this Court to substitute its judgment regarding what books to put on the shelves of Greenville County libraries—and where to put them—for that of Library officials. They assert a constitutional right to receive information of their choosing in public libraries, and they claim that Defendants' collection and shelving decisions and policies violated that supposed right.

If the Constitution recognizes such a right, courts are in for a heap of trouble. Libraries are not infinite repositories of information. A library has limited shelf space and must make constant purchasing, shelving, and weeding decisions. If a person has a right to receive specific information from specific books in a specific library, does that mean a public library has no discretion in its purchasing, shelving, and weeding decisions? That can't possibly be right. But what then is the standard a court must apply when determining if a library is impermissibly refusing to purchase a book or impermissibly weeding it out? Thankfully, this Court need not answer that challenging question. Instead, the Court should dismiss this suit for at least three reasons.

*First*, Plaintiffs lack standing. Some of them assert merely abstract disagreement with the Library's policies and an inchoate desire to some day check out unidentified books that are allegedly no longer in the children's or young adult's collection, but they fail to identify a single book that

---

[1] Pursuant to Local Civil Rule 7.04 D.S.C., a full explanation of the motion is provided herein, and, accordingly, a separate supporting memorandum would serve no useful purpose.

they specifically wanted to check out or imminently planned to check out but were unable to. In the absence of a concrete, particularized injury, these abstract "someday" intentions can't establish constitutional standing. Another Plaintiff concedes she has an "unrestricted" library card and can check out any book she wants, but finds it inconvenient to walk a few more steps from the young adult section to the adult section of the library, where those books are allegedly now housed. That's not enough to satisfy even the de minimis injury required for First Amendment standing. Other Plaintiffs are minors with "restricted" library cards and identify a book or two that they can't check out without parental permission.

*Second*, even if the Plaintiffs had standing, their suit should be dismissed because they failed to state viable claims for relief. Start with the First Amendment claims. Neither this Court, the Fourth Circuit, nor the Supreme Court have ever held that a library patron has a constitutional right to force the government to provide (or keep providing) him with specific books of his choosing at taxpayer expense, much less to provide those books on the shelves he wants or at the specific library branch location he wishes. In fact, the law is to the contrary. "A plaintiff may not invoke [the right to receive information] to challenge a library's decisions about which books to buy, which books to keep, or which books to remove." *Little v. Llano Cnty.*, 138 F.4th 834, 837 (5th Cir. 2025) (en banc). This conclusion, which is supported both by common sense and relevant case law, disposes of the entire complaint brought by Plaintiffs because each of their claims— including their Equal Protection claims—relies on this alleged right to receive information. Without that right, their claims fail. Their First Amendment claims fail for another reason, too, namely that the selection, curation, and management of public library materials are government speech not subject to or constrained by the Free Speech Clause.

*Third*, the Equal Protection claims are equally flawed. Plaintiffs attempt to reframe their non-viable First Amendment claims as Equal Protection claims, but that new packaging can't

2

create plausible causes of action where none exist. Furthermore, even if the claims are considered under an Equal Protection analysis, they fail for the fundamental reason that Defendants' challenged actions draw no distinction on the basis of sexual orientation, gender identity, or any other class or status, and, in contrast, treat all similarly situated library patrons similarly.

Finally, even if Plaintiffs' claims were viable, the two individual Defendants named in their official capacities are entitled to qualified immunity. The supposed rights asserted by Plaintiffs were not "clearly established" or settled "beyond debate." Indeed, they're not established at all.

## FACTUAL BACKGROUND[2]

The Greenville Library System is a public library system established by Greenville County, the most populous county in the state. Am. Comp. ¶ 13, 24. The library system is controlled and managed by a county-appointed board currently consisting of eleven members (the "Board"). *Id.* at ¶¶ 15–16. As part of its management of the library system, the Board is empowered by law to

- "Acquire books and other library materials and provide for use throughout the county," S.C. Code Ann. § 4-9-36(3);

- "Take any actions deemed necessary and proper by the board to establish, equip, operate, and maintain an effective library system within the limits of approved appropriations of county council," *id*. § 4-9-36(9);

- "Provide and make available to residents of the county books and library materials," *id*. § 4-9-37(a); and

- "Adopt regulations necessary to insure effective operation, maintenance and security of the property of the library system," *id*. § 4-9-37(b).

The Board is also responsible for establishing and applying its Collection and Development Maintenance Policy (the "Collection Policy"), which is intended to assist library staff and inform the public of its collection decisions. *See* Am. Comp. ¶¶ 18, 27. The Board regularly updates and

---

[2] These facts are drawn from the allegations of the Amended Complaint and the documents incorporated therein. *Phillips v. LCI Int'l, Inc*., 190 F.3d 609, 618 (4th Cir. 1999). In addition, to the extent this Motion arises under Rule 12(b)(1) for lack of standing, the facts include those from the parties' declarations and exhibits. *White Tail Park, Inc. v. Stroube*, 413 F.3d 451, 459 (4th Cir. 2005).

maintains this policy, with the most recent amendment taking effect in February 2025. Under this policy, the library system undertakes an ongoing process of evaluating materials to determine if they should be added, removed, or retained in the library's collection. Such decisions are made following different criteria outlined in the policy and are ultimately left to the Board's discretion.

In addition to the Board's ongoing collection decision-making, the Greenville Library System also offers a process by which community members may challenge certain collection decisions. This process begins with a community member lodging a formal complaint, which the Library Collection Development Committee subsequently reviews. *See* Am. Comp. Ex. B. The committee then develops a recommendation to the Board under library regulations. *Id.* If the complainant disagrees with the committee's recommendation, the complainant may appeal to the Board's Library Materials Committee, which may make further recommendations to the Board.

In 2024, the Library Board amended the Collection Policy in two ways, which form the basis for this lawsuit. *First*, the Board added the following provision to the Juvenile Collection (whose target audience is infancy through 12 years of age) section of the Policy:

> The Library recognizes parents/legal guardians are the primary source of education for their children, and that they have a fundamental right and responsibility to direct the upbringing and education of children under their care including issues of moral, social, physical, civic, and spiritual development.
>
> To that end, materials targeting audiences aged 0-12 in which the illustrations, themes, or story lines affirm, portray, or discuss changing the appearance of a minor's gender in ways inconsistent with the minor's biological sex, will be located in the Parenting and Early Childhood (PEC) collection, including:
>
> - Social transitioning: Pronouns or dress inconsistent with biological sex for the purpose of affirming gender transitioning.
>
> - Medical or surgical procedures: Puberty blocking drugs, cross-sex hormones, or surgical procedures for the purpose of affirming gender transitioning.
>
> - Gender fluidity: The possibility of changing genders at will or being no gender at all for the purpose of affirming gender transitioning.

Am. Comp. ¶ 74; *see also* Am. Comp. Ex. B at 8.

4

*Second*, the Board added a provision to the Young Adult Collection (aimed at teens aged 13 through 18) section of the Policy, which reads:

> The Library System recognizes that parents/legal guardians have a fundamental right to be involved in all aspects of their minor children's lives, especially in matters as life changing as gender identification.

> Therefore, materials targeting audiences aged 13–17 with characters who have transitioned or are in the process of transitioning from a gender that corresponds to their biological sex to a different gender will be located in the Adult Collection.

> This includes materials with illustrations, themes, or storylines that celebrate, portray, or affirm gender transitioning, whether changes are social (names, pronouns) or physical.

Am. Comp. ¶ 79; *see also* Am. Comp. Ex. B at 13.

Plaintiffs brought suit on March 26, 2025, and filed an Amended Complaint on April 4, 2025. The main thrust of Plaintiffs' complaint is that the two new provisions of the Policy dealing with gender transitioning violate their First Amendment and Equal Protection Rights. Am. Comp. ¶¶ 36–96. Additionally, they claim that "the Library also enforces a widespread custom and practice of discriminating against the collection, retention, and display of LGBTQ library materials, including with respect to books for adults." Am. Comp. ¶ 97. But none of the Plaintiffs have asserted any specific alleged interaction with or injury caused by these supposedly widespread customs and practices.

## STANDARD OF REVIEW

**Standing.** "Federal courts are courts of limited subject matter jurisdiction, and as such there is no presumption that the court has jurisdiction." *Pinkley, Inc. v. City of Fredrick*, 191 F.3d 394, 399 (4th Cir. 1999). Whether a plaintiff has standing to warrant the invocation of federal court jurisdiction presents a threshold question in every federal case. *Warth v. Seldin*, 422 U.S. 490, 498 (1975). The burden of proving subject matter jurisdiction in response to a Rule 12(b)(1) motion to dismiss is on the plaintiff, the party asserting jurisdiction. *Richmond, Fredericksburg & Potomac*

*R.R. v. United States*, 945 F.2d 765, 768 (4th Cir. 1991). When the Rule 12(b)(1) motion challenges the facts underlying a Complaint's jurisdictional assertions, "the district court is to regard the pleadings' allegations as mere evidence on the issue, and may consider evidence outside the pleadings without converting the proceeding to one for summary judgment." *Id*.

**Failure to state a claim.** A motion to dismiss under Rule 12(b)(6) tests the complaint's legal sufficiency. *Eastern Shore Mkts., Inc. v. J.D. Assocs. Ltd. Pshp.,* 213 F.3d 175, 180 (4th Cir. 2000). The court must take the facts in the light most favorable to the plaintiff, but need not accept the legal conclusions drawn from the facts. *Id.* at 175. The court need not accept "unwarranted inferences, unreasonable conclusions, or arguments" as true. *Id.* at 175. A complaint must provide more than labels and conclusions to survive a 12(b)(6) motion. *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 555 (2007). "Factual allegations must be enough to raise a right to relief above the speculative level" and "sufficient to state a claim for relief that is plausible on its face." *Id.* Courts may consider documents integral to the complaint or referenced in it, even if not physically attached to the complaint. *Katyle v. Penn Nat. Gaming, Inc*., 637 F.3d 462, 466 (4th Cir. 2011).

<u>**ARGUMENT**</u>

## I.     The case should be dismissed because Plaintiffs lack standing.

Article III of the Constitution limits the federal courts to adjudicating actual "cases" and "controversies." *See Doe v. Obama*, 631 F.3d 157, 160 (4th Cir. 2011). "[S]tanding is an essential and unchanging part" of that case-or-controversy requirement. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). The "irreducible constitutional minimum" of standing requires a plaintiff to plead and prove (1) that she suffered an "injury in fact," meaning an invasion of a legally protected interest which is concrete and particularized" and "actual or imminent, not 'conjectural' or 'hypothetical,'" (2) a causal connection between the injury and the conduct complained of, and (3) that it is "likely," not merely "speculative" that the injury will be "redressed by a favorable

decision." *Id*. at 560–61. Because "standing is not dispensed in gross," "plaintiffs must demonstrate standing for each claim that they press" against each defendant, "and for each form of relief that they seek." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021).

In *Lujan*, the Supreme Court addressed two plaintiffs' challenge to a regulation that interpreted the Endangered Species Act as not applying to foreign nations. *Id.* at 564. The plaintiffs claimed they had standing because they had visited other countries to observe endangered species and intended to do so again in the future. *Id.* at 563–64. The Supreme Court disagreed, finding these indefinite plans insufficient to confer standing: "Such 'some day' intentions—without any description of concrete plans, or indeed even any specification of when the some day will be—do not support a finding of the 'actual or imminent' injury that our cases require." *Id.* at 564.

In *Doe v. Obama*, the Fourth Circuit interpreted, applied, and expounded on the Supreme Court's "some day intentions" language. 631 F.3d at 163. The plaintiffs asserted that parents who "are actively considering adopting" human embryos had standing to challenge an executive order that removed restrictions on research involving human embryonic stem cells, claiming that the order would reduce the number of *in vitro* human embryos available for adoption such that they will be unable to adopt." *Id.* at 159, 162. The court concluded the plaintiffs lacked standing, reasoning that "*Lujan*'s requirement that plaintiffs have some concrete plan constrains us" because "[t]he plaintiff parents here did not allege that they have already tried and failed to adopt embryos, nor do they allege any concrete plans for future adoption, so the possibility that they will never suffer the alleged injury looms too large." *Id.* at 163.

The Eleventh Circuit's decision in *ACLU of Fla., Inc. v. Miami-Dade Cnty. Sch. Bd.* is instructive. 557 F.3d 1177 (11th Cir. 2009). In that case, the ACLU of Florida sued a school board for removing *Vamos a Cuba* and other books in a series called "A Visit to" from the school's libraries as a violation of their members' First Amendment rights to freedom of speech and access

to information. *Id.* at 1188. Mark Balzli, a member of that chapter of the ACLU, swore in his declaration that: (1) his son was a student at North Beach Elementary School; (2) he wanted his son to have access to *Vamos a Cuba* and the other books in the "A Visit to" series; (3) he saw *Vamos a Cuba* in the North Beach Elementary library; and (4) he had planned to check the book out of the library with his son "in the future," but they "will be unable to do so when school resumes on August 14, 2006" because of the school board's order removing the series. *Id.* The court concluded that Mr. Balzli's declaration established an injury in fact as to *Vamos a Cuba* but not as to the other books in the "A Visit to" series. *Id.* at 1195, 1197–98.

The court observed that Mr. Balzli's declaration, dated July 5, 2006, stated that he anticipated checking out *Vamos a Cuba* "when school resumes on August 14, 2006," and that this showed a specific intention pegged to a sufficiently fixed period. *Id.* at 1194. But the plaintiffs' declarations failed to establish that they faced a threat of imminent injury from the removal of any of the *other* "A Visit to" books. *Id.* at 1197. The court concluded that the plaintiffs' "declarations merely establish a free-floating desire to access the other books in the 'A Visit to' series, a desire untethered to any intended action during any reasonably specific period of time." *Id.* at 1196. This free-floating desire was like the declarations in *Lujan*, and therefore did not confer standing. *Id.*

### A.     Plaintiffs O.R., Cheryl Rogers, and Greg Rogers lack standing to assert their First Amendment claims.

The specific allegations about O.R. and Cheryl and Greg Rogers (O.R.'s parents) are insufficient to satisfy the injury-in-fact requirement. Am. Comp. ¶¶ 116–33. O.R. is 17 years old, identifies as transgender, and has a young adult library card, meaning O.R. cannot check out books from the adult sections of the library. Am. Comp. ¶¶ 116, 127. Notably, neither O.R. nor either parent has identified a single book that any of them has wanted to check out but have been unable to because of the library's policy. O.R. allegedly "is particularly interested in reading books with

8

transgender and other LGTBQ characters" and "often goes to the library and checks out books by himself," but alleges that "[b]ecause O.R. has a young adult library card, he cannot check out books from the adult sections of the library." Am. Comp. ¶¶ 125–27. But, again, O.R. has not identified a single book that is unavailable to him because of the policy at issue here.

O.R.'s further allegations that when he "is unable to find a book he wants to read in the Young Adult section (whether because it was banished to the PEC section or removed from the library altogether), it makes him feel as if he's not seen, and like his identity is seen as vulgar or inappropriate by his community" are also insufficient to confer standing. Am. Comp. ¶ 133. Importantly, a plaintiff "cannot sue based on the psychological distress they may suffer from a law they dislike." *Tenn. Conf. of NAACP v. Lee*, -- F.4th --, No. 24-5546, 2025 WL 1587965, at *4 (6th Cir. June 5, 2025); *Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464, 485 (1982) ("the psychological consequences presumably produced by observation of conduct with which one disagrees [is] not an injury sufficient to confer standing under Art. III"). O.R. lacks standing based on any alleged past or future psychological distress. Nor can the allegation that O.R. is "unable to find a book he wants to read" establish standing because, again, O.R. hasn't pled with any degree of specificity a single book title that's been made inaccessible by the library's collection decisions. O.R.'s parents likewise lack have Article III standing. They claim that they "also wish to be able to access the full array of LGBTQ-related books, including titles the Library has quietly removed from its shelves with no explanation." Am. Comp. ¶ 131. But like the plaintiffs in *ACLU of Fla.*, the Rogers' mere "wish" to access unidentified books at an unspecified time in the future is too speculative to constitute an injury-in-fact.

**B.    Plaintiff E.G. lacks standing to assert her First Amendment claims.**

E.G. is 12 years old and identifies as "queer." Am. Comp. ¶¶ 134, 137. E.G. has an unrestricted minor library card, meaning she can check out any book she wants from the library. *Id.*

9

at ¶¶ 136, 140. Although she has access to and the ability to check out any book in the library, E.G. claims that she wants "to be able to read books about queer and transgender characters [her] age in the juvenile section of the library," and "finds it frustrating to walk all over the library to find books targeting her age, simply because those books have characters in the LGBTQ community and other people who identify as outside societal norms." *Id.* ¶¶ 138, 140. She claims she "feels indignant that these books aren't in the same section as other children's books." *Id.* at ¶ 140. E.G., however, has not alleged a cognizable Article III injury. She has not alleged that there are any books that have been removed from the library that she wants to check out. And although she has identified several specific books that she was interested in that are now allegedly located in the Parenting and Early Childhood ("PEC") section of the library, *id.* at ¶ 138, she admits that she has access to these books and the ability to check them out on her own library card. Her "frustrati[on]" and "indignan[ce]" at having to walk a few extra steps to the PEC section of the library to locate these books are not sufficient for Article III purposes and a First Amendment claim.

### C.     Plaintiff M.G. lacks standing to assert her First Amendment claims.

M.G. is 11 years old; she is E.G.'s sister. Am. Comp. ¶ 134. She has a juvenile library card, which allows her to check out books only from the juvenile section of the library. *Id.* ¶ 136. She has identified one book—*Snapdragon*—that she was allegedly unable to check out using her library card. *Id.* ¶ 141. But, notably, M.G. can still walk to where *Snapdragon* has been shelved, pull down the book, and sit and read it in the library. Furthermore, her mother, Amber Galea, or another parent or legal guardian, or even her sister, E.G., could check the book out for her. There's no allegation that her mother *wouldn't* consent to checking the book out for her, and presumably she would, given that Ms. Galea was willing to file a federal lawsuit to access the book. Nor is there any allegation that her mother wouldn't consent to M.G. having an unrestricted minor card, which she approved E.G. having.

10

Even in the First Amendment context, children have fewer constitutional protections than adults because of the "concern over the inability of children to make mature choices." *Bellotti v. Baird*, 443 U.S. 622, 636 (1979) (plurality); *see also Ginsberg v. New York*, 390 U.S. 629, 638 (1968) (upholding constitutionality of New York law that forbid the sale of "girlie" magazines to minors under the age of 17, even though the statute covered material that was not obscene for adults).[3] Conditioning a minor's exercise of constitutional rights on parental consent is hardly a novel or unconstitutional practice. *See Bellotti*, 443 U.S. at 637 (plurality) ("The State commonly protects its youth from adverse governmental action and from their own immaturity by requiring parental consent to or involvement in important decisions by minors."); *Bazen v. Bazen*, 837 S.E.2d 23, 27 (S.C. 2019) ("The Due Process Clause of the Fourteenth Amendment to the Constitution of the United States protects a parent's 'fundamental right/ to make decisions concerning the welfare and upbringing of her minor children."). For example, in South Carolina, a health services provider must generally obtain the consent of a parent to provide treatment to a minor under the age of 16, S.C. Code Ann. §§ 65-5-340, -350, and a minor aged 16 or 17 can only obtain a marriage license upon the sworn affidavit of a parent or legal guardian giving consent for the child to marry, *id.* § 20-1-250. A state can even completely restrict some constitutional rights—*e.g*., the right to bear arms—to a minor. *See* S.C. Code Ann. § 16-23-30(A)(3), (B) (making it unlawful for a person under the age of 18 to possess or acquire a handgun in South Carolina). In short, M.G. has not suffered an Article III injury, especially in light of the public library's recognition of and deference to parents' right to supervise the care and upbringing of their children.

---

[3] *See also Ginsberg*, 390 U.S. at 638 (Stewart, J. concurring) ("at least in some precisely delineated areas, a child—like someone in a captive audience—is not possessed of that full capacity for individual choice which is the presupposition of First Amendment guarantees," which justifies why "a State may deprive children of other rights—the right to marry, for example, or the right to vote—deprivations that would be constitutionally intolerable for adults").

**D.    Plaintiff W.M. lacks standing to assert his First Amendment claims.**

W.M. is 9 years old and has a juvenile library card, meaning he can only check out books from the juvenile section. Am. Comp. ¶ 148. He "believes moving books out of the juvenile section because they feature LGBTQ characters is unfair," and "is interested in books that have been moved to the adult section under Greenville's policy, including the *Magnus Chase* series by Rick Riordan[.]" Am. Comp. ¶ 150. W.M.'s allegations are insufficient to confer standing. His sense that the policy is "unfair" is the sort of psychological injury that is not cognizable under Article III. Further, he has not alleged that he has been unable to access any of the *Magnus Chase* books, or any other books he wants to read because of the Policy. For example, there is no allegation that his mother cannot or will not check the books out for him, or even that he has been burdened in any way by the placement of the series in the adult section of the library.

**E.    Plaintiffs all lack standing to assert claims based on alleged widespread custom and practice of discrimination (Counts Three and Four).**

Plaintiffs all lack standing to assert their claims that the Library "enforces a widespread custom and practice of discriminating against the collection, retention, and display of LGBTQ library materials, including with respect to books for adults." Am. Comp. ¶¶ 97, 175, 180. Notably, none of the Plaintiffs have asserted any specific alleged interaction with or injury caused by these supposedly widespread customs and practices. In the absence of specific allegation of injury (and there are none), the claims relating to these alleged customs and practices are nothing more than abstract policy disagreements that seek an advisory opinion from the Court. Since there is no claimed injury resulting from the claimed widespread custom and practice complained of here, there is no Article III standing. *Laird v. Tatum*, 408 U.S. 1, 13–14 (1972) ("Allegations of a subjective chill are not an adequate substitute for a claim of specific present objective harm or a threat of specific future harm; the federal courts established pursuant to Article III of the

12

Constitution do not render advisory opinions.") (quotations and citation omitted).

### F.     Plaintiffs all lack standing to assert their Equal Protection claims.

Plaintiffs' standing (or the lack thereof) to assert their Equal Protection claims can be treated *en masse* because they all suffer from the same jurisdictional shortcoming, namely, the failure plausibly to allege a cognizable constitutional injury by pleading that *they* have been subjected to disparate treatment. "The 'injury in fact' in an equal protection case . . . is the denial of equal treatment resulting from the imposition of the barrier" that "makes it more difficult for members of one group to obtain a benefit than it is for members of another group." *Ne. Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville*, 508 U.S. 656, 666 (1993). The Library's policies do not erect such a barrier, and Plaintiffs don't plausibly allege otherwise.

There is no barrier that is unique to Plaintiffs or that differs at all from the barrier that applies to every other similarly-situated minor patron. The challenged policies—both facially and as allegedly applied—apply equally to *all* minor patrons, regardless of their gender identity or sexual orientation. *All* minor patrons who have a restricted library card have the same limitation on their access to books outside of the children's and young adults' sections. And *all* minor patrons with unrestricted library cards have equal access to all library materials. Stated differently, all similarly situated individuals are treated similarly. In the absence of a plausible allegation of disparate treatment of similarly situated people (and there is none in the Amended Complaint), Plaintiffs lack an injury and therefore, lack standing to assert their Equal Protection claims.

Even so-called stigmatic injury standing (if that's the angle some of the Plaintiffs are pursuing) requires them to show they are subjected to "discriminatory treatment" that differed from the way other similarly-situated individuals were treated and that imposed concrete burdens or the denial of benefits that, again, differed from the treatment of other similarly-situated individuals. *Bostic v. Schaefer*, 760 F.3d 352, 372 (4th Cir. 2014) (holding that LGBTQ plaintiffs

13

asserting an Equal Protection claim can establish stigmatic injury standing only if they identify a "concrete interest with respect to which he or she is personally subject to discriminatory treatment and that interest independently satisfies the causation requirement of standing doctrine") (cleaned up). Here, Plaintiffs have not identified any way in which they have personally been subject to discriminatory treatment different from the treatment of other similarly-situated patrons.

Because Plaintiffs have not claimed (and cannot plausibly claim) that they are treated differently from other similarly-situated patrons, they may try to reframe their standing as resting on the allegedly disparate accessibility of particular materials. *E.g.*, Am. Comp. ¶ 4 (alleging that books celebrating gender transition were relocated to the Parenting and Early Childhood section while a book portraying a traditional religious view of gender identity and sexuality allegedly remained in the juvenile section); *id.* ¶ 169 (alleging the challenged policies "classify *materials* for exclusion based on sex and transgender status") (emphasis added); *see also id.* ¶¶ 171, 180 (claiming unequal treatment due to supposed lack of access to certain material). Even so, they still lack standing. To the extent that Plaintiffs' base their claims on the allegedly wrongful or unequal treatment or classification of *materials*, they lack standing to assert claims on behalf of those materials or third parties. *See Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 381–82 (2024) (requiring an injury in fact for a plaintiff to have standing and noting that "[t]he injury in fact requirement prevents the federal courts from becoming a 'vehicle for the vindication of the value interests of concerned bystanders.'") (internal quotation omitted); *Warth v. Seldin*, 422 U.S. 490, 499 (1975) (noting that a plaintiff "must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties").

Because Plaintiffs lack standing to assert claims on behalf of the materials that were supposedly subject to disparate treatment and because they've not alleged facts to support their novel viewpoint-inaccessibility injury, they lack standing to assert their Equal Protection claims.

14

II.      **Plaintiffs fail to state viable First Amendment claims.**

    A.      **The so-called right to receive information does not obligate the government itself to provide (or keep providing) information that a plaintiff desires.**

Even if Plaintiffs have standing (and, as explained above, they don't), their First Amendment claims nonetheless fail on the merits. Plaintiffs' First Amendment claims rely on their alleged "right to receive information in public libraries." Am. Comp. ¶ 7; *see also id.* ¶ 167 (claiming that the "Juvenile (February 2024) and Young Adult (August 2024) Collection Policy amendments are per se unconstitutional and infringe on Plaintiffs' right to receive information under the First Amendment"). The problem with this argument is that any right to receive information in or from a public library does not entitle a person to have access to specific books or material. In other words, a library's decision to remove a book, not purchase a book, or move a book to a different section of the library does not implicate the First Amendment right to receive information.

True, the Supreme Court has generally recognized that the First Amendment sometimes limits the government's power to prevent one person from receiving another's speech. *See*, *e.g.*, *Martin v. City of Struthers*, 319 U.S. 141, 142–43 (1943) (holding that a city's prohibition on door-to-door distribution of "handbills, circulars[,] or other advertisements" violated the First Amendment based on a person's "right to distribute literature" and another's "right to receive it"); *Thomas v. Collins*, 323 U.S. 516, 538 (1945) (holding a court could not bar a union organizer from delivering a speech to company employees); *Lamont v. Postmaster Gen. of U.S.*, 381 U.S. 301, 306 (1965) (holding the government could not burden someone's right to receive political literature through the mail). But none of the right-to-receive-information cases concerned the alleged right to receive information *from* the government. And the Supreme Court has never suggested that the First Amendment obligates the government to provide information to anyone. Instead, the right to receive information is a *negative* right—the negative right to be free from "government

15

interference with the exchange of information by private citizens." Erik Ugland, *Demarcating the Right to Gather News: A Sequential Interpretation of the First Amendment*, 3 DUKE J. CONST. LAW & PUB. POL'Y 113, 140 (2008); *see also Toledo Area AFL-CIO Council v. Pizza*, 154 F.3d 307, 319 (6th Cir. 1998) ("the First Amendment only 'protects individuals' 'negative' rights to be free from government action and does not create 'positive' rights—requirements that the government act'") (quoting Bradley A. Smith, *Money Talks: Speech, Corruption, Equality, and Campaign Finance*, 86 GEO. L.J 45, 67 (1997)); *Pahls v. Thomas*, 718 F.3d 1210, 1239 (10th Cir. 2013) ("The First Amendment does not impose upon public officials an affirmative duty to ensure a balanced presentation of competing viewpoints" given that "freedom of speech is a negative liberty."); Lillian R. Bevier, *Specious Arguments, Intractable Dilemmas,* 94 COLUM. L. REV. 1258, 1277 (1994) (the First Amendment "is a source of negative rights against the government, not a repository of positive entitlement to government favors"). This negative-rights understanding of the Free Speech Clause is consistent with the constitutional text, which simply restricts the government's power to "abridge[]" speech. U.S. Const., amend. I.

The right-to-receive-information case law pertaining to public libraries is consistent with the understanding that this right is a negative right. *See*, *e.g.*, *Neinast v. Bd. of Tr. of the Columbus Metro. Libr.*, 346 F.3d 585, 590 (6th Cir. 2003); *Kreimer v. Bureau of Police for Town of Morristown*, 958 F.2d 1242, 1247–48 (3d Cir. 1992); *Willis v. Town of Marshall,* 426 F.3d 251, 260 (4th Cir. 2005). *Kreimer,* for example, held that a library could evict a vagrant whose "odor was often so offensive that it prevented the [l]ibrary patrons from using certain areas of the [l]ibrary," but also determined that the right to receive information "includes the right to some level of *access* to a public library, the quintessential locus of the receipt of information." 958 F.2d at 1255 (emphasis added); *see also Neinast,* 346 F.3d at 591 (quoting *Kreimer* in determining that the First Amendment includes the right to some level of access to a public library). Somewhat

analogously, the Fourth Circuit in *Willis* held that plaintiff had a First Amendment right to listen to musical performances at a town community center, and further noted that this right seemed less compelling than "the right to use a public library." 426 F.3d at 260. These cases generally stand for the proposition that the government cannot categorically exclude someone from a public library (in other words, there's a negative right not to be excluded). However, not being excluded—or, stated differently, having the right to access or use a public library generally—is a far cry from having the right to access or receive specific information, materials, or books from the government. Neither the precedents of the Supreme Court nor the federal circuits support the recognition of such a broad First Amendment positive right.

The Fifth Circuit's recent *en banc* decision in *Little v. Llano County* is instructive. 138 F.4th 834 (5th Cir. 2025) (*en banc*). In that case, patrons of a county library in Texas sued the local librarian and other officials, alleging they removed 17 books because of their treatment of racial and sexual themes. *Id.* at 836. The district court concluded that defendants abridged plaintiffs' "right to receive information" under the First Amendment and ordered the books be returned to the shelves; a divided Fifth Circuit panel affirmed in part. *Id.* The en banc court reversed, holding that "plaintiffs cannot challenge the library's decision to remove the 17 by invoking a right to receive information" because there is no right to *receive* "a book of their choice at taxpayer expense." *Id.* at 848, 850–51.[4] The court reasoned that if a public library declines to purchase a book or removes a book from the shelves that it previously purchased, "the library does not prevent anyone from 'receiving' the information in it." *Id.* Because the library does not own every copy of every book, someone could buy the book themself, borrow it from a friend, or even look for it at another library. *Id.*

---

[4] Ten of the 17 judges of the Fifth Circuit joined the part of the opinion holding that the defendants' decision to remove the 17 books did not infringe plaintiffs' alleged right to receive information.

Consistent with Supreme Court case law and the Fifth Circuit's recent *Little* decision, this Court should dismiss Plaintiffs' First Amendment claims. These claims rely on an alleged right to receive information from the government at taxpayer expense in a public library. But such a right does not exist under the First Amendment. Plaintiffs, therefore, have failed to state viable First Amendment claims, and their claims should be dismissed.

**B.     Defendants' selection, curation, and placement of library materials is government speech that is not subject to the Free Speech Clause**.

A public library's selection, curation, and placement of library materials is not the type of speech to which the First Amendment applies. In other words, even if the Defendants engaged in content or viewpoint discrimination (which is denied), their actions are not a violation of the First Amendment's Free Speech Clause because governments *can* and inevitably *do* select between and among viewpoints when deciding what message the government wants to convey.

Start with the general, undisputed proposition: the Free Speech Clause does not regulate government speech. *See City of Pleasant Grove v. Summum*, 555 U.S. 460, 467 (2009) ("The Free Speech Clause restricts government regulation of private speech; it does not regulate government speech.") (citations omitted). When, as here, government officials determine how public funds and spaces will be used to present ideas and messages, those decisions constitute government speech. *See id.* at 467–72 (holding that a city's decision of what privately-created material it would select and display on public grounds "constitute[s] government speech" and was a government-controlled message" that involved the government "speak[ing] for itself"); *Shurtleff v. City of Bos.*, 596 U.S. 243, 252 (2022) ("When the government wishes to state an opinion, to speak for the community, to formulate policies, or to implement programs, it naturally chooses what to say and what not to say."). And importantly, "when the government speaks for itself, the First Amendment does not demand airtime for all views." *Shurtleff*, 596 U.S. at 247–48.

This principle also applies in the public library context. Again, the recent Fifth Circuit *en banc* decision in *Little* is instructive. A seven-judge plurality in *Little* held that a public library's collection decisions are government speech. 138 F.4th at 865 (Duncan, J., plurality op.) In reaching this conclusion, the plurality relied on (1) case law instructing that the government engages in expressive activity by selecting and presenting a curated collection of third-party speech; (2) its conclusion that a library's collection is not a public forum; and (3) application of the *Shurtleff* factors. These three rationales apply with equal force here.

### 1. Case law

In *Moody v. NetChoice, LLC*, the Supreme Court stated that "[d]eciding on the third-party speech that will be included in or excluded from a compilation—and then organizing and presenting the included items—is expressive activity of its own." 603 U.S. 707 (2024). In other words, the *speaker* is the one who selects, compiles, and presents the curated collection. *See Hurley v. Irish–Amer. Gay, Lesbian and Bisexual Grp. of Bos., Inc.*, 515 U.S. 557, 570 (1995). And if it's the government that is doing the curating, then it is the government that is doing the speaking. *See, e.g.*, *Ark. Educ. Television Comm'n v. Forbes*, 523 U.S. 666, 674 (1998) ("When a public broadcaster exercises editorial discretion in the selection and presentation of its programming, it engages in speech activity.") (citation omitted).

A key precedent in *Little*—and here—is *City of Pleasant Grove v. Summum*, 555 U.S. 460. In that case, the city created displays in a public park by accepting privately donated monuments, including one of the Ten Commandments. After the city refused to include a religious organization's monument, the organization sued, arguing that the city engaged in viewpoint discrimination and violated the Free Speech Clause. *Id.* at 464–66. The Supreme Court disagreed, holding that the city's selection to display some monuments but not others "constituted government speech," even though private sculptors created the monuments. *Id.* at 472–74. It was

not the monuments themselves that constituted the relevant speech, but rather the government's choice in picking the ones it wished to display. *Id.* at 473 ("The City has selected those monuments that it wants to display for the purpose of presenting the image of the City that it wishes to project to all who frequent the Park[.]").

The *Little* plurality concluded that *Summum* "maps neatly onto" the public library context. *Little*, 138 F.4th at 852. Just as a city or county selects private speech (monuments) to display in a public park, a city or county selects private speech (books) and displays them on the library shelf; the "relevant expression lies not in the monuments or the books themselves, but in the government's selecting and presenting the ones it wants." *Id.* at 853. So too here. Defendants' decision to purchase (or not purchase), remove (or not remove), or keep shelved (or shelve elsewhere) a book is expressive conduct that constitutes government speech.

Other courts and jurists have likewise concluded that library curation is government speech. *See People for the Ethical Treatment of Animals v. Gittens*, 414 F.3d 23, 28 (D.C. Cir. 2005) (hereinafter "*PETA*") ("With respect to the public library, the government speaks through its selection of which books to put on the shelves and which books to exclude."); *Bryant v. Gates*, 532 F.3d 888, 898 (D.C. Cir. 2008) (Kavanaugh, J., concurring) ("As the case law makes clear, 'government speech' can include not only the words of government officials but also 'compilation of the speech of third parties' by government entities such as libraries[.]"); *see also United States v. Am. Libr. Ass'n, Inc.*, 539 U.S. 194 (2003) ("*ALA*") (plurality) ("Public library staffs necessarily consider content in making collection decisions and enjoy broad discretion in making them.").[5]

---

[5] *See also ALA*, 539 U.S. at 204 (plurality) ("To fulfill their traditional missions, public libraries must have broad discretion to decide what material to provide to their patrons."); *id.* (a library's "goal has never been to provide 'universal coverage,'" but rather "to provide materials 'that would be of the greatest direct benefit or interest to the community'") (citation omitted); *id.* ("libraries collect only those materials deemed to have 'requisite and appropriate quality'"); *id.* at 208 ("A library's need to exercise judgment in making collection decisions depends on its traditional role

Case law from the Fourth Circuit is also instructive. *See Am. C.L. Union of N. Carolina v. Tennyson*, 815 F.3d 183 (4th Cir. 2016); *Vista-Graphics, Inc. v. Virginia Dep't of Transportation*, 682 F. App'x 231, 235 (4th Cir. 2017). In *Tennyson*, the court considered whether North Carolina's specialty license plate program constitutes government speech. 815 F.3d at 185. Under that program, North Carolina had approved a "Choose Life" plate but repeatedly rejected efforts to include a pro-choice plate. *Id.* at 184. The Fourth Circuit, relying on the Supreme Court's decision in *Walker*, concluded that the program amounted to government speech and "North Carolina is therefore free to reject license plate designs that convey messages with which it disagrees." *Id.* at 185. Similarly, in *Vista-Graphics, Inc.*, the court held that a program instituted by the Virginia Department of Transportation creating content restrictions on material displayed at public rest areas and welcome centers did not violate the Free Speech Clause. 682 F. App'x at 237. The court "easily conclude[d] that the plaintiffs' guides displayed at rest areas operated by the Commonwealth constitute government speech," rejecting a rule requiring a state to display guides promoting every potential point of view given the "obvious" infirmity of such a rule, which would require a state to display information denigrating state facilities or promoting out-of-state tourist attractions." *Id.* at 237. Even though the content of the information contained in the guides was created by private individuals or businesses—just like the books in a library—the decision whether to allow placement of the guides in a public rest facility constitutes government speech not subject to the First Amendment. *Id.*[6]

---

in identifying suitable and worthwhile material[.]"); *id*. at 217 (Breyer, J., concurring in judgment) (referring to "the discretion necessary to create, maintain, or select a library's 'collection'").

[6] *See also Newton v. LePage*, 700 F.3d 595, 602 (1st Cir. 2012) (Governor's removal of a "pro labor" mural did not violate the First Amendment because the decision to keep the mural or take it down was government speech); *Sutliffe v. Epping School District*, 584 F.3d 314 (1st Cir. 2009) (town's decision to not include a nonprofit group's hyperlink on the town's website did not implicate the First Amendment because the decision of what to include on the town's own website

### 2. Forum analysis

Governmental entities are limited in their ability to regulate private speech in public fora. *Shurtleff*, 596 U.S. at 252.[7] The Supreme Court recognizes two categories of public fora: "traditional public forums" and "limited (or designated) public forums." *Am. Civil Liberties Union v. Mote*, 423 F.3d 438, 443 (4th Cir. 2005). In traditional public fora—sidewalks, streets, and parks—"the government may only establish content-neutral 'time, place, and manner' restrictions or content-based rules that are 'necessary to achieve a compelling state interest' and are 'narrowly drawn to achieve that interest.'" *Child Evangelism Fellowship of MD, Inc. v. Montgomery Cnty. Pub. Sch.*, 457 F.3d 376, 383 (4th Cir. 2006) (quoting *Perry Educ. Ass'n v. Perry Local Educators Ass'n*, 460 U.S. 37, 45 (1983)). The government has more latitude in regulating limited public fora, which are places that the government has opened for public expression of particular kinds or by particular groups, but still the restrictions "must be both reasonable and viewpoint neutral." *Id.*

A public library's *bookshelves* are neither a traditional public forum nor a limited public forum. If they were, libraries would have to remain "viewpoint neutral" when choosing books. *See Summum*, 555 U.S. at 470 (limited public fora restrictions must be "viewpoint neutral"). But that's

---

was "an expressive act by the government"); *McGriff v. City of Miami Beach*, 84 F.4th 1330, 1334 (11th Cir. 2023) (the city was speaking in installation and curation of art: "Having bought the artwork, the City's decision to display it, or not display it, was classic government speech."); *PETA*, 414 F.3d at 28 (government did not violate PETA's free speech rights when it declined to include a painting of "a sad, shackled circus elephant with a trainer poking a sharp stick at him" in a public art installation; ); *Ill. Dunesland Pres. Soc'y v. Ill. Dep't of Natural Res.*, 584 F.3d 719 (7th Cir. 2009) (no First Amendment violation when state park decided not to display certain items on display racks); *Wells v. City & Cnty. of Denver,* 257 F.3d 1132, 1137, 1143–44 (10th Cir. 2001) (holiday display was government speech, thus Denver had no First Amendment duty to add a sign saying, "The 'Christ Child' is a religious myth"); *Freedom from Religion Found., Inc. v. City of Warren, Mich.*, 707 F.3d 686, 696 (6th Cir. 2013) (city's holiday display was government speech).

[7] Notably, "[t]he public forum analysis has been much criticized." *Newton v. LePage*, 700 F.3d 595, 602 (1st Cir. 2012) (citing cases and a law review article criticizing the doctrine). But this Court need not resolve the tension in the public-forum case law, given that the books on the shelves of a public library do not fit within *any* category of recognized public forum.

absurd. Libraries are entitled to shelve books celebrating the Civil Rights Movement or Holocaust survivors, while declining to shelve books celebrating the KKK or Nazis. The very task of a librarian is to make decisions about content. There is, after all, only a limited amount of shelf space in a library. If libraries were required to be content and viewpoint-neutral, they'd all have to be shut down. But "where the application of forum analysis would lead almost inexorably to closing of the forum, it is obvious that forum analysis is out of place." *Summum*, 555 U.S. at 480; *see also ALA*, 539 U.S. at 205 (plurality) ("[F]orum analysis and heightened judicial scrutiny are . . . incompatible with the discretion that public libraries must have to fulfill their traditional missions.").

True, some *portion* of a library facility may be a public forum—if, for example, there is a space within the library designated for book discussions or author readings—but that's very different from claiming that the library bookshelves and book collection are a public forum. *ALA*, 539 U.S. at 206 (plurality) ("A public library does not acquire Internet terminals in order to create a public forum any more than it collects books in order to provide a public forum for the authors of books to speak."); *Little*, 138 F.4th at 859 (plurality) (reasoning that while a "library might open one of its rooms to poetry readings by the public and thereby create a limited public forum . . . Forum analysis has no place on a library's bookshelves"). Forum analysis is not applicable here and does not further Plaintiffs' First Amendment claims.

### 3.  The *Shurtleff* factors

To determine whether speech is government speech, and therefore does not implicate the Free Speech Clause, courts often examine several factors (the *Shurtleff* factors), including (1) the history of the expression at issue, (2) the public's likely perception as to whether the government or a private party is speaking, and (3) the extent of government control of the expression. *Shurtleff*, 596 U.S. at 252. These factors "are not exhaustive," "will not be relevant in every case," and "are neither individually nor jointly necessary for speech to constitute government speech." *McGriff v.*

*City of Miami Beach*, 84 F.4th 1330, 1334 (11th Cir. 2023) (quotations and citations omitted); *see also Shurtleff*, 596 U.S. at 252 (the court's "review is not mechanical; it is driven by a case's context rather than the rote application of rigid factors").

All three factors support the conclusion that a public library's collection decisions are government speech. Defendants will not belabor the argument but point this Court to the plurality's thorough analysis of the *Shurtleff* factors in the context of public libraries in *Little*. 138 F.4th at 861–65 (plurality) (concluding that all three factors supported the conclusion that a library's choice of books is government speech). As to the first factor, the *Little* plurality reasoned that both in terms of historical and contemporary practice, public libraries intentionally choose books they think are worth reading and merit the public's attention. *Id.* at 862–63. This is true of the Greenville County Library System, as evidenced by its 13-page Collection Policy. Am. Comp., Exhibit B. Among other things, that Policy teaches that "[c]ollection decisions are based on the merit of the work as it relates to the Library's mission" and on "[c]ommunity needs, interests, demands, and standards. (Doc 5-1 at 2–3.) Notably, the Policy also has "content criteria"—further showing that libraries necessarily discriminate based on content—which includes "comprehensiveness and depth of treatment," "authority, skill, competence and purpose of author/producer," and "vitality and originality." Collection Policy at 2–3. These are the sorts of standards that public libraries have always used in creating their collections. *Little*, 138 F.4th at 862–63 (plurality). But they are not the sort of standards that courts can—or should—police.

Second, the public knows that the speech at issue—the library's collection decisions—is speech made by the government, and not by a private person. Again, it's important to remember that the Defendants' speech here is the selection and shelving of books (the curation of a collection), *not* the content of the books (the author's words on the page). The content of the books is obviously that of the author of the book, whether that author be Shakespeare, Willa Cather,

24

Stephanie Meyer, or Malcolm Gladwell. But the library collection as a whole, which is a compilation of thousands of library decisions regarding what is worthwhile, meritorious, and otherwise of value to the reading public, is government speech. In other words, "the library conveys its *own* message (which books are worth reading) by collecting third-party speech (books)." *Little*, 138 F.4th at 864 (plurality) (emphasis in original).

Third, necessarily the government has actively shaped the expression. Indeed, this is the very reason a public library exists: to curate a collection of books for consumption by the reading public. There may be more books in a library than paintings in a museum or sculptures in a park, but the basic government speech is the same. As *Little* reasoned, "literally from the moment they arose in the mid-19th century, public libraries have been shaping their collections for specific educational, civic, and moral purposes," and "still do today." 138 F.4th at 865 (plurality).

Analysis of the *Shurtleff* factors here further demonstrates that the speech at issue here is government speech that does not implicate Defendants' free speech rights.

### C.     Even under the plurality opinion by Justice Brennan in *Pico*—a standard that neither this Court, the Fourth Circuit, nor the Supreme Court has ever adopted—the Defendants have not violated the First Amendment.

The conclusion that a public library collection is government speech is not altered by *Board of Education, Island Trees Union Free School District No. 26 v. Pico*, 457 U.S. 853 (1982). As explained below, *Pico's* fractured opinions provide no applicable, controlling precedent here, and Plaintiffs cannot show that Defendants violated the First Amendment even under the most favorable (to them) standard articulated by several members of the Supreme Court.

In *Pico*, a school board voted to remove nine books from the district's middle and high school libraries because they posed a "moral danger" to the students. *See* 457 U.S. at 857. Students at the school sued, claiming that the board violated their First Amendment rights by removing the books for "social, political, and moral" reasons. *Id*. at 865, 858–59. After the district court granted

summary judgment for the school board, the Second Circuit reversed and remanded on the First Amendment claim. *Id*. at 859–60. The Supreme Court affirmed in a severely fractured decision.

The lead opinion by Justice Brennan was joined in full by only two justices (Justices Marshall and Stevens) and joined in part by Justice Blackmun. *Id*. at 855, 882. In total, seven Justices filed opinions in *Pico*, and the Court was divided four-to-four on the constitutional issue of whether and how, if at all, the First Amendment limits a school board's discretion to remove books from a school library. The result is that "*Pico* is of no precedential value as to the application of the First Amendment to these issues." *Muir v. Ala. Educ. Television Comm'n*, 688 F.2d 1033, 1045 n.30 (5th Cir. 1982) (*en banc*) (plurality opinion of Hill, J.). With numerous opinions and "no part of any of them gathering five votes from among the nine justices . . . *Pico* is a non-decision so far as precedent is concerned. It establishes no standard." *Am. Civ. Lib. Union of Fla., Inc. v. Miami-Dade Cnty. Sch. Bd.*, 557 F.3d 1177, 1200 (11th Cir. 2009).

*Pico* does not and cannot control. It does not establish a standard of review. It has no precedential value for the First Amendment issue of whether school districts (or, by analogy, public libraries) have the discretion to purchase, remove, or reshelve books from their libraries. Plaintiffs' claim depends on this Court adopting a legal theory not established by any controlling precedent.

Even if this Court finds that Plaintiffs are entitled to the most favorable (to them) standard in *Pico*, Plaintiffs still cannot show that Defendants violated the First Amendment. The best-case scenario for Plaintiffs is for this Court to adopt a standard that failed to attract a majority in *Pico*: that officials may not remove books from library shelves "simply because they dislike the ideas contained in those books and seek by their removal to prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion." *Pico*, 457 U.S. at 872; *see* Am. Comp. ¶¶ 166, 177. Even so, Plaintiffs' claims fail. Their First Amendment allegations are twofold: that Defendants violated their First Amendment rights by (1) removing certain books, and (2) reshelving certain

books in a different section of the library. Even if *Pico* applies, Plaintiffs' claims *still* fail because they have not plausibly alleged that Defendants removed or reshelved any books for illicit reasons rather than for legitimate, constitutionally compliant reasons.

Plaintiffs' reshelving claim does not implicate *Pico*. The *Pico* plurality was clear that its holding "affects only the discretion to *remove* books," not "the discretion of a local school board to choose books to *add* to the libraries of their schools," nor by extension the discretion of the library to simply move a book from one section of the library to another. 457 U.S. at 871–72 (emphasis in original). Further, the library's choice to reshelve material in the PEC or Adult collections is consistent with the long-recognized constitutional right of parents to "establish a home and bring up children" and "to control the education of their own." *Meyer v. Nebraska*, 262 U.S. 390, 399 (1923); *Pierce v. Society of Sisters*, 268 U.S. 510, 534–35 (1925) (the "liberty of parents and guardians" includes the right "to direct the upbringing and education of children under their control").

Indeed, just *today*, the Supreme Court again reaffirmed the fundamental right of parents to supervise, educate, and instill moral convictions in their children—including by controlling the books they're exposed to relating to themes of gender identity and sexual orientation—in an analogous, albeit slightly different, context. *See Mahmoud v. Taylor*, 605 U.S. __, No. 24-297 (June 27, 2025); *see also Troxel v. Granville*, 530 U.S. 57, 91 (2000) (Scalia, J. dissenting) ("In my view, a right of parents to direct the upbringing of their children is among the 'unalienable Rights' with which the Declaration of Independence proclaims 'all men . . . are endowed by their Creator.' And in my view that right is also among the 'othe[r] [rights] retained by the people' which the Ninth Amendment says the Constitution's enumeration of rights 'shall not be construed to deny or disparage.'"). Far from prescribing what shall be orthodox in politics, nationalism, religion, or other matters to children and young adults, the Library's viewpoint-neutral Collection Policy—which applies to *all* books geared toward 0–12 year olds, or 13–17 year olds, dealing with gender

27

transitioning (whether the book takes a positive or negative view of the subject)— does the opposite

here, placing the responsibility to determine what is suitable for a child or young adult where it

belongs: with parents. *See* Collection Policy at 8 ("The Library recognizes parents/legal guardians

are the primary source of education for their children, and they have a fundamental right and

responsibility to direct the upbringing and education of children under their care, including issues of

moral, social, physical, civic, and spiritual development.").

### III.     Plaintiffs fail to state viable Equal Protection claims.

#### A.     Reframing a failed First Amendment claim as an Equal Protection claim can't create a viable cause of action where none exists.

A plaintiff cannot manufacture a plausible claim by reframing a failed First Amendment

claim as an Equal Protection claim. *See Orin v. Barclay*, 272 F.3d 1207, 1213 n. 3 (9th Cir. 2001)

(finding that the Equal Protection claim was "no more than a First Amendment claim dressed in

equal protection clothing" and was "subsumed by, and co-extensive with" plaintiff's First

Amendment claim); *Lee v. York Cnty. Sch. Div.*, 418 F. Supp. 2d 816, 834 (E.D. Va. 2006) (finding

it inappropriate to address an Equal Protection argument that was "'a mere rewording of a First

Amendment claim'" because plaintiff "asks this court to do under the Fourteenth Amendment what

he asks it to do under the First Amendment: to evaluate the constitutionality of [the challenged

statute]") (*quoting Edwards v. City of Goldsboro*, 178 F.3d231, 250 (4th Cir. 1999)); Ronald D.

Rotunda & John E. Nowak, TREATISE ON CONSTITUTIONAL LAW: SUBSTANCE AND PROCEDURE

§ 18.39 (5th ed. 2013) ("[L]aws that classify persons in terms of their abilities to exercise rights that

have specific recognition in the first eight Amendments do not generally arise as equal protection

issues. In these instances, the denial of the right to one class of persons is likely to be held a violation

of the specific guarantee without any need to resort to equal protection analysis."). But that's

precisely what Plaintiffs have done here. As argued above, their First Amendment claims fail as a

matter of law. They repurpose those same arguments in an attempt to fit them within the framework of Equal Protection jurisprudence. But even with a new title, the claims still fail.

Plaintiffs' equal protection claim relies on their allegation that the "Policies' explicit classifications subject LGBTQ children and their parents to unequal treatment by ***preventing them from accessing*** library materials reflecting themselves and their families." Comp. ¶ 171 (articulating the alleged equal protection injury of Count Two of the Complaint) (emphasis added); *see also* Comp. ¶ 180 (claiming that the Library's practices "subject LGBTQ patrons to unequal treatment by infringing on their ability to access library materials positively reflecting themselves and families"). In other words, Plaintiffs' equal protection claims rely on their alleged right-to-receive argument, which is a First Amendment claim lacking merit. That Plaintiffs additionally allege that this may be done on the basis of a classification does not change the essential character of this claim, nor does it make Plaintiffs' Equal Protection claim viable.

### B.     Plaintiffs' Equal Protection claims fail because the Collection Policy treats all similarly situated patrons of the Greenville Library System equally.

Plaintiffs' Equal Protection claims also fails for another reason: lack of disparate treatment. Specifically, all similarly situated Greenville County library patrons are treated the same under the Collection Policy. The policy does not discriminate or distinguish based on sex or LGBTQ status. True, the Policy does discriminate based on *age*—classifying and shelving books either as appropriate for those aged 0–12, 13–17, or for an adult. But Plaintiffs do not allege that their constitutional rights have been infringed because of this age classification. Nor would their claim be successful if they did, because age status is not a suspect class, and age classifications are subject to only rational basis review. *Mass. Bd. of Retirement v. Murgia*, 427 U.S. 307, 312–14 (1976). Plaintiffs' failure to plausibly plead that the Collection Policy or actions of the Library discriminate or distinguish based on sex or LGBTQ status is fatal to their Equal Protection claims.

To have a viable equal protection claim, plaintiffs must sufficiently allege: (1) disparate treatment from those similarly situated, (2) that such unequal treatment was the result of intentional or purposeful discrimination, and (3) that the "disparity in treatment can[not] be justified under the requisite level of scrutiny." *Morrison v. Garraghty*, 239 F.3d 648, 654 (4th Cir. 2001); *Pers. Adm'r of Massachusetts v. Feeney*, 442 U.S. 256, 272–73 (1979); U.S. Const. amend. XIV, § 1 ("No State shall . . . deny to any person within its jurisdiction the equal protection of the laws."). It is insufficient for a classification merely to have a disproportionate effect on a particular group. *Pers. Adm'r of Massachusetts*, 442 U.S. at 271–72. Generally, courts apply a rational basis review to equal protection claims, unless the classification is based upon a suspect or quasi-suspect class. *Morrison*, 239 F.3d at 654.

The Collection Policy does not prevent any child identifying as LGBTQ from accessing any book that a child who does not identify as LGBTQ could access, or vice versa. All similarly situated children who patronize the Greenville Library System are subject to the same limitations on what they can check out from the library. For example, no ten-year-old child can check out *Melissa*, or any comparable book, from the Greenville Library System (unless they have an unrestricted card), regardless of whether the child identifies as LGBTQ or not. The Collection Policy does not distinguish its patrons by sex or by gender identity—again, only by age.

The Court need not rely on Plaintiffs' conclusory allegation that the Collection Policy "discriminate[s] on the basis of sex and transgender status" when the plain text of the Collection Policy shows that any resulting classification is by age. Am. Comp. ¶ 170. All minors are treated the same under the policy, as are all adults. Plaintiffs cite to *Grimm v. Gloucester County School Board*, 972 F.3d 586 (4th Cir. 2020), as amended (Aug. 28, 2020), for the proposition that the Collection Policy distinguishes by "sex and transgender status," requiring application of heightened (intermediate) scrutiny. Comp. ¶ 170. Even a cursory comparison of the instant case to that of

*Grimm* demonstrates that the Collection Policy does not distinguish patrons by these characteristics. *Grimm* involved a school board's policy requiring that students may only use the school locker room or bathroom corresponding with their biological gender. 972 F.3d at 599. As explained by the Fourth Circuit, the policy in *Grimm* distinguished students by sex by reference to "biological gender" and the application of sex stereotypes. *Id.* at 608. Here, there is *no* reference to a child's gender or status (except age) or any sex stereotypes in the Collection Policy or its application. Nor does the Collection Policy distinguish by whether a child is transgender when determining whether that child can check out certain books from the library. In short, *Grimm* is inapplicable.[8]

While *Grimm* is of little help here, the Supreme Court's recent opinion in *United States v. Skrmetti* is instructive. 605 U.S. __, No. 23-477 (2025). That case involved a Tennessee law limiting all minors in accessing certain medical treatments for "gender dysphoria, gender identity disorder, or gender incongruence." *Id.* slip op. at 9. The Court held that the statute did not distinguish by sex when it did "not prohibit conduct for one sex that it permits for another." *Id.* at 13. The Court explained that, under the law, "*no* minor" could receive certain treatments for the cited conditions, regardless of sex or gender identity. *Id.* (emphasis in original). Intermediate scrutiny was not triggered by merely implicating sex. *Id.* at 9–15. Rather, the law created two classifications wholly independent of sex and transgender status: age and medical condition. *Id.* at 9. Neither category triggered heightened scrutiny, and the law easily survived rational basis review.

---

[8] There is reason to doubt whether *Grimm* was rightly decided, and whether it accurately reflects current law. Notably, other federal circuits have held that transgender status does not constitute a suspect class and have applied rational basis review to equal protection claims based on transgender status. *See*, *e.g.*, *Gore v. Lee*, 107 F.4th 548, 558 (6th Cir. 2024); *Corbitt v. Sec'y of the Alabama L. Enf't Agency*, 115 F.4th 1335, 1347 n.9 (11th Cir. 2024). Further, Justice Barrett (joined by Justice Thomas) and Justice Alito both recently wrote in *Skrmetti* to explain why transgender status does not constitute a suspect class. *Skrmetti*. 605 U.S. __, No. 23-477 (June 18, 2025) (Barrett, J. concurring) (Barrett concurring slip op. at 1); *id.* (Alito, J. concurring) (Alito concurring slip op. at 1). At the very least, the Supreme Court has never "previously held that transgender individuals are a suspect or quasi-suspect class." *Id*. (majority slip op. at 16).

Similarly, the Collection Policy does not prevent *any* child from checking out a book based on the child's sex, gender identity, or transgender status. Even if Plaintiffs correctly assert that transgender individuals represent a quasi-suspect class—which Defendants dispute—Plaintiffs fail to allege that the Collection Policy actually differentiates by this trait. Instead*,* as in *Skrmetti*, the Collection Policy does not distinguish based on transgender (or sex, or sexual orientation) but only on the basis of age. The Collection Policy, therefore, is only subject to rational basis review.

The Collection Policy easily satisfies rational basis review. As argued *supra*, the intent of the challenged portions of the policy is unimpeachable: to recognize and promote the primacy of parents and legal guardians to direct the upbringing and education of their children. *See* Collection Policy, at 8 ("The Library recognizes parents/legal guardians are the primary source of education for their children, and that they have a fundamental right and responsibility to direct the upbringing and education of children under their care including issues of moral, social, physical, civic, and spiritual development"); *id.* at 13 ("The Library System recognizes that parents/legal guardians have a fundamental right to be involved in all aspects of their minor children's lives, especially in matters as life changing as gender identification."). This goal is rationally related to the means chosen: removing certain books from the juvenile and young adult sections of the library and placing them in the Adult or PEC sections of the library. The Policy survives rational basis.

Again, Plaintiffs' Equal Protection claims are not really Equal Protection claims at all. Both of the Equal Protection claims are based on an alleged right to "access library materials positively reflecting themselves and families." *See* Am. Comp. ¶¶ 171, 180. But this right simply doesn't exist. This Court should dismiss the Equal Protection claims for failure to state a claim.

## IV.    Defendants James and Allen are entitled to qualified immunity.

Plaintiffs assert claims against Defendants James and Allen in their official capacities under Section 1983, which "creates a cause of action against any person who, acting under color

32

of state law, abridges a right arising under the Constitution or laws of the United States." *Franklin v. City of Charlotte*, 64 F.4th 519, 530 (4th Cir. 2023) (quoting *Cooper v. Sheehan*, 735 F.3d 153, 158 (4th Cir. 2013)). It is not entirely clear from the Amended Complaint whether Plaintiffs seek only declaratory and injunctive relief against Ms. James and Ms. Allen or if they also seek monetary damages and attorneys' fees. (*Compare* Am. Compl. at ¶¶ 168, 174, 179, 183, and Requests for Relief ii, iii, and iv *with* Requests for Relief v and vi (seeking, respectively, attorneys' fees and "other relief" without limiting such requests to the non-officer Defendants).)

To the extent that the suit seeks a civil liability or award against Ms. James or Ms. Allen, under the doctrine of qualified immunity, a state official is immune from civil liability if her conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). In determining whether qualified immunity is appropriate, courts consider whether (1) the officer "violated a federal statutory or constitutional right," and (2) "the unlawfulness of their conduct was clearly established at the time" of the conduct at issue. *Feminist Majority Found. v. Hurley*, 911 F.3d 674, 699 (4th Cir. 2018).

For a right to be "clearly established," it must be sufficiently particularized to put potential defendants on notice that the unlawfulness of their conduct is "apparent" under the clearly-established law in place at the time of the conduct. *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). Unlawfulness is "apparent" only when "*every* reasonable official would have understood that what he is doing violates that right." *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011) (emphasis added and quotation omitted)). "[E]xisting precedent must have placed the statutory or constitutional question *beyond debate*." *Id*. (emphasis added) (citation omitted). The burden is on the plaintiff to establish both the violation and that the right was "clearly established." *Bryant v. Muth*, 994 F.2d 1082, 1086 (4th Cir. 1993).

33

Plaintiffs cannot establish that the rights they claim here, if such rights even existed, were so "clearly established" that any government officials in Ms. James' or Ms. Allen's positions would have known that their conduct was unlawful. There are no cases under South Carolina or Fourth Circuit law involving facts precisely like this case and establishing that minor library patrons have a constitutional right to check out books provided by a public library at taxpayer expense in the children's or young adults' sections of the library containing portrayals of or information about gender transition or transgender status. To the contrary, the extant law then (and, even more so, now) pointed in the opposite direction. *See ALA*, 539 U.S. at 204–08; *PETA*, 414 F.3d at 28; *see also Little*, 138 F.4th 834 (5th Cir. 2025) (*en banc*) (rejecting claims strikingly similar to those presented in this suit); *Chiras v. Miller*, 432 F.3d 606 (5th Cir. 2005); *Presidents Council, District 25 v. Community School Board No. 25*, 457 F.2d 289 (2nd Cir. 1972); *Page v. Lexington Cnty. Sch. Dist.*, No. 3:06-249-CMC, 2007 WL 2123784, at *6 (D.S.C. July 20, 2007).

Because the alleged rights that are claimed by Plaintiffs and were supposedly violated by Defendants were not clearly established (assuming they exist at all), Defendants James and Allen are entitled to qualified immunity.

**V.     Plaintiffs' class allegations and their anticipated request for class certification are not yet before the Court, and, in any event, lack merit.**

Plaintiffs' Amended Complaint asserts putative class allegations and seeks, among other things, certification of two classes. *See* Am. Comp. ¶¶ 152–61 (setting forth the putative class allegations); *id*. at p. 36 (requesting that this Court "certify[] the Juvenile & Young Adult Class and Unrestricted Library Card Class under Rule 23(b)(2) of the Federal Rules of Civil Procedure"). Plaintiffs have not yet moved for class certification, so that question is not presently before the Court. *See Stafford v. Bojangles' Restaurants, Inc.*, 123 F.4th 671, 679 (4th Cir. 2024) (requiring plaintiffs to affirmatively show Rule 23 compliance in order for a class to be certified); *Mr. Dee's*

34

*Inc. v. Inmar, Inc*., 127 F.4th 925, 931 (4th Cir. 2025) (explaining that it is the "burden of the party seeking class certification, not the district court's" to show why certification is appropriate); 7AA WRIGHT & MILLER'S FEDERAL PRACTICE & PROCEDURE § 1785 (3d ed. 2025) (noting that the question of whether to certify a class is normally raised by either the plaintiff or defendant making a motion to certify or deny certification, respectively).

Furthermore, Plaintiffs' class allegations and putative claims are fundamentally flawed. Because the named Plaintiffs lack standing and have not asserted viable claims, the putative class allegations and claims must necessarily fail, too. *See*, *e.g*., *Manuel v. Wells Fargo Bank, Nat. Ass'n*, 123 F. Supp. 3d 810, 816 (E.D. Va. 2015) ("If a named plaintiff in a putative class action cannot establish that he has standing to pursue a claim or claims, then the entire action must be dismissed as to the claim or claims as to which standing is lacking."); *see also Doe v. Obama*, 631 F.3d 157, 161 (4th Cir. 2011). To the extent any of Plaintiffs' claims survive this Motion to Dismiss, Defendants reserve—and expressly do not waive—the right to oppose class certification and seek appropriate pre-certification discovery in aid of their opposition. *Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 351 n.13 (1978) (noting that discovery is often used to address issues related to class action certification); *Bryant v. Food Lion, Inc*., 774 F. Supp. 1484 (D.S.C. 1991) (allowing parties to conduct discovery regarding "issues relevant to class certification" prior to deciding whether to certify a class).

## CONCLUSION

For the reasons stated above, this action should be dismissed because the Plaintiffs lack standing under Fed. R. Civ. P. 12(b)(1) and the Plaintiffs have failed to state a claim under Fed. R. Civ. P. 12(b)(6). Defendants respectfully request that this Court enter an Order dismissing this action with prejudice and awarding such other relief as this Court deems just and appropriate.

Respectfully submitted,

NELSON MULLINS RILEY & SCARBOROUGH LLP

By: /s Miles E. Coleman
    Miles E. Coleman (Fed. Bar No. 11594)
    E-Mail: miles.coleman@nelsonmullins.com
    2 W. Washington Street / Suite 400
    Greenville, SC 29601
    (864) 373-2300

WILSON JONES CARTER & BAXLEY

    Charles F. Turner, Jr.
    Fed. ID No. 05849
    cfturner@wjcblaw.com
    325 Rocky Slope Rd., Suite 201
    Greenville, South Carolina 29607
    (864) 672-3711

*Attorneys for Greenville County Library System; Beverly James, in her official capacity as Executive Director of the Greenville County Library System; and Karen Allen, in her official capacity as Youth Services Manager of the Greenville County Library System*

Greenville, South Carolina
June 27, 2025