## UNITED STATES DISTRICT COURT
## DISTRICT OF SOUTH CAROLINA
## GREENVILLE DIVISION

| | |
|---|---|
| **O.R.**, by and through his parents, Cheryl Rogers and Greg Rogers; **CHERYL ROGERS**; **GREG ROGERS**; **E.G. and M.G.**, by and through their mother, Amber Galea; and **W.M.**, by and through his mother, Kersey Clark,<br><br>   *Plaintiffs*,<br><br> v.<br><br>**BEVERLY JAMES**, in her official capacity as Executive Director of the Greenville County Library System; **KAREN ALLEN**, in her official capacity as Youth Services Manager of the Greenville County Library System, **GREENVILLE COUNTY**, South Carolina; **GREENVILLE COUNTY LIBRARY SYSTEM**,<br><br>   *Defendants*. | Case No. 6:25-cv-02599-DCC |

### PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANTS'[1] MOTION TO DISMISS

---

[1] Throughout this Response, Plaintiffs use "Defendants" to refer only to Defendant Greenville County Library System, Defendant Executive Director Beverly James, and Defendant Youth Services Manager Karen Allen. Defendant Greenville County did not move to dismiss. *See* ECF No. 19 (Answer to Amended Complaint of Defendants Greenville County).

TABLE OF CONTENTS

INTRODUCTION ................................................................................................................ 1

STATEMENT OF FACTS ..................................................................................................... 2

LEGAL STANDARD............................................................................................................ 4

ARGUMENT ..................................................................................................................... 5

    I.   Plaintiffs have Article III standing. ............................................................... 5

        A.  All plaintiffs are suffering an actual and ongoing injury because Defendants have impeded their ability to access library materials they wish to read or discover through browsing. ................................................................................... 5

        B.  Plaintiffs need not assert an intent to access specific removed books to establish standing. ........................................................................................... 8

    II.  Plaintiffs assert plausible First Amendment claims. ...................................11

        A.  The First Amendment prohibits removal or restriction of library materials based on invidious viewpoint discrimination................................................. 12

        B.  Taken as true, Plaintiffs' factual allegations establish First Amendment violations. ................................................................................................. 17

        C.  Library curation is not government speech......................................... 19

        D.  Defendants' invocation of 'parental rights' cannot justify their discriminatory policies. .......................................................................................... 22

    III. Plaintiffs assert plausible Equal Protection claims. .................................... 22

        A.  The Library's Policies result in differential treatment for LGBTQ, and particularly transgender, library patrons................................................................ 23

            1.  The Written Policy facially discriminates based on sex and transgender status. ......................................................................................... 24

            2.  The Unwritten Policy Facially Discriminates Based on Sex and Transgender Status............................................................................ 27

        B.  The Unwritten Policy and Written Policy disparately impact LGBTQ Plaintiffs and were motivated by a discriminatory purpose. ................................. 28

        C.  The Library's Policies cannot survive any level of scrutiny. ............................... 32

1. The Library's Policies trigger heightened scrutiny and are not substantially related to a sufficiently important government interest. ................................. 32

2. The Library's Policies are based in animus and thus cannot survive even rational basis review. .................................................................................. 33

D. Plaintiffs' Equal Protection claims are distinct from their First Amendment claims. ................................................................................................................. 33

IV. Qualified immunity does not apply to claims for prospective relief. ........................ 35

CONCLUSION ........................................................................................................................ 35

## INTRODUCTION

Through a patchwork of facially discriminatory policies, the Greenville County Library (the "Library") has systematically removed and relocated library materials that contain LGBTQ-affirming themes and characters. Dozens of books have been hidden from view, and dozens more have been purged entirely. Because Plaintiffs have plausibly alleged that these policies inflict actual and ongoing injuries-in-fact and violate their First and Fourteenth Amendment rights, Defendants' Motion to Dismiss should be denied.

Public libraries are a "mighty resource in the free marketplace of ideas," *Minarcini v. Strongsville City Sch. Dist.*, 541 F.2d 577, 582 (6th Cir. 1976) (citing *Abrams v. United States*, 250 U.S. 616, 630 (1919) (Holmes, J., dissenting)), and "the quintessential locus of the receipt of information." *Kreimer v. Bureau of Police*, 958 F.2d 1242, 1255 (3d Cir. 1992). They are "dedicated to quiet, to knowledge, and to beauty," *Brown v. Louisiana*, 383 U.S. 131, 142 (1966), and designed to "facilitate research, learning, and recreational pursuits by furnishing materials of requisite and appropriate quality." *United States v. Am. Libr. Ass'n*, 539 U.S. 194, 206 (2003) [hereinafter *ALA*] (plurality opinion). Defendants seek to change all of that.

Rather than facilitating "freewheeling inquiry," *Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico*, 457 U.S. 853, 915 (1982) (Rehnquist, J., dissenting), Defendants have weaponized Library policies to—in Defendants' own words—take an "ethical and moral stand" against the "dangerous" "idea" of "transgenderism." ECF No. 5 at ¶ 3. They ask the Court to depart from decades of settled law, throw out the First Amendment right to receive information, and convert public libraries into venues for propagation of a government-approved message. But libraries are designed to facilitate access to private speech, not to convey government orthodoxy. When the government creates a medium for facilitating access to a wide range of private speech, the First Amendment does not tolerate invidious viewpoint discrimination.

Defendants' standing arguments fall flat. As patrons of the Greenville Library, Plaintiffs are unquestionably injured by Defendants' ideological crusade. Through facially discriminatory policies, Defendants have "limit[ed] the books and materials [Plaintiffs] can obtain" and

1

"blocked [their] access to new ideas and viewpoints." *Penguin Random House LLC v. Robbins*, 774 F. Supp. 3d 1001, 1014 (S.D. Iowa 2025). Plaintiffs claim they want to "read[] books with transgender and other LGBTQ characters," ECF No. 5 at ¶125, and cannot do so because of Defendants' censorship. That establishes an actual and ongoing injury to Plaintiffs' First Amendment rights to access information, and no more is required to establish standing.

Defendants' Policies also violate the Equal Protection Clause. To start, the challenged policies treat LGBTQ library patrons—particularly transgender youth—differently than their cisgender peers. When browsing the juvenile and young adult sections, cisgender youth will see a diverse array of materials that depict their lived experiences. Transgender youth, by contrast, will find none. Those harms are felt throughout the library as well, where LGBTQ-affirming materials have been secretly culled from the shelves. Beyond disparate treatment, Plaintiffs also state a plausible claim of purposeful discrimination under *Arlington Heights*. And because the Library's stated interest—suppressing the mere existence of transgender people, a quasi-suspect class under *Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 610–13 (4th Cir. 2020), because Board Members find their experiences "dangerous"—satisfies no level of scrutiny, Plaintiffs are likely to prevail.

## STATEMENT OF FACTS

For the last several years, government officials have been systematically purging books featuring transgender and other LGBTQ characters from the Greenville County Library System's shelves. Under policy amendments passed in 2024 (the "Written Policy"), any juvenile or young adult materials that contain even a single transgender character or portrayal of gender transition must be moved to a separate, adult section[2] of the library, where minors are unable to check out

---

[2] Materials targeting audiences aged 0–12 violating the Written Policy must be moved to the "Parenting and Early Childhood (PEC) collection," ECF No. 5 at ¶ 74, while materials targeting audiences aged 13-17 must be moved to the "Adult Collection." *Id.* at ¶ 79.

books with a regular library card.[3] ECF No. 5 at ¶¶ 36, 52–74, 79–93. In doing so, officials did not rely on neutral, professional library curatorial standards but rather on Greenville County Board of Trustees members' own political and moral disapproval of transgender people, as evidenced by multiple statements made during the Board's consideration of the amendments— including that such materials were "trash" and promoted a "dangerous" "radical agenda" against which the Library had "every right . . . to take an ethical and moral stand." *Id.* at ¶¶ 3, 61, 85.

These formal policy amendments were passed amidst a broader custom and practice (the "Unwritten Policy") enforced by the Greenville Library in recent years of discriminating against the collection, retention, and display of library materials—including books for adults—that positively portray LGBTQ people. *Id.* at ¶¶ 97–107. As a result, the Library has secretly removed dozens of LGBTQ titles from its shelves, banned all themed displays, and instilled a "culture of fear" amongst the Greenville Library staff. *Id.* at ¶¶ 101–115.

The Written Policy and Unwritten Policy (together, the "Policies"), directly contradict the Greenville Library's proclaimed philosophy of providing access to "material presenting a wide variety of views and opinions on current and historical issues," *Id.* at ¶ 29, and "neither promot[ing] nor censor[ing] any particular religious, moral, philosophical or political conviction or opinion." *Id.* Further, the Library contradicts any asserted government interest in disclaiming the ideas contained in books containing disfavored ideas by advising the public that "[t]he inclusion of an item in the collection does not represent an endorsement of its contents." ECF No. 1-1 at 2.

Plaintiffs are residents of Greenville, South Carolina—some of whom are transgender or otherwise members of the LGBTQ community—who wish to freely access materials featuring transgender and other LGBTQ characters in their local library, without discriminatory barriers

---

[3] For minors to have the ability to check out books in the adult sections of the Greenville Library, their parents must choose for them to have an "Unrestricted Minor" library card, which gives them access to *all* adult materials in the Library collection. Otherwise, minors with Juvenile or Young Adult library cards are not permitted to check out books from adult sections of the Library on their own—they must have one of their parents check out such books for them.

impeding their ability to do so. ECF No. 5 at ¶¶ 116–151. Plaintiffs have experienced and continue to experience cognizable injuries because of the challenged Written Policy and Unwritten Policy (together, the "Policies"). For example, eleven- and nine-year-old Plaintiffs M.G. and W.M. are not LGBTQ-identified but still wish to access books with LGBTQ characters in the age-appropriate sections of the Library. *Id.* at ¶¶ 134–150. The Policies have limited their ability to find, read, and bring home the books they want to read, and they believe the Policies are an unfair attempt by the Library to hide these books from them. *Id.* at ¶¶ 139–141, 149–150.

Additionally, seventeen-year-old O.R. is a transgender boy with a Young Adult library card who seeks out LGBTQ-related books at the Library to feel less invisible and to find the strength to be himself. *Id.* at ¶¶ 125–130. O.R.'s parents, Plaintiffs Cheryl and Greg Rogers, support O.R. and want him to be able to check out age-appropriate books and materials with transgender characters, but they do not wish to give him access to the entire adult collection to do so. *Id.* at ¶¶ 123, 129. Because of the Policies, O.R. is often unable to find books that positively reflect his identity and experience in the sections of the library from which he can check out books, which makes him feel "denigrated and stigmatized," "as if he's not seen, and like his identity is seen as vulgar or inappropriate by his community." *Id.* at ¶¶ 130, 132–133. Similarly, although Plaintiff E.G., a twelve-year-old girl who identifies as queer, has an unrestricted minor library card, she "finds it frustrating to walk all over the library to find books targeting her age, simply because those books have characters in the LGBTQ community." *Id.* at ¶¶ 134–140. In addition to the First Amendment harms to all Plaintiffs, the Policies inflict a "continuing dignitary and stigmatic harm" on these two LGBTQ Plaintiffs. *Id.* at ¶¶ 152–159.

Based on these injuries, Plaintiffs sued to enjoin the Written Policy and Unwritten Policy as violations of their rights under the First and Fourteenth Amendments of the U.S. Constitution.

### LEGAL STANDARD

When evaluating a motion to dismiss, either on substantive claims or standing, courts must accept as true all material allegations of the complaint, draw all reasonable inferences from

those facts in the plaintiff's favor, and construe them in the light most favorable to the plaintiff. *Wikimedia Found. v. Nat'l Sec. Agency*, 857 F.3d 193, 207–208 (4th Cir. 2017); *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Notably, standing requirements are "relaxed" in First Amendment cases. *Cooksey v. Futrell*, 721 F.3d 226, 235 (4th Cir. 2013) (citing *Sec'y of State of Md. v. Joseph H. Munson Co., Inc*., 467 U.S. 947, 956 (1984)). The court may dismiss the case only if "it appears certain that the plaintiff cannot prove any set of facts in support of his claim entitling him to relief." *Martin v. Duffy*, 858 F.3d 239, 248 (4th Cir. 2017) (citations omitted). If a complaint contains facts sufficient to state a claim for relief that is plausible on its face, the court must deny the motion. *Iqbal*, 556 U.S. at 678.

ARGUMENT

I.     **Plaintiffs have Article III standing.**

Standing has three elements: injury in fact, causation, and redressability. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992). Plaintiffs easily satisfy all three requirements. As discussed below, all Plaintiffs have suffered—and continue to suffer—injuries in fact from Defendants' Policies of restricting access to library books with transgender characters or other LGBTQ library materials. These injuries were directly caused by Defendants, and the Court can redress these injuries by enjoining Defendants' unlawful conduct.

A.     <u>All plaintiffs are suffering an actual and ongoing injury because Defendants have impeded their ability to access library materials they wish to read or discover through browsing.</u>

To demonstrate injury in fact, a plaintiff must show "an invasion of a legally protected interest" that is "concrete and particularized" as well as "actual or imminent." *Id.* at 560.[4] As part of Library Board Members' "ethical and moral stand" against the "dangerous" and "trash" "idea" of "transgenderism," Defendants imposed restrictions on patrons' access to library materials that

---

[4] The injury-in-fact requirement is "relaxed" in First Amendment cases, *Cooksey*, 721 F.3d at 235, and "[t]he loss of First Amendment rights, even minimally, is injurious." *Counts v. Cedarville Sch. Dist.*, 295 F. Supp. 2d 996, 999 (W.D. Ark. 2003).

contain transgender characters. ECF No. 1-1. These restrictions unquestionably burden all Plaintiffs' ability to access the restricted materials. For example, with a Young Adult library card, O.R. cannot check out *any* books with transgender characters. *Id.*; ECF No. 5 at ¶ 127. The same is true for M.G. and W.M., who may only access the juvenile section. *Id.* at ¶¶ 136, 148. Even E.G., who can check out any book in the library, must leave the children's section to hunt those books down. *Id.* at ¶ 140. For LGBTQ Plaintiffs, these injuries are also cognizable under the Fourteenth Amendment because they treat transgender patrons differently from their cisgender peers based on Library officials' discriminatory intent against LGBTQ people.

Defendants' restriction of library materials interferes with Plaintiffs' legally protected interests under the First and Fourteenth Amendments. All Plaintiffs have a legally protected interest under the First Amendment in accessing library materials free from invidious government viewpoint discrimination. *See infra* § II.A. The LGBTQ Plaintiffs, O.R. and E.G., have a legally protected interest under the Equal Protection Clause in accessing library materials reflecting their identities free from government discrimination based on sex and transgender status. *See infra* § III. Defendants' Policies interfere with these legally protected interests by selectively restricting access to library materials based on officials' personal disapproval of the ideas contained in them and of transgender people in general. *See* ECF No. 5 at ¶¶ 3-4, 61, 85.

As many other courts have held, these impediments to Plaintiffs' ability to access information constitute injuries in fact. *See, e.g.*, *Virden v. Crawford Cnty.*, No. 2:23-CV-2071, 2023 WL 5944154, at *3 (W.D. Ark. Sept. 12, 2023); *Counts v. Cedarville Sch. Dist.*, 295 F. Supp. 2d 996, 999 (W.D. Ark. 2003). Indeed, the court in *Virden* found that plaintiffs had standing under an identical set of facts. 2023 WL 5944154 at *3. There, like here, *see* ECF No. 5 at ¶ 2, a public library implemented a policy that removed all books with LGBTQ themes from the children's section and placed them in a separate section. *Virden*, 2023 WL 5944154 at *3. The *Virden* court found that even though it was *possible* to access the books, the policy injured the plaintiffs' First Amendment right to access information because the books were no longer "where children and their parents would expect to find them." *Id.; see also Sund v. City of*

*Wichita Falls*, 121 F. Supp. 2d 530, 534 (N.D. Tex. 2000) (explaining that removing books from children's section of the library burdens access to information because "youths who simply wish to browse in the children's sections of the Library will never find the censored Books"), *abrogated by Little v. Llano Cnty.*, 138 F.4th 834 (5th Cir. 2025) (en banc).

*Counts v. Cedarville Sch. Dist.*, 295 F. Supp. 2d 996 (W.D. Ark. 2003) is also instructive. There, the plaintiff challenged her school's requirement that students have parental permission to check out books from the *Harry Potter* series. *Id.* at 1001. The plaintiff *had* parental permission and owned several of the books, *id.*, just as Plaintiffs O.R., E.G., M.G., and W.M. have their parents' permission to check out books containing LGBTQ characters or themes they wish to read. *See* ECF No. 5 at ¶¶ 128–129, 142–144, 149. Nonetheless, the *Counts* court ruled that the plaintiff was injured by the school's imposition of a parental-consent requirement. 295 F. Supp. 2d at 999–1000; *see id.* at 1002 ("[T]he fact that [plaintiff] cannot simply go in the library, take the books off the shelf and thumb through them . . . without going through the permission and check-out process is a restriction on her access."). The same burden exists here.

Defendants insist that there is no injury because Plaintiffs can still browse the adult section and read restricted books within the library. ECF No. 20 at 10. But that "confuses restriction with outright prohibition." *Virden*, 2023 WL 5944154 at *3; *see also Counts*, 295 F. Supp. 2d at 999. A state-imposed restriction on access to information—however small—establishes an injury in fact. *Virden*, 2023 WL 5944154 at *3; *see Elrod v. Burns*, 427 U.S. 347, 359 n.13 (1976). Similarly, under the Equal Protection Clause, an injury in fact exists when the state creates a barrier that makes it harder for members of one group to obtain a benefit than it is for members of another group. *Bostic v. Schaefer*, 760 F.3d 352, 372 (4th Cir. 2014).

 Moreover, Defendants' argument invites the question: why implement the Written Policy if they did not think it would impede Plaintiffs' access? Before the Written Policy's approval, members of the library board *admitted* that they were trying to make the material less accessible. Board Member Moston said that the Written Policy was about placing these books "in an area where . . . [parents] can expect their young adult collection to . . . not expose their children to

such a radical agenda." ECF No. 5 at ¶ 85. Chair Hill justified the Written Policy by saying "it's not a good idea to encourage transgenderism with regard to 13- to 17-year-olds." *Id.* at ¶ 87. Mission accomplished. Defendants have forced Plaintiffs to wander the library hunting for books that should have been easy to find, and that most are not permitted to take home using their own library card. *Id.* at ¶¶ 127–130, 139–141, 148–150. That is more than enough to constitute injury in fact. *Virden*, 2023 WL 5944154 at *3.

Plaintiffs also allege that Defendants have systematically removed dozens of books because they contain transgender or LGBTQ characters, discuss LGBTQ issues, or both. ECF No. 5 at ¶¶ 101–103. Unquestionably, library patrons are injured by a policy that results in the complete removal of books. *See GLBT Youth in Iowa Schools Task Force v. Reynolds*, 114 F.4th 660, 667–68 (8th Cir. 2024) (holding that plaintiffs had standing to assert pre-enforcement challenge to library program that required the removal of books with sexual content). Plaintiffs cannot even struggle to find these books in the library system—they simply are not there.

B.     Plaintiffs need not assert an intent to access specific removed books to establish standing.

Defendants also argue that because not all Plaintiffs identify books they have been unable to check out, their injury is not sufficiently imminent. ECF No. 20 at 8–9. In two ways, this misapprehends the nature of the right at issue.

*First*, Defendants' actions *do* inflict acute harms related to Plaintiffs' access to particular book titles—e.g., impeding E.G. and M.G.'s access to *The Cardboard Kingdom* and *Red: A Crayon's Story*. ECF No. 5 at ¶ 138. But they also result in a library system where *ideas* that are disliked by the library board—and depictions of people disliked by the board—are systematically excluded from view, such that Plaintiffs and other "youths who simply wish to browse in the children's sections of the Library will never find," let alone come across or stumble upon, books containing them. *Sund*, 121 F. Supp. 2d at 534. Under the Written Policy, Defendants relocated *every* children's book with a transgender character or that makes any reference to ideas like "gender fluidity" or "social transitioning." ECF No. 5 at ¶¶ 74, 79–80. Under the Unwritten

Policy, Defendants impede access to books, *id.* at ¶¶ 106–108, refuse to honor patrons' requests to add new titles, *id.* at ¶¶ 98–100, and even surreptitiously remove dozens of books from the library catalogue, *id.* at ¶¶ 101–105. The injuries here do not arise merely from the removal of individual titles, but from Defendants' systematic discrimination against all materials with LGBTQ themes and characters, which all Plaintiffs would like to access. Thus, while some Plaintiffs do allege title-specific harms, *see, e.g., id.* at ¶ 141 (describing M.G.'s inability to check out *Snapdragon*), every Plaintiff is harmed by the restriction on their ability to access LGBTQ library materials even beyond the specific books they've already identified that they wish to read.

Contrary to Defendants' assertions, these broader harms from the removal of a wide swath of materials on a particular subject matter differ from the harm at issue in *ACLU of Fla. v. Miami-Dade Cnty. Sch. Bd.*, 557 F.3d 1177, 1197 (11th Cir. 2009). There, because the school board removed a particular educational book series from the curriculum, the plaintiffs challenging that removal needed to allege a specific desire to access those books. *Id.* But here, Defendants aren't attempting merely to ban specific books, but an entire class of ideas and perspectives. When Defendants rid the Library's shelves of disfavored viewpoints, Plaintiffs are unable to freely browse or peruse the sections of the library targeting their age group and discover new books that reflect these ideas. Defendants assert that Plaintiffs must somehow "know[] *in advance*" what books the library has removed, *Sund*, 121 F. Supp. 2d at 550 (emphasis in original), but the systematic removal of these ideas injures every library patron who wishes to access them—even those who cannot say which books are missing. *See, e.g., Robbins*, 774 F. Supp. 3d at 1011, 1014 (holding that student had standing to assert pre-enforcement challenge to law that "directly limits the books and materials she can obtain" including specific books "she otherwise would have read" but also more broadly "stunting [her] academic development and personal growth" and "block[ing] her access to new ideas and viewpoints, as well as information about history, politics, and science."); *see also Llano Cnty.*, 138 F.4th at 882 (Higginson, J., dissenting) (explaining that the First Amendment conveys "a negative right

9

against government censorship that is targeted at denying them access to disfavored, even outcast, information and ideas").

*Second*, Defendants are wrong to treat Plaintiffs' injuries as future harms. Restrictions on library access do not cause a *future* injury; they cause a present, ongoing, and *actual* injury to Plaintiffs' First Amendment right to receive information. *See Deal v. Mercer Cnty. Bd. of Educ.*, 911 F.3d 183, 188–89 (4th Cir. 2018) ("The Supreme Court has always described and treated the two concepts—actual, ongoing injury vs. imminent injury—as disjunctive." (citing *Lujan,* 504 U.S. at 560)). The right of access protected by the First Amendment is ongoing; it does not extinguish once someone has read a particular book. *See Minarcini*, 541 F.2d at 583 (discussing the right to receive)*; see also Counts*, 295 F. Supp. 2d at 1002 (striking down library restriction that infringed on plaintiff's right to "simply go in the library, take the books off the shelf and thumb through them."). If First Amendment rights were not ongoing, many Supreme Court decisions would not make sense. For example, the Supreme Court struck down a ban on political canvassing because it restricted "spontaneous" *future* speech, and "any action of the government by means of which it might prevent free and general discussion" offended the First Amendment. *Watchtower Bible & Tract Soc'y of N.Y., Inc. v. Vill. of Stratton*, 536 U.S. 150, 167–68 (2002) (quoting *Grosjean v. Am. Press Co.,* 297 U.S. 233, 249–50 (1936)). The right to receive information works the same way—the harm begins when access to these ideas is restricted and continues until access is restored. *See Suri v. Trump*, No. 25-1560, 2025 WL 1806692, at *9 (4th Cir. July 1, 2025) ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." (quoting *Elrod*, 427 U.S. at 373)). The First Amendment protects a plaintiff's right to "simply go in the library, take the books off the shelf and thumb through them." *Counts*, 295 F. Supp. 2d at 1002. A plaintiff need not allege a concrete plan to check out a specific book on a specific date to satisfy the "lenient and forgiving" injury-in-fact standard in First Amendment cases. *GLBT Youth*, 114 F.4th at 667.

Defendants' attempt to reduce Plaintiffs' injuries to psychological distress is similarly unavailing. ECF No. 20 at 9. True, psychological distress that arises from the mere observation

of conduct with which one disagrees may not be enough for standing. *Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464, 485 (1982). But Plaintiffs are not mere observers; they are library patrons whose access to constitutionally protected materials is directly affected by Defendants' actions, and the harm they experience—that of the government communicating that the ideas they desire to access are not acceptable—is a paradigmatic First Amendment injury. Moreover, the Fourth Circuit has held that feelings of marginalization and exclusion—like those Plaintiffs experience—are cognizable forms of injury under the First Amendment. *See Deal*, 911 F.3d at 188–89. Similarly, under the Fourteenth Amendment, "discrimination itself, by perpetuating 'archaic and stereotypic notions' or by stigmatizing members of the disfavored group as 'innately inferior' and therefore less worthy participants in the political community," inflicts a cognizable dignitary harm on "those persons who are personally denied equal treatment." *Heckler v. Mathews*, 465 U.S. 728, 739–40 (1984).

Moreover, in addition to the First Amendment harms that affect all Plaintiffs, the LGBTQ Plaintiffs experience an additional layer of differential treatment: an inability or difficulty finding books about people like themselves at the Library. ECF No. 5 at ¶¶ 124–140. By moving, or removing, LGBTQ-related books, the Library has made it difficult for O.R. and E.G. to connect with characters that are also LGBTQ. Cisgender minors face no such obstacle; the juvenile and young adult sections still contain books with cisgender, heterosexual characters. Moreover, Defendants' actions—as an "ethical and moral stand" against LGBTQ people—stigmatize the LGBTQ Plaintiffs who use the library as inferior, resulting in Plaintiffs feeling as if they and their families are "not want[ed]" and "seen as vulgar or inappropriate by [their] community." *Id.* at ¶¶ 4, 144, 133.

## II.    Plaintiffs assert plausible First Amendment claims.

The First Amendment "prohibits government officials from wielding their power selectively to punish or suppress speech." *Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175, 198 (2024). That is true even where the government's purported object is to protect children from

dangerous, harmful, or inappropriate ideas because, "[i]f there is any fixed star in our
constitutional constellation, it is that no official, high or petty, can prescribe what shall be
orthodox in politics, nationalism, religion, or other matters of opinion." *W. Va. State Bd. of Educ.
v. Barnette*, 319 U.S. 624, 642 (1943). This principle is true in the private sphere, and it is just as
true in public libraries, spaces where anyone—no matter their background, income, or identity—
can explore the world of ideas, information, and creativity in "a place dedicated to quiet, to
knowledge, and to beauty." *Brown*, 383 U.S. at 142. Defendants' widespread and ideologically
driven suppression of books with LGBTQ themes and characters fundamentally violates these
principles. Thus, their motion to dismiss Plaintiffs' First Amendment claims should be denied.

A.    The First Amendment prohibits removal or restriction of library materials based
on invidious viewpoint discrimination.

The First Amendment prohibits "viewpoint discrimination in curating a public library
branch." *Davison v. Randall*, 912 F.3d 666, 685 (4th Cir. 2019) (citing *Pico*, 457 U.S. at 870–71
(plurality opinion)). This is tied to the First Amendment's protection of "*both* a speaker's right to
communicate information and ideas to a broad audience, *and* the intended recipients' right to
receive that information and those ideas." *Rossignol v. Voorhaar*, 316 F.3d 516, 522 (4th Cir.
2003) (citing *Pico*, 457 U.S. at 867) (plurality opinion) (emphasis in original).

In its first decision considering library censorship, which arose in the context of school
rather than public libraries, the Supreme Court held that schools "possess significant discretion to
determine the content of their school libraries" but school officials "may not remove books from
school library shelves simply because they dislike the ideas contained in those books and seek by
their removal to 'prescribe what shall be orthodox in politics, nationalism, religion, or other
matters of opinion.'" *Pico*, 457 U.S. at 870, 872 (plurality opinion) (quoting *Barnette*, 319 U.S.
at 642); *accord id.* at 879 n.2 (Blackmun, J., concurring) (finding "crucial" to the First
Amendment analysis "the State's decision to single out an idea for disapproval and then deny
access to it").

Although *Pico*'s holding commanded only a plurality of the Court, every Justice agreed that the removal of library books could violate students' First Amendment rights. *Id.* at 872 (plurality opinion); *id.* at 879–89 (Blackmun, J., concurring); *id.* at 883–84 (White, J., concurring); *id.* at 907 (Rehnquist, J., dissenting). Even the dissenting Justices "cheerfully concede[d]" that it would violate students' right to receive information if libraries removed books in a "narrowly partisan or political manner." *Id.* Thus, the Justices' disagreement in *Pico* "was not over whether the right to access information existed at all, but rather over how it should be balanced against the unique pedagogical and disciplinary concerns that are present in a public-school environment." *Virden*, 2023 WL 5944154, *5; *see also Fayetteville Pub. Libr. v. Crawford Cnty.*, 684 F. Supp. 3d 879, 909 (W.D. Ark. 2023). Because this case is about a public library, those concerns are not present here.

Lower courts have been virtually unanimous in applying the principles announced in *Pico* despite its status as a plurality decision.[5] In doing so, courts have recognized that "[t]he

───────────────────

[5] *See*, *e.g. ACLU of Fla.*, 557 F.3d at 1200, 1227 (writing that "*Pico* is of no precedential value," but also concluding that "the real issue for the federal courts . . . is whether [government actors'] decision to remove the book from school library shelves was motivated by . . . a desire to promote political orthodoxy and by opposition to the viewpoint of the book"); *Crookshanks as next friend of C.C. v. Elizabeth Sch. Dist.*, 775 F. Supp. 3d 1160, 1179 (D. Colo. 2025) (noting that although "the precedential value of *Pico* has perplexed courts for years," it "remains a useful starting point in determining the constitutionality of [a school district's] book-removal decision" and concluding that officials' anti-LGBTQ motivations for book removals were "blatantly unconstitutional under *Pico* and other precedents"); *PEN Am. Ctr., Inc. v. Escambia Cnty. Sch. Bd.*, 711 F. Supp. 3d 1325, 1331 (N.D. Fla. 2024) (explaining the lack of clarity regarding "[t]he applicable legal standard for evaluating alleged First Amendment violations in the school library context," but noting the "common theme" that "content-based removal decisions based on legitimate pedagogical concerns" were constitutionally permissible, while "remov[ing] books solely because they disagree with the views expressed in the books" was not); *Counts*, 295 F. Supp. 2d at 1004–05 (applying *Pico*'s prohibition on "the official suppression of ideas" to reject school district moving the *Harry Potter* book series to a special area for students who presented signed parental permission slips, as the policy was based in part on officials' "personal distaste" for "witchcraft"); *Case v. Unified Sch. Dist. No. 233*, 908 F. Supp. 864, 875 (D. Kan. 1995) (finding that "[t]he plurality decision in *Pico* is not binding precedent" but following its analysis to conclude that the "decisive factor behind" a school board's book removal "was the school board members' personal disapproval of the ideas contained in the book," thereby violating the First Amendment).

principles set forth in *Pico*—a school library case—have even greater force when applied to public libraries." *See Sund*, 121 F. Supp. 2d at 548; *Virden*, 2023 WL 5944154 at *5 (explaining that the First Amendment right to receive information is broader in a public library than a school library); *see also Mainstream Loudoun v. Bd. of Trs. of Loudoun Cnty. Libr.*, 2 F. Supp. 2d 783, 794 (E.D. Va. 1998) ("[N]either the dissent nor the plurality of *Pico* can be said to support defendants' argument that public libraries enjoy unfettered discretion to remove materials from their collections.").

Despite playing no inculcative function, public libraries are still afforded "broad discretion" to make content-based decisions about what materials have the "requisite and appropriate quality" to be included in their collections. *ALA*, 539 U.S. at 204–05. But that does not mean the First Amendment plays no role. To the contrary, *Pico*'s distinction between legitimate content-based restrictions and invidious viewpoint discrimination is a familiar feature of First Amendment law. When the government facilitates or subsidizes private speech through a government program or nonpublic forum,[6] it can make content-based distinctions consistent with the program's nature, but *cannot* engage in "invidious viewpoint discrimination" that seeks to "drive certain ideas or viewpoints from the marketplace." *Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569, 587 (1998) (marks and citation omitted).

---

[6] Defendants argue that "[a] public library's bookshelves are neither a traditional public forum nor a limited public forum" and therefore that the government has no obligation to be "viewpoint neutral." ECF No. 20 at 22. But there are two obvious problems. First, Defendants apparently forget about the third option: the *nonpublic* forum. *See Ark. Ed. Television Comm'n v. Forbes*, 523 U.S. 666, 677 (1998). In a nonpublic forum, the government may "make distinctions in access on the basis of subject matter and speaker identity," but still cannot "employ[] viewpoint-discriminatory criteria." *Shurtleff v. City of Boston*, 596 U.S. 243, 275–76 (2022) (Alito, J., concurring). Rather, such restrictions must still be "reasonable and not an effort to suppress expression merely because public officials oppose the speaker's view." *Perry Educ. Ass'n v. Perry Loc. Educators' Ass'n*, 460 U.S. 37, 46 (1983). And second, Defendants decline to mention that this District has treated libraries as limited public fora. *Grant-Davis v. Bd. of Trs. of Charleston Cnty. Pub. Libr.*, No. 2:15-CV-2676-PMD-MGB, 2017 WL 9360875, at *20 (D.S.C. May 24, 2017), *report and recommendation adopted,* No. 2:15-CV-2676-PMD-MGB, 2017 WL 3634070 (D.S.C. Aug. 24, 2017), *aff'd,* 710 F. App'x 134 (4th Cir. 2018).

The First Amendment forbids the government from "using an existing medium of expression and to control it . . . in ways which distort its usual functioning." *Legal Services Corp. v. Velazquez*, 531 U.S. 533, 543 (2001). Even where "content-based considerations . . . may be taken into account" because of "the nature" of the program, those considerations must be tethered to the program's purpose and usual functioning. *Finley*, 524 U.S. at 585 (explaining that the NEA can consider subjective criteria such as "artistic excellence" but may not engage in invidious viewpoint discrimination); *see also Ark. Ed. Television Comm'n v. Forbes*, 523 U.S. 666, 674 (1998) (emphasizing the "nature" of public broadcasting in explaining what First Amendment restrictions apply to it).

Similarly, when the government creates a nonpublic forum, the government can make content-based distinctions to ensure that speech is "compatible with the intended purpose of the property" and "reasonable in light of the purpose which the forum at issue serves." *Perry Educ. Ass'n v. Perry Loc. Educators' Ass'n*, 460 U.S. 37, 49 (1983). But those restrictions must still be "viewpoint neutral," and cannot be imposed "solely to suppress the point of view [a speaker] espouses on an otherwise includible subject." *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 806 (1985). These holdings apply forcefully to public libraries.[7] Curatorial decisions that are aimed at "the suppression of dangerous ideas," *Finley*, 524 U.S. at 587 (quotation omitted), would "distort" the "usual functioning" of a public library and be fundamentally inconsistent with "the purpose" that a library "serves." *Velazquez*, 531 U.S. at 543. The "usual functioning" of public libraries is "to facilitate research, learning, and recreational pursuits by furnishing materials of requisite and appropriate quality." *ALA*, 539 U.S. at 206 (plurality opinion). A library's "mission [is] to provide the citizenry with access to a wide array of information, viewpoints, and content." *Fayetteville Pub. Lib.*, 684 F. Supp. 3d at 891.

---

[7] Indeed, the *ALA* plurality appeared to apply the nonpublic forum doctrine in its evaluation of the Children's Internet Protection Act, citing *Cornelius* and *Perry* (nonpublic forum cases) and determining that the law's "approach" in excluding "certain categories of content"— namely, obscenity and child pornography—was "entirely reasonable" given public libraries' "traditional role in identifying suitable and worthwhile material." *ALA*, 539 U.S. at 207–08.

The Greenville Library is no exception. Its mission is to "champion literacy, inspire learning, and foster community connection" by being residents' "first choice for exploration, discovery, and information." ECF No. 5 at ¶ 26. The Library asserts that it "strives to support an informed community by providing access to the world of ideas and information," by providing access to "material presenting a wide variety of views and opinions on current and historical issues." *Id.* at ¶ 29. To that end, the Library's Collection Policy proclaims that the "Library will neither promote nor censor any particular religious, moral, philosophical or political conviction or opinion" and that "[m]aterial will not be excluded because of the race or nationality or the religious, social, or political views of the author, publisher, or creator." *Id.*

Defendants argue that the Court should depart from the overwhelming consensus among lower courts and follow the Fifth Circuit's recent decision in *Little v. Llano County*, 138 F.4th 834, 860–65 (5th Cir. 2025) (en banc). In that case, a majority of the en banc Fifth Circuit held that plaintiffs could not challenge a library's book-removal decisions "by invoking a right to receive information," overruling its prior decision in *Campbell v. St. Tammany Par. Sch. Bd.*, 64 F.3d 184 (5th Cir. 1995). *Llano Cnty.*, 138 F.4th at 850–51. As the *Llano County* dissent pointed out in detail, the majority's decision ignores the distinction between public libraries and school libraries, which even "the dissenting Justices in *Pico* took great care to emphasize," "sanctions government censorship in every section of every public library in [the Fifth C]ircuit," "forsakes core First Amendment principles," "not only reaches a result directly contrary to *Pico*, but also casts aside the reasoning of a supermajority of the Court in the process," and "overturns decades of settled First Amendment law." *Id.* at 869–89 (Higginson, J., dissenting). The Fifth Circuit's decision in *Llano County* contains no limiting principle whatsoever and would allow any public library to engage in the very conduct proscribed by a supermajority of the *Pico* court: the wholesale suppression of disfavored speech for narrow partisan reasons. This Court should not follow in its footsteps.

By nature, public libraries are "designed for freewheeling inquiry," not "for the selective conveyance of ideas." *Pico*, 457 U.S. at 915 (Rehnquist, J., dissenting) (distinguishing public

libraries from school libraries). Greenville County public officials' interventions suppressing books for ideological reasons unrelated to traditional library collection criteria have distorted the functioning of the library and are not "reasonable in light of the purpose which [a public library] serves." *Perry*, 460 U.S. at 49; *see also ALA*, 539 U.S. at 207–208. As a result, the Library's Policies have transgressed the protections of the First Amendment.

      B.      <u>Taken as true, Plaintiffs' factual allegations establish First Amendment violations.</u>

Plaintiffs assert that the challenged Policies (which have resulted in the removal and/or restriction of dozens of books with LGBTQ characters or themes) were adopted with the explicit goal of "tak[ing] an ethical and moral stand" against the "dangerous thing" and "radical agenda" of "transgenderism," by "trying to move books specifically because they promote or affirm or introduce gender transition ideology," and thus avoiding "putting ideas in kids' minds that may not have already been there." ECF No. 5 at ¶¶ 3–4, 85–87.[8] These allegations, which must be taken as true at this stage, are based on public statements by Library Board Members, are more than plausible explanations for Defendants' conduct, and are paradigmatic examples of unconstitutional viewpoint discrimination. The First Amendment does not allow Greenville Library officials' "personal distaste," *Counts*, 295 F. Supp. 2d at 1004, or "ideological objections," *PEN Am. Ctr., Inc. v. Escambia Cnty. Sch. Bd.*, 711 F. Supp. 3d 1325, 1331 (N.D. Fla. 2024), to transgender and other LGBTQ experiences and identities to limit Plaintiffs' (and all Greenville Library patrons') access to materials reflecting those experiences and identities.

Cases from other federal districts agree. As discussed above, in *Virden*, plaintiffs challenged a library policy that required branches to "remove from their children's sections all books containing LGBTQ themes, affix a prominent color label to those books, and place them in a newly-created section called the 'social section.'" 2023 WL 5944154 at *1. Plaintiffs alleged

---

[8]Defendants unconvincingly maintain that Library's policy is "viewpoint neutral" because it "applies to *all* books geared toward [children] . . . dealing with gender transitioning." ECF No. 20 at 27–28. But the *purpose* of the restriction is to hide positive portrayals of gender transition. ECF No. 5 at ¶¶ 50, 56 (statements of Board Member Moston).

that the policy violated the First Amendment, in part because the policy was adopted "in response to political pressure from constituents who objected, at least partly on religious grounds, to the presence of the[] books in the children's section." *Id.* This allegation was "sufficient to state a 'plausible' claim that the County has restricted [plaintiffs'] access to information for political or partisan motives." *Id.* at *7 (quoting *Iqbal*, 556 U.S. at 678). So too here. *See* ECF No. 5 at ¶ 46 (Board Member Aufmuth noting that the complaint about *Melissa* "seem[ed] to be religious based."). In fact, Plaintiffs' Complaint asserts stronger evidence of impermissible intent by the Greenville Library than was enough to grant summary judgment for the *Virden* plaintiffs. *Compare Virden*, 2024 WL 4360495 at *3–4 (describing summary judgment record), *with* ECF No. 5 at ¶¶ 3–4, 55–58, 85–87.

The *Sund* case is also instructive. That case involved the Wichita Falls City Council's reaction to a public library's purchase of children's books about children with gay and lesbian parents. *Sund*, 121 F. Supp. 2d at 532. The City Council ordered the library to remove all books from the children's section that were determined to need "parental approval and/or supervision" in the opinion of at least 300 petition signatories. *Id.* at 534. The head librarian testified that the books at issue were age-appropriate for their target audiences and were not obscene or otherwise inappropriate. *Id.* at 543.[9] The books' opponents testified that the books supported the "homosexual agenda" and were trying to "brainwash" children into this "destructive lifestyle." *Id.* at 544. Ultimately, the court concluded that these opponents "made no pretenses about their objectives" "[i]n advancing their overall 'moral' agenda." *Id.* at 549 n.19. Finding that "[t]here simply is no interest, *let alone a compelling one,* in restricting access to non-obscene, fully-protected library books solely on the basis of the majority's disagreement with their perceived message," *id.* at 552 (emphasis in original), the court ruled that city council placed "an

___

[9] The *Sund* court also considered the testimony of an education expert who testified about the importance of "books and libraries validat[ing] and speak[ing] to life experiences for children, because when children find nothing that speaks to who they are and to validate them, then they have feelings of insignificance and unimportance." 121 F. Supp. 2d at 538.

unconstitutional burden on Plaintiffs' right to receive information under the First Amendment." *Id.* at 551.

By explicitly targeting any children's books with transgender characters because of officials' personal disapproval of gender transition, Defendants here have similarly taken overt "aim at the suppression of dangerous ideas" and have sought to "impos[e] a disproportionate burden calculated to drive [those] ideas or viewpoints from the marketplace." *Finley*, 524 U.S. at 587 (internal quotations omitted). The same is true for Defendants' Unwritten Policy of suppressing other LGBTQ-related materials, which Defendants do not seriously dispute. Indeed, Defendants never even attempt to articulate what "legitimate, constitutionally compliant reasons" they supposedly have for their egregiously discriminatory policies. ECF No. 20 at 36. That is because no such reasons exist.

The Court must deny Defendants' motion to dismiss for failure to state a claim because the First Amendment protects against such viewpoint-based suppression of ideas by the state.

C.     <u>Library curation is not government speech.</u>

No court has *ever* held that the removal, relocation, or curation of library materials is government speech. *See, e.g.*, *GLBT Youth*, 114 F.4th at 667–68 (rejecting the idea that "placement and removal of books in school libraries" is government speech); *Crookshanks as next friend of C.C. v. Elizabeth Sch. Dist.*, 775 F. Supp. 3d 1160, 1175 (D. Colo. 2025) (same); *PEN Am. Ctr., Inc.*, 711 F. Supp. 3d at 1331 (same); *Virden*, 2024 WL 4360495 at *5 (same); *Fayetteville Pub. Libr*, 760 F. Supp. 3d at 834 (same); *but see Llano Cnty.*, 138 F.4th at 860–65 (seven out of seventeen judges sitting en banc would hold that "a library's choice of the books on its shelves is government speech"). And for good reason: the Supreme Court has cautioned that the government speech doctrine is "susceptible to dangerous misuse" because "private speech could be passed off as government speech," thereby allowing the government to "silence or muffle the expression of disfavored viewpoints." *Matal v. Tam*, 582 U.S. 218, 235 (2017). If Defendants were correct, public libraries could remove every book with Christian characters, or

19

that supports Republican or Democratic ideas. Fortunately, that is not the law. Courts

consistently hold that library collections are not government speech.

Defendants (and the Fifth Circuit plurality) invoke *Moody v. NetChoice, LLC*, 603 U.S.

707 (2024), a case about *private* speech, to argue that whenever the government exercises

editorial discretion over what private speech to facilitate, the government necessarily engages in

government speech. ECF No. 20 at 18–19. But that argument forgets that the Government is

bound by the First Amendment, not protected by it. *See Shurtleff v. City of Boston*, 596 U.S. 243,

268–269 (2022) (Alito, J., concurring) ("[T]he government-speech doctrine is not based on the

view . . . that governmental entities have First Amendment rights."). That expression would be

protected if committed by a private actor does not, *ipso facto*, make the expression "government

speech" when the government is the speaker. *Id.* Were that true, "[n]aked censorship of a speaker

based on viewpoint," which "might well constitute 'expression' in the thin sense that it conveys

the government's disapproval of the speaker's message," could be deemed government speech

and thus immunized from First Amendment scrutiny. *Id.* "But plainly that kind of action cannot

fall beyond the reach of the First Amendment." *Id.*

Rather, to determine whether the government's editorial decisions constitute government

speech, the court must conduct a "holistic inquiry" examining (1) "the history of the expression

at issue"; (2) "the public's likely perception as to who is speaking"; and (3) "the extent to which

the government has shaped or controlled the expression." *Id.* at 252 (majority opinion).

Defendants' proposed rule would collapse the holistic inquiry into a test based only on the third

factor. But "analyzing that factor in isolation . . . flattens the distinction between government

speech and speech tolerated by the censor." *Id.* at 264 (Alito, J., concurring). Applying the

holistic inquiry reveals the obvious: curation of a public library's collection is not government

speech.

*First*, there is no history showing that public library collections are government speech.

Unlike the park monuments in *Pleasant Grove City v. Summum*, the government has not

historically used library collections to speak to the public. *GLBT Youth,* 114 F.4th at 668–69

20

(citing *Pleasant Grove City v. Summum*, 555 U.S. 460 (2009)). Rather, the government's role in establishing and maintaining public libraries is "deciding what private speech to make available to the public." *ALA*, 539 U.S. at 195; *see also Pico*, 457 U.S. at 915 (Rehnquist, J., dissenting) (contrasting the "inculcative" role of school libraries with "university or public libraries," which are "designed for freewheeling inquiry"). Further, most public libraries house voluminous collections spanning the vast array of private expression. To the extent libraries are selective in the texts that they choose to accept and present, it is merely to choose materials "of requisite and appropriate quality." *ALA*, 539 U.S. at 195.[10] In short, library collections have not historically been "closely identified in the public mind with the government," and their contents are not "meant to convey" and do not "have the effect of conveying a government message." *GLBT Youth*, 114 F.4th at 668 (quoting *Matal*, 852 U.S. at 238.).

*Second*, no one considers the library catalogue to be an expression of the state's own views. *Id.* In fact, the Library itself disclaims that idea, maintaining in its Collection Policy that "[t]he inclusion of an item in the collection *does not* represent an endorsement of its contents." ECF No. 1-1 at 2 (emphasis added). As the Eighth Circuit pointed out in *GLBT Youth*, well-appointed libraries contain texts that contradict one another. 114 F.4th at 668. Thus, if this is the government speaking, it is "babbling prodigiously and incoherently." *Matal* 582 U.S. at 236.

*Third*, as in *GLBT Youth*, South Carolina does not have a history of actively "assert[ing] extensive control over removing books from public libraries," 114 F.4th at 668–69. To the contrary, the challenged policies sharply diverge from the careful, diverse, and pluralistic curatorial approach described in Library's Collection Policy. Indeed, it states that the Library has the responsibility to acquire "material presenting a wide variety of views," and that it will

---

[10] The Greenville Library itself sets forth many curatorial criteria to guide this general quality assessment in its Collection Policy, such as "[l]iterary, artistic, and technical values," "[r]ecommendations in reviews," "[j]udgment of work as a whole," "authority, skill, competence, and purpose of author/producer," "[o]bjectivity," "[c]larity," "[t]echnical quality," "[v]itality and originality," and "[a]rtistic presentation," among others. ECF No. 5 at ¶¶ 31-32.

"neither promote nor censor any particular religious, moral, philosophical, or political conviction or opinion." *See* ECF No. 1-1 at 2.

In sum: Public libraries "democratize access to a broad range of often-contradictory ideas and provide fertile ground for our minds to grow." *Llano Cnty.*, 138 F.4th at 888 (Higginson, J., dissenting). They "offer every one of us the tools to educate and entertain ourselves, to embrace or reject new ideas, and, above all, to engage and challenge our minds." *Id.* They are not institutions designed for the government to promote or "express its own message." *Shurtleff*, 596 U.S. at 271 (Alito, J., concurring). As a result, the First Amendment applies, and the government speech doctrine does not.

        D.     <u>Defendants' invocation of 'parental rights' cannot justify their discriminatory policies.</u>

To the extent Defendants posit that minor Plaintiffs' First Amendment rights are not implicated because exercise of their rights is conditioned on their parent's consent, ECF No. 20 at 10–11, Defendants are mistaken. First, that parents have an interest in controlling their children does not extinguish the children's right to receive information. Second, the Policies abridge the rights of minors whose parents support their children reading books with LGBTQ characters. *See Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 805 (2011) (violent video games ban "abridges the First Amendment rights of young people whose parents . . . think violent video games are a harmless pastime."). Like the law in *Entertainment Merchants Ass'n*, the Policies "do not enforce parental authority over children's speech" but instead "impose governmental authority, subject only to a parental veto." *Id.* at 795 n.3. The Policies' "entire effect is only in support of what the State thinks parents ought to want," not what all parents *actually* want. *Id.* at 804.

      **III.**     **Plaintiffs assert plausible Equal Protection claims.**

The Equal Protection Clause of the Fourteenth Amendment "protects us not just from state-imposed classifications, but also from 'intentional and arbitrary discrimination.'" *Grimm*,

972 F.3d at 606–07 (quoting *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000) (per curiam)), *as amended* (Aug. 28, 2020). Here, Defendants have transgressed both.

To survive a motion to dismiss an equal protection claim on a facial disparate-treatment theory, a plaintiff must plead facts sufficient to demonstrate that "he has been treated differently from others with whom he is similarly situated and that the unequal treatment was the result of intentional or purposeful discrimination." *Veney v. Wyche,* 293 F.3d 726, 730–31 (4th Cir. 2002) (quoting *Morrison v. Garraghty,* 239 F.3d 648, 654 (4th Cir. 2001)). "Once this showing is made, the court proceeds to determine whether the disparity in treatment can be justified under the requisite level of scrutiny." *Morrison*, 239 F.3d at 654. Conversely, a plaintiff may also plead facts sufficient to show that an otherwise facially neutral "action disparately impacts a [protected] group," and "that the action was motivated, at least in part, by an 'invidiously discriminatory' intent." *Sylvia Dev. Corp. v. Calvert Cnty., Md.*, 48 F.3d 810, 819 (4th Cir. 1995) (quoting *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265 (1977)). Here, the facially discriminatory nature of both the Written Policy and Unwritten Policy result in different treatment for LGBTQ Plaintiffs O.R. and E.G., as well as the classes they seek to represent, as compared to other similarly situated library patrons. It also disparately impacts transgender and other LGBTQ library patrons. Because both the disparate impact and "unequal treatment [are] the result of intentional or purposeful discrimination," *Morrison*, 239 F.3d at 654, and cannot be justified under any level of scrutiny, Defendants' motion should be denied.

A.    The Library's Policies result in differential treatment for LGBTQ, and particularly transgender, library patrons.

The Policies create a system by which transgender and other LGBTQ patrons are uniquely banished to a separate section of the library to attempt—and often fail—to find stories that represent their experiences. These burdens intentionally inflict an unconstitutional stigma on transgender and other LGBTQ library patrons, communicating to them and the entire community that they and their families do not belong. These injuries establish valid equal protection claims that easily survive a motion to dismiss.

23

Both Policies are facially discriminatory. But even if this Court concludes that the Policies are facially neutral, they nonetheless violate LGBTQ Plaintiffs' equal protection rights because they disparately impact LGBTQ Plaintiffs and are motivated by discriminatory intent. *See infra* § III.B.

        1.    *The Written Policy facially discriminates based on sex and transgender status.*

The Written Policy facially discriminates based on sex and transgender status. The Juvenile Section of the Written Policy explicitly targets any "materials targeting audiences aged 0–12 in which the illustrations, themes, or story lines affirm, portray, or discuss changing the appearance of a minor's gender in ways inconsistent with the minor's biological sex," including any depictions of "[p]ronouns or dress inconsistent with biological sex for the purpose of affirming gender transitioning," the use of "[p]uberty blocking drugs, cross-sex hormones, or surgical procedures for the purpose of affirming gender transitioning," as well as "[t]he possibility of changing genders at will or being no gender at all for the purpose of affirming gender transitioning." ECF No. 5 at ¶ 74. The Young Adult Section of the Written Policy likewise explicitly targets "materials targeting audiences aged 13–17 with characters who have transitioned or are in the process of transitioning from a gender that corresponds to their biological sex to a different gender," which includes "materials with illustrations, themes, or storylines that celebrate, portray, or affirm gender transitioning, whether changes are social (names, pronouns) or physical." *Id.* at ¶ 79. The Policy forbids any such materials from being in the Juvenile or Young Adult sections of the Library, requiring that they be moved to the PEC or Adult sections, respectively.

Unlike the law at issue in *United States v. Skrmetti*, the Written Policy explicitly classifies based on sex and transgender status, not merely based on a particular medical treatment. In *Skrmetti*, the Supreme Court held that a Tennessee law banning medical treatment for gender dysphoria in minors classified based on medical use, not sex or transgender status. 145 S. Ct. 1816, 1829–830, 1833 (2025). Critically, the law in *Skrmetti* did "not regulate any other behavior

in which minors might engage for the purpose of expressing their gender identity," such as "names, pronouns, hair styles, [or] attire." *Id.* at 1859 (Alito, J., concurring). All the Justices in *Skrmetti* agreed that, unlike the law in *Skrmetti*, a hypothetical law requiring all children to wear "sex-consistent clothing" would be a facial sex classification. *Id.* at 1832 (majority opinion); *id.* at 1874 (Sotomayor, J., dissenting). Similarly, all Justices agreed that a hypothetical law would classify based on transgender status if, instead of "regulat[ing] a class or [medical] treatments or conditions," a law were to "regulate[] a class of *persons* identified on the basis of a specified characteristic," such as having undergone a particular medical procedure. *Id.* at 1834 n.3 (majority opinion).

The Written Policy triggers heightened scrutiny. By creating a system of differential treatment for patrons based on whether or not they are living consistently with their "biological sex"—whether that be via medical transition or merely "[p]ronouns or dress"—the Written Policy "necessarily rests on a sex classification" and "punish[es] transgender persons for gender non-conformity, thereby relying on sex stereotypes." *Grimm*, 972 F.3d at 608. Transgender people are, by definition, in some stage of "the process of transitioning from a gender that corresponds to their biological sex to a different gender." ECF No. 5 at ¶ 79. The effect of the Written Policy is that a minor patron who identifies with their sex assigned at birth can freely browse and access materials "celebrat[ing], portray[ing], or affirm[ing]" their identity and experience in the section of the library geared toward their age group, while a transgender minor patron, like O.R., cannot—merely because that minor patron is in some stage of living "inconsistent[ly] with [their] biological sex." *Id.*

Defendants' discrimination against books with transgender *characters* is also necessarily discrimination against transgender *people* using the library. Other library patrons are able to brose the bookshelves to easily find books book "celebrat[ing], portray[ing], or affirm[ing]" any identity or experience that mirrors their own. *Id.* But if a transgender minor library patron wishes to do so, they must (1) be sure to be in one of the Greenville Library branches that even have a PEC section (only half do), (2) find that section, which is located separately from the section full

25

of other books targeting their age group; and (3) find the specific book they may be interested in reading (among books intended "for parents and guardians"). *Id.* at ¶ 48. Even then, if the transgender minor patron does not have an unrestricted library card, which requires separate parental permission to access *all* adult materials, they may not check the book out themselves. *Id.* at ¶ 127.

This unequal treatment is accompanied by a powerful stigma. Both the Written Policy and Unwritten Policy additionally subject transgender and other LGBTQ library patrons to differential treatment by inflicting an unconstitutional stigma upon them. "[D]iscrimination itself, by perpetuating archaic and stereotypic notions or by stigmatizing members of the disfavored group as innately inferior and therefore as less worthy participants in the political community, can cause serious non-economic injuries to those persons who are personally denied equal treatment solely because of their membership in a disfavored group." *Heckler*, 465 U.S. at 739–40 (cleaned up). By systematically suppressing materials reflecting their and their loved ones' experiences, or by segregating materials with even a single character sharing their identity, the Greenville Library "stigmatiz[es] their families." *Bostic*, 760 F.3d at 383. The exclusion "tells those [individuals], and all the world, that their otherwise valid [identities] are unworthy of . . . recognition." *United States v. Windsor*, 570 U.S. 744, 772 (2013). Ultimately, these policies "den[y] the equal dignity" of Plaintiffs and other LGBTQ library patrons, which the Equal Protection Clause does not permit. *Obergefell v. Hodges*, 576 U.S. 644, 674 (2015).[11]

Defendants assert that the policies treat everyone equally because no one, whether transgender or cisgender, can easily access books with LGBTQ characters. But that "equal application" reasoning has been rejected time and again. *See Grimm*, 972 F.3d at 609 (rejecting argument that prohibiting transgender people from using restrooms consistent with their identity treats all students "the same, regardless of sex" because "that is like saying that racially

---

[11] As discussed above, that the discrimination communicates a stigmatizing message does not mean that the discrimination constitutes "government speech." *See, e.g.*, *Shurtleff*, 596 U.S. at 269 (2022) (Alito, J., concurring).

segregated bathrooms treated everyone equally"); *Obergefell*, 576 U.S. at 671 (rejecting argument that petitioners did "not seek to exercise the right to marry but rather a new and nonexistent 'right to same-sex marriage'" just as "*Loving* did not ask about a 'right to interracial marriage.'"). When a policy facially classifies based on sex or transgender status, there is a facial classification even when it applies "equally" to all sexes or equally to both transgender and cisgender people.

2. *The Unwritten Policy Facially Discriminates Based on Sex and Transgender Status.*

Plaintiffs also allege that the Library has a longstanding practice of "discriminating against the collection, retention, and display of LGBTQ library materials, including with respect to books for adults," i.e., an Unwritten Policy. ECF No. 5 at ¶ 97. Specifically, the Greenville Library (1) "systematically ignores procurement requests for LGBTQ-related materials and fails to obtain new LGBTQ-related titles for the Juvenile Collection, the Young Adult collection, or Adult collection," *Id.* at ¶ 98, (2) "has removed dozens of LGBTQ titles from its collection—including adult, young adult, and juvenile titles—with no explanation," *Id.* at ¶ 101, and (3) has "adopted a widespread practice of moving LGBTQ titles from the Juvenile and Young Adult sections to the Adult section even when those books do not depict transgender people or gender transition." *Id.* at ¶ 106. This Unwritten Policy is facially discriminatory. *See*, *e.g.*, *Faustin v. City & Cnty. of Denver*, 423 F.3d 1192, 1196 n.1 (10th Cir. 2005) (permitting "facial challenges to unwritten policies"); *Everts v. Sushi Brokers LLC*, 247 F. Supp. 3d 1075, 1080 (D. Ariz. 2017) (holding that unwritten policy of reassigning pregnant servers to lower-paid hostess position was facially discriminatory under Title VII).

And in the same way that anti-transgender discrimination constitutes sex discrimination, so too does discrimination based on an individual's sexuality. *See Grimm*, 972 F.3d at 616 ("[I]t is impossible to discriminate against a person for being homosexual or transgender without discriminating against that individual based on sex." (quoting *Bostock v. Clayton Cnty.*, 590 U.S. 644, 660 (2020))).

27

The Unwritten Policy imposes the same harms on LGBTQ library patrons that the Written Policy imposes on transgender minor patrons. Namely, it makes it significantly more difficult for LGBTQ library patrons to be able to browse and freely obtain materials that reflect their identities and experiences as compared to non-LGBTQ patrons seeking to do the same. In other words, the Greenville Library's Unwritten Policy of suppressing LGBTQ-related materials treats LGBTQ patrons differently than non-LGBTQ patrons.

    B.    <u>The Unwritten Policy and Written Policy disparately impact LGBTQ Plaintiffs and were motivated by a discriminatory purpose.</u>

Even if the Library's Policies were not facially discriminatory, they would still trigger heightened scrutiny because they disparately impact LGBTQ Plaintiffs[12] and were motivated by a discriminatory purpose. To trigger heightened scrutiny, Plaintiffs "need not show that discriminatory purpose was the 'sole' or even a 'primary' motive for the legislation, just that it was 'a motivating factor.'" *N.C. State Conf. of NAACP v. McCrory*, 831 F.3d 204, 220 (4th Cir. 2016) (cleaned up) (quoting *Arlington Heights*, 429 U.S. at 265–66). Nor must Plaintiffs show outright animus to prove a discriminatory purpose. *Hassan v. City of New York*, 804 F.3d 277, 298 (3d Cir. 2015), *as amended* (Feb. 2, 2016) ("intentional discrimination" need not be motivated by "ill will, enmity, or hostility" to contravene the Equal Protection Clause). Moreover, at the motion to dismiss stage, allegations regarding "the 'purposeful discrimination' necessary to support a disparate-impact theory" need not yet have all the "meat on the bones" required to "ultimately prevail under this theory." *Wood v. Fla. Dep't of Educ.*, 730 F. Supp. 3d

---

[12] Although Defendants claim that the Written Policy is neutral because it "applies to *all* books geared toward 0–12 year olds, or 13–17 year olds, dealing with gender transitioning (whether the book takes a positive or negative view of the subject)," ECF No. 20, at 27–28, the record shows otherwise. The Written Policy explicitly targets materials that "*affirm* gender transitioning." ECF 5 at ¶¶ 2, 54, 64, 67 (Board Member Odom: "We're specifically targeting *affirming* gender transition") (emphasis added). Moreover, "books that advocate against gender transition—such as the Christian-themed book, *God Made Boys and Girls* by Marty Machowski—remain available in the juvenile section." *Id.* at ¶ 4.

1232, 1241 (N.D. Fla. 2024) (citing *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 274 (1979); *Arlington Heights*, 429 U.S. at 264–66).

The presence of discriminatory intent is "evaluated using the 'sensitive inquiry' established in *Village of Arlington Heights*." *Jesus Christ Is the Answer Ministries, Inc. v. Baltimore Cnty.*, 915 F.3d 256, 263 (4th Cir. 2019), as amended (Feb. 25, 2019) (quoting *Arlington Heights*, 429 U.S. at 266–68). This inquiry must take into account all available "circumstantial and direct evidence" of possible discriminatory intent, including but not limited to: (1) "[t]he impact of the official action and whether it bears more heavily on one [group] than another," (2) "[t]he historical background of the [action], particularly if it reveals a series of official actions taken for invidious purposes," (3) "[t]he specific sequence of events leading to the challenged" action, (4) any "[d]epartures from . . . normal procedur[es]" or "[s]ubstantive . . . factors usually considered important," and (5) the relevant "legislative or administrative history . . . , especially where there are contemporary statements by members of the decision-making body." *Arlington Heights*, 429 U.S. at 266–68.

Even without the benefit of discovery, Plaintiffs in this case have provided overwhelming evidence of discriminatory motive by the Greenville Library officials who passed the Written Policy and who have implemented and enforced the longstanding Unwritten Policy of suppressing LGBTQ-related materials. *First*, as described above, these policies harm LGBTQ patrons seeking to access materials in their public library that reflect them and their experiences.

*Second*, the "historical background" of the Policy and Practice does in fact, "reveal[] a series of official actions taken for invidious purposes," and *third*, the "specific sequence of events leading to" these policies' enactment does "shed light" on a discriminatory purpose. *Id.* at 267. Specifically, Defendants have demonstrated a "deep and longstanding hostility to LGBTQ themes over the course of many years," including by publicly and controversially firing an employee for refusing to cancel a planned "Drag Queen Story Hour," instructing all branches to remove Pride-themed public displays (and taking care to do so orally, rather than in writing, to minimize evidence), ordering an employee to "remove a TV slide promoting the LGBTQ book

29

club," harassing and intimidating other library branch employees for an LGBTQ book display,
subsequently passing a policy eradicating themed displays altogether aside from those about
government holidays, and instilling a "culture of fear" amongst staff based on these incidents.
ECF No. 5 at ¶¶ 109–115.

*Fourth*, Defendants "substantive[ly] depart[ed]" from "the factors usually considered
important" in the Library's own Collection Policy by passing the Written Policy and in enforcing
the Unwritten Policy. *Arlington Heights*, 429 U.S. at 267. Most significantly, Defendants'
Policies fly directly in the face of the Greenville Library's proclamations that it "strives to
support an informed community by providing access to the world of ideas and information," has
a "responsibility to acquire, as available, material presenting a wide variety of views and
opinions on current and historical issues," and that the "Library will neither promote nor censor
any particular religious, moral, philosophical or political conviction or opinion" nor exclude
material "because of the race or nationality or the religious, social, or political views of the
author, publisher, or creator." ECF No. 5 at ¶ 29.

*Fifth*, the relevant "administrative history" of the Policy is replete with "contemporary
statements by members of the decision-making body" demonstrating their discriminatory intent.
*Arlington Heights*, 429 U.S. at 268. These include statements that a book about a transgender girl
was objectionable because it "present[ed]" that experience as "normal and good," ECF No. 5 at
¶ 50, that presenting the possibility of transgender experience was "dangerous," *id.* at ¶ 56, that
such a book was "trash," *id*. at ¶ 61, that "putting [these] ideas in kids' minds that may not have
already been there" was "a dangerous thing" and a "radical agenda" against which the library
had "every right to take an ethical and moral stand." *Id*. at ¶ 85. Simultaneously, several
dissenting members of the decision-making body pointed out the discriminatory nature of the
Policy (to no avail), *id.*at ¶ 84, 86, and Library Board Member Brian Aufmuth even lamented,
"We can't target one group just because we don't like that group." *Id*. at ¶ 90.

The Ninth Circuit's decision in *Arce v. Douglas*, in which it considered the
constitutionality of a law that eliminated the Mexican-American Studies ("MAS") program

30

established by the Tucson public school board, is particularly instructive. *See* 793 F.3d 968, 973

(9th Cir. 2015). That Arizona statute did not mention the MAS program on its face, but

prohibited Arizona schools from offering any classes that "[p]romote[d] resentment toward a

race or class of people," "[we]re designed primarily for pupils of a particular ethnic group," or

"[a]dvocate[d] ethnic solidarity instead of the treatment of pupils as individuals." *Id.* (quoting

A.R.S. § 15–112(A)). Just as the Library's Written Policy was enacted in response to complaints

about specific transgender-themed books, ECF No. 5 at ¶¶ 37–77, the *Arce* court found that the

"enactment and enforcement of [the Arizona law] had a disproportionate impact on Mexican-

American and other Hispanic students," in part because it "was enacted in response to

complaints about the MAS program" and had "been enforced only against the MAS program,

even though two other ethnic studies programs in Arizona were alleged by the state

superintendent to seemingly violate" the statute. 793 F.3d at 978. As is true in this case, various

public statements made by Arizona officials seeking to target the program, "especially when

coupled with the administrative history . . . that immediately preceded enactment, raise[d] at least

a plausible inference that racial animus underlay passage of the legislation." *Id.* at 979. Based on

that evidence—even absent a full record of statements and general climate (like the anti-LGBTQ

climate in this case) "evincing animus against Mexican Americans," *id.* at 979 n.5—the court

found that the district court's grant of summary judgment for defendants on the Equal Protection

claim was in error. *Id.* at 981.[13]

       Library Board Member Aufmuth was correct—Defendants cannot discriminatorily target

transgender and other LGBTQ library materials (and, by extension, transgender and LGBTQ

library patrons) merely because they disapprove of them. The "wishes or objections of some

fraction of the body politic" cannot be the basis for official government discrimination. *City of

Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 448 (1985). "Private biases may be outside the

---

[13] *See also Pernell v. Fla. Bd. of Governors of State Univ. Sys.*, No. 4:22CV304, 2022 WL
20099419, at *3 (N.D. Fla. Nov. 22, 2022) (holding that plaintiffs had stated plausible Equal
Protection claims challenging Florida's "Individual Freedom Act," also known as the "Stop
WOKE Act," sufficient to survive motion to dismiss).

reach of the law, but the law cannot, directly or indirectly, give them effect." *Id.* (quoting *Palmore v. Sidoti,* 466 U.S. 429, 433 (1984)). Because the Library's Policies were "elected or reaffirmed . . . at least in part 'because of,' not merely 'in spite of,' [their] adverse effects upon an identifiable group," *C & H Co. v. Richardson,* 78 F. App'x 894, 902 (4th Cir. 2003) (quoting *Feeney*, 442 U.S. at 279), Defendant's motion to dismiss Plaintiffs' Equal Protection claims must be denied.

      C.    <u>The Library's Policies cannot survive any level of scrutiny.</u>

           *1.    The Library's Policies trigger heightened scrutiny and are not substantially related to a sufficiently important government interest.*

Because the Library's Policies discriminate based on sex and transgender status, they are subject to heightened scrutiny. *See Grimm*, 972 F.3d at 607.[14] To survive that demanding standard, Defendants must show that "the classification serves important governmental objectives and that the discriminatory means employed are substantially related to the achievement of those objectives." *Miss. Univ. for Women v. Hogan*, 458 U.S. 718, 724 (1982). Defendants submit that "the intent of the . . . Policy is . . . to recognize and promote the primacy of parents and legal guardians to direct the upbringing and education of their children." ECF No. 20 at 32. To start, the record shows a different motive. *See infra* § III.C.2; *United States v. Virginia*, 518 U.S. 515, 533 (1996) (holding that the "justification must be genuine"). But beyond that, Defendants do not seriously attempt to explain how restricting a specific class of materials representing a disfavored group of people and imposing a targeted burden on that group furthers "the primacy of parents." Parents who wish to monitor the content of their children's acquisitions at the library are in no different position under the challenged policies.[15] Because the Written

---

[14] Because *Skrmetti* did not resolve the standard of scrutiny for discrimination against transgender people, the Fourth Circuit's precedent from *Grimm* applying heightened scrutiny to intentional discrimination against transgender people remains binding in this Circuit. *See Grimm*, 972 F.3d at 611-612 (reciting the history of discrimination against transgender people).

[15] If anything, in *contravention* of *Mahmoud v. Taylor*, 145 S. Ct. 2332 (2025), the primacy of parents is *negatively* affected by the challenged policies, as there is no ability for

Policy and Unwritten Policy are not substantially related to a sufficiently important governmental interest, Defendants' motion must be denied.

> 2. *The Library's Policies are based in animus and thus cannot survive even rational basis review.*

In addition to failing heightened scrutiny, the Library's anti-LGBTQ policies and practices cannot survive *any* level of judicial review. Plaintiffs have amply demonstrated that the challenged policies are "inexplicable by anything but animus toward" transgender and other LGBTQ individuals. *Romer v. Evans*, 517 U.S. 620, 632 (1996). Because "a bare desire to harm a politically unpopular group cannot constitute a legitimate governmental interest," *id.* at 634 (quoting *Dep't of Agric. v. Moreno*, 413 U.S. 528, 534 (1973)), "no legitimate purpose overcomes" the policies' animating "purpose and effect to disparage and to injure" transgender and LGBTQ+ people. *Windsor*, 570 U.S. at 775; s*ee also id.* at 771 (explaining that "moral disapproval of homosexuality, and a moral conviction that heterosexuality better comports with traditional (especially Judeo-Christian) morality" constitutes an unconstitutional discriminatory purpose).

D.     <u>Plaintiffs' Equal Protection claims are distinct from their First Amendment claims.</u>

Defendants are mistaken in their assertion that Plaintiffs seek to "manufacture a plausible claim by reframing a failed First Amendment claim as an Equal Protection claim." ECF No. 20 at 28. Of course, the Supreme Court has long held that Equal Protection claims may be "closely intertwined with First Amendment interests," *Police Dep't of City of Chicago v. Mosley*, 408 U.S. 92, 95 (1972), and the Fourth Circuit recognizes the same. *See Courthouse News Serv. v. Smith*, 126 F.4th 899, 918 (4th Cir. 2025) ("The equal protection interests involved in the differential

---

LGBTQ-supportive parents to opt out of the policies without giving their children access to *all* adult material in the library. In other words, as stated above, the Policies only enforce "what the State thinks parents ought to want" and "do not enforce parental authority" but instead "impose governmental authority, subject only to a parental veto." *Ent. Merchs. Ass'n*, 564 U.S. at 804, 795 n.3.

treatment of speech are inextricably intertwined with First Amendment concerns." (internal alteration omitted) (quoting *McGuire v. Reilly*, 260 F.3d 36, 49 (1st Cir. 2001))). This case lies at this "First Amendment-Equal Protection intersection." *Mosley*, 408 U.S. at 95 n.3.

That both claims are factually tied Plaintiffs' access to certain library materials does not mean that the Equal Protection claims are "subsumed by, and co-extensive with" their First Amendment claims. *Orin v. Barclay*, 272 F.3d 1207, 1213 n.3 (9th Cir. 2001) (declining to reach plaintiff's Equal Protection claim in case challenging arrest for criminal trespass for anti-abortion protest on college campus where plaintiff "made only passing reference to Equal Protection in his Complaint and dedicated to it only one sentence in his opening brief on appeal"); *see also Llano Cnty.*, 138 F.4th at 865 n.59 (plurality opinion) (leaving open the possibility that book removals "can be challenged under other parts of the Constitution" (citing *Summum*, 555 U.S. at 468)); *People for the Ethical Treatment of Animals v. Gittens*, 414 F.3d 23, 28 (D.C. Cir. 2005) (noting that although First Amendment did not place limits on an art exhibition deemed government speech, "other constitutional constraints not at issue here, such as the Equal Protection Clause, might").

Unlike the cases cited by Defendants, Plaintiffs O.R. and E.G. and the classes they seek to represent *do* "contend that [they are] treated disparately in [a] way other than through alleged discrimination against [their] viewpoints." *Lee v. York Cnty. Sch. Div.*, 418 F. Supp. 2d 816, 834 (E.D. Va. 2006) (finding that Equal Protection and free speech claims coextensive in employee speech case where teacher sued after religious materials he posted on his classroom walls were removed); *see also Edwards v. City of Goldsboro*, 178 F.3d 231, 250 (4th Cir. 1999) (finding police officer's "pure or generic retaliation claim" did "not implicate the Equal Protection Clause" and declining to reach theory that "selective[] enforce[ment] [of] a policy or regulation against an individual, who is not a member of an identifiable group" can violate the Equal Protection Clause).

Here, several Plaintiffs *are* "member[s] of an identifiable group," *id.*, and that membership forms the basis of their Equal Protection claims. Specifically, O.R. is "a 17-year-old

transgender boy" who seeks to represent a class of "all minor, transgender library patrons who lack adult library cards" (the "Juvenile & Young Adult Class") and E.G. is "a 12-year-old girl that identifies as queer" who seeks to represent a class of "all LGBTQ-identifying library patrons who have adult or juvenile non-restricted library cards" (the "Unrestricted Library Card Class"). ECF No. 5 at ¶¶ 153, 157. Just as the Mexican-American plaintiffs in *Arce* brought both First and Fourteenth Amendment claims, so too do Plaintiffs in this case. *See* 793 F.3d at 976–986. The Written Policy and Unwritten Policy inflict First Amendment injuries on *all* Plaintiffs (both LGBTQ and not), because all Plaintiffs wish to access books portraying transgender and other LGBTQ stories without impediment or burden. But they inflict Equal Protection injuries on both the Juvenile & Young Adult and Unrestricted Library Card classes (i.e. all "LGBTQ library patrons") *specifically* by subjecting them to "unequal treatment," in part based on the impediment on their "ability to access library materials positively reflecting themselves and families," and *also* the "dignitary harm and unconstitutional stigma" of their LGBTQ "identities and experiences" being treated as "unacceptable and unworthy of inclusion in public space." ECF No. 5 at ¶¶ 171, 180. Although these injuries and claims overlap, they are distinct. The Equal Protection claims are premised on the ways in which these policies affect transgender and other LGBTQ patrons *differently* than other patrons, based on their sex and/or LGBTQ status.

## IV.     Qualified immunity does not apply to claims for prospective relief.

"[Q]ualified immunity does not apply against . . . prospective relief." *Henderson v. Harmon*, 102 F.4th 242, 251 n.6 (4th Cir. 2024). Thus, Defendants' assertion of qualified immunity is immaterial. *See* ECF 5 at 36–37 (Requested Relief).

### CONCLUSION

Taking the well-pleaded allegations as true, Plaintiffs have stated plausible claims for relief under the First Amendment and Equal Protection Clause. The Court should deny the Motion to Dismiss.

Dated: July 25, 2025

**ACLU OF SOUTH CAROLINA**

*/s/ Allen Chaney*
Allen Chaney, Fed. ID No. 13181
Samuel Kennedy*
P.O. Box 1668
Columbia, SC 29202
T: (864) 372-6881
E: achaney@aclusc.org

**AMERICAN CIVIL LIBERTIES UNION FOUNDATION**

Shana Knizhnik*
Joshua Block (*pro hac vice*)
125 Broad Street, Floor 18
New York, NY 10004
T: (212) 549-2500
E: sknizhnik@aclu.org
    jblock@aclu.org

*\* Application for Admission Pro Hac Vice Forthcoming*