IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
GREENVILLE DIVISION

| | |
|---|---|
| O.R., by and through his parents, Cheryl Rogers and Greg Rogers, on behalf of himself and those similarly situated; <br><br> CHERYL ROGERS; <br><br> GREG ROGERS; <br><br> E.G., by and through her mother, Amber Galea, on behalf of herself and those similarly situated; <br><br> M.G., by and through her mother, Amber Galea; and <br><br> W.M., by and through his mother, Kersey Clark, <br><br> *Plaintiffs*, <br><br> v. <br><br> GREENVILLE COUNTY, SOUTH CAROLINA; <br><br> GREENVILLE COUNTY LIBRARY SYSTEM; <br><br> BEVERLY JAMES, in her official capacity as Executive Director of the Greenville County Library System; and <br><br> KAREN ALLEN, in her official capacity as Youth Services Manager of the Greenville County Library System, <br><br> *Defendants*. | C/A No. 6:25-cv-02599-DCC |

**REPLY IN SUPPORT OF THE LIBRARY
DEFENDANTS' MOTION TO DISMISS**

WILSON JONES CARTER & BAXLEY, P.A.

Charles F. Turner, Jr. (Fed. ID No. 05849)
J. Nathan Ozmint (Fed. ID No. 14360)
John P. "Jack" Riordan (Fed. ID No. 07314)
325 Rocky Slope Rd., Suite 201
Greenville, South Carolina 29607
(864) 672-3711
cfturner@wjcblaw.com
jpriordan@wjcblaw.com
jnozmint@wjcblaw.com

NELSON MULLINS RILEY & SCARBOROUGH LLP

Miles E. Coleman (Fed. ID No. 11594)
2 West Washington Street, Suite 400
Greenville, SC 29601
(864) 373-2300
miles.coleman@nelsonmullins.com

*Attorneys for Greenville County Library System; Beverly James, in her official capacity as Executive Director of the Greenville County Library System; and Karen Allen, in her official capacity as Youth Services Manager of the Greenville County Library System*

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES .................................................................................................................. ii

INTRODUCTION .................................................................................................................................. 1

ARGUMENT ........................................................................................................................................ 2

    1      Plaintiffs lack standing because there is no constitutional right to receive content from the government. ........................................................................................ 2

    2.      *Pico* has little bearing on Plaintiffs' claims. ............................................................ 4

    3.      Public library shelves are not a nonpublic forum. ................................................... 6

    4.      Library curation is government speech. ................................................................... 7

    5.      Plaintiffs have no answer to *Little's* thorough, thoughtful, and well-reasoned en banc decision. ......................................................................................... 9

    6.      Plaintiffs have not plausibly alleged an Equal Protection violation. ..................... 10

    7.      *Mahmoud*, *Skrmetti*, and *Free Speech Coalition v. Paxton* are instructive. ........... 12

CONCLUSION .................................................................................................................................... 15

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Arkansas Educ. Television Comm'n v. Forbes*,
    523 U.S. 666 (1998) ..................................................................................................... 6

*Bethel Sch. Dist. No. 403 v. Fraser*,
    478 U.S. 675 (1986) ................................................................................................... 14

*Board of Education, Island Trees Union Free School District No. 26 v. Pico*,
    457 U.S. 853 (1982) .................................................................................. 4, 5, 10, 14

*Boring v. Buncombe Cnty. Bd. of Educ.*,
    136 F.3d 364 (4th Cir. 1998) (en banc) ...................................................................... 9

*Chiras v. Miller*,
    432 F.3d 606 (5th Cir. 2005) ....................................................................................... 6

*City of Pleasant Grove v. Summum*,
    555 U.S. 460 (2009) ..................................................................................................... 8

*Crookshanks v. Elizabeth School District*,
    Case No. 25-1105 (10th Cir.) ..................................................................................... 7

*David v. Alphin*,
    704 F.3d 327 (4th Cir. 2013) ....................................................................................... 2

*Davison v. Randall*, 912 F.3d 666, 685 (4th Cir. 2019) ................................................. 5, 6

*Espinoza v. Montana Dept. of Revenue*,
    591 U.S. 464 (2020) ................................................................................................... 12

*Free Speech Coal., Inc. v. Paxton*,
    145 S. Ct. 2291 (2025) ........................................................................................... 8, 14

*Hazelwood Sch. Dist. v. Kuhlmeier*,
    484 U.S. 260 (1988) ................................................................................................... 14

*Little v. Llano Cnty.*,
    138 F.4th 834 (5th Cir. 2025) (en banc) ......................................................... 7, 9, 10

*Mahmoud v. Taylor*,
    145 S. Ct. 2332 (2025) ........................................................................... 9, 12, 13, 14

*Marks v. United States*,
    430 U.S. 188 (1977) ..................................................................................................... 4

*McConnell v. Fed. Election Comm'n*,
　540 U.S. 93 (2003), *overruled on other grounds by Citizens United v. Fed.
　Election Comm'n*, 558 U.S. 310 (2010) ................................................................................ 3

*Moody v. NetChoice, LLC*,
　603 U.S. 707 (2024) ................................................................................................................ 8

*Morrison v. Garraghty*,
　239 F.3d 648 (4th Cir. 2001) ................................................................................................ 11

*Peck v. Upshur County Bd. of Ed.*,
　155 F.3d 274 (4th Cir. 1998) ................................................................................................ 14

*Regan v. Taxation With Representation of Washington*,
　461 U.S. 540 (1983) ................................................................................................................ 1

*S.G. ex rel. A.G. v. Sayreville Bd. of Educ.*,
　333 F.3d 417 (3d Cir. 2003) .................................................................................................. 14

*Shelley v. Kraemer*,
　334 U.S. 1 (1948) .................................................................................................................. 10

*Shurtleff v. City of Boston*,
　596 U.S. 243 (2022) (Alito, J., concurring) ........................................................................ 6, 9

*Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*,
　600 U.S. 181 (2023) .............................................................................................................. 10

*Tuffendsam v. Dearborn County Board of Health*,
　385 F.3d 1124 (7th Cir. 2004) (Posner, J.) ............................................................................. 1

*United States v. Am. Library Ass'n Inc.*,
　539 U.S. 194 (2003) ............................................................................................................ 5, 6

*United States v. Skrmetti*,
　145 S. Ct. 1816 (2025) ............................................................................................. 11, 12, 13

*Veney v. Wyche*,
　293 F.3d 726 (4th Cir. 2002) ................................................................................................ 11

*Walker v. Texas Division, Sons of Confederate Veterans, Inc.*,
　576 U.S. 200 (2015) ................................................................................................................ 7

*Walker-Serrano ex rel. Walker v. Leonard*,
　325 F.3d 412 (3d Cir. 2003) .................................................................................................. 14

*Walls v. Sanders*,
　__ F.4th __, 2025 WL 1948450 (8th Cir. July 16, 2025) ....................................................... 9

*Warth v. Seldin*,
    422 U.S. 490 (1975) .................................................................................................... 2

*White Coat Waste Project v. Greater Richmond Transit Co.*,
    35 F.4th 179 (4th Cir. 2022) ...................................................................................... 6

*Wisconsin v. Yoder*,
    406 U.S. 205 (1972) .................................................................................................. 12

*Ysursa v. Pocatello Educational Ass'n*,
    555 U.S. 353 (2009) .................................................................................................... 1

**Other Authorities**

*Board of Education v. Pico: The Supreme Court's Answer to School Library
    Censorship*, 44 OHIO STATE L.J. 1103, 1113 (1983) ................................................ 4

David P. Currie, *Positive and Negative Constitutional Rights*, 53 U. CHI. L. REV.
    864 (1986) .................................................................................................................... 1

Euguene Volokh, *Does The First Amendment Bar Public Schools from Removing
    Public Library Books Based on Their Viewpoints?*, REASON (May 18, 2022,
    8:01 a.m.), https://reason.com/volokh/2022/05/18/does-the-first-amendment-
    bar-public-schools-from-removing-library-books-based-on-their-viewpoints/
    [perma.cc/P47R-D5N6] ............................................................................................ 4

Sean Maloney, *Political Advocacy Groups: The Puppet Masters Behind Public
    School Boards' Banning of Books*, 73 DEPAUL L. REV. 129, 143 (2023) ................ 4

W. Katz, *Collection Development: The Selection of Materials for Libraries* 6 (1980) ................... 5

The Library Defendants explained that the Court must dismiss Plaintiffs' suit because Plaintiffs lack standing and have failed to state causes of action on which relief can be granted.[1] (*See* ECF 20.) Nothing in Plaintiffs' Response changes that conclusion.

## INTRODUCTION

Plaintiffs' claims are fatally and fundamentally flawed. All four of their claims rely on an alleged constitutional right to receive information (or content) *from the government*. The problem is that no such right exists. The First Amendment recognizes a negative right to be free from government infringement of speech.[2] But it does not grant a corresponding right to receive specific content from the government at taxpayer expense. *See Ysursa v. Pocatello Educational Ass'n*, 555 U.S. 353, 355 (2009) ("The First Amendment prohibits government from 'abridging the freedom of speech'; it does not confer an affirmative right to use government … mechanisms for the purpose of obtaining funds for expression."); *Regan v. Taxation With Representation of Washington*, 461 U.S. 540, 549 (1983) ("[A] legislature's decision not to subsidize the exercise of a fundamental right does not infringe the right.").

The practical consequence of Plaintiffs' novel theory would be to either (a) require every public library to become a warehouse of books espousing every idea ever penned or (b) shutter their doors. Thankfully, the First Amendment requires neither. Plaintiffs can access much of the content they want at Greenville County libraries (albeit sometimes in a different section of the

---

[1] The "Library Defendants" are, collectively, Greenville County Library System, Beverly James, in her official capacity as Executive Director of the Greenville County Library System, and Karen Allen, in her official capacity as Youth Services Manager of the Greenville County Library System.

[2] *Tuffendsam v. Dearborn County Board of Health*, 385 F.3d 1124, 1126 (7th Cir. 2004) (Posner, J.) ("The Constitution is, with immaterial exceptions, a charter of negative rather than positive liberties. … It limits the powers of government but does not give people legally enforceable rights to demand public services and to obtain damages or other legal relief if the government fails to provide them."); David P. Currie, *Positive and Negative Constitutional Rights*, 53 U. CHI. L. REV. 864 (1986).

1

library than where Plaintiffs prefer it to be placed). Plaintiffs are free to obtain the rest of the content of their choice (not located at a local public library) from a variety of sources (such as Amazon.com or a private bookstore). Defendants' refusal to subsidize the content of Plaintiffs' choosing is not a constitutional violation. Because Plaintiffs' First Amendment and Equal Protection rights have not been violated, their amended complaint should be dismissed.

## ARGUMENT

**1.     Plaintiffs lack standing because there is no constitutional right to receive content from the government.**

Plaintiffs argue they have standing because "Defendants have impeded their ability to access library materials they wish to read or discover through browsing." Pls. Resp. at 5 (ECF No. 27). In other words, Plaintiffs' claimed injury—denial of access to content at government expense—is identical to what they claim the constitutional violation to be—denial of access to content at government expense.

Accordingly, there is a chicken or egg problem. Plaintiffs' alleged injury depends on (and is coextensive with) the existence of the alleged right, meaning they can't establish standing without first proving the alleged right exists. Plaintiffs claim they have standing because they are injured by the lack of access to specific content, but Defendants claim there is no such thing as a constitutional right to receive specific content from the government. If Defendants are correct, and there's no constitutional right, then there can be no deprivation of that right. If there's no deprivation, then there's no constitutional injury. If no injury, then no standing.

To have Article III standing, a plaintiff bears the burden of establishing "a concrete and particularized invasion of a ***legally protected interest***." *David v. Alphin*, 704 F.3d 327, 333 (4th Cir. 2013) (cleaned up) (emphasis added). "Although standing in no way depends on the merits of the plaintiff's contention that particular conduct is illegal, ... it often turns on the nature and source

of the claim asserted." *Warth v. Seldin*, 422 U.S. 490, 500 (1975) (internal quotation marks and citations omitted). If the nature and source of the claim asserted is not a legally cognizable right, then plaintiffs asserting such a claim lack standing. For example, in *McConnell v. Fed. Election Comm'n*, 540 U.S. 93, 227 (2003), *overruled on other grounds by Citizens United v. Fed. Election Comm'n*, 558 U.S. 310 (2010), plaintiffs claimed that increases in hard-money campaign contributions in a federal law deprived them of an "equal ability to participate in the election process based on their economic status." *Id.* The Supreme Court held that plaintiffs lacked standing because the Court had "never recognized a legal right comparable to the broad and diffuse injury asserted" by the plaintiffs. *Id.* So too here.

Although the Supreme Court has generally recognized that the First Amendment sometimes limits the government's power to prevent *one person from receiving another's speech*, *see* Defs. Mem. In Supp. of Mot. to Dismiss at 16–17 (ECF No. 20), the Court has never recognized a right to receive content *from the government*. Plaintiffs' right-to-receive-content-from-the-government claim is novel, involving a "broad and diffuse injury," *McConnell*, 540 U.S. at 227, that is not legally cognizable. Accordingly, Plaintiffs' claims should be dismissed for lack standing.

This argument isn't putting the merits horse before the standing cart. Defendants do not ask the Court to determine (at least, not in *this* threshold argument) whether a particular plaintiff's claim is viable under the alleged facts, but whether that claim could be viable *under any set of facts*. Stated differently, it asks not whether *these* plaintiffs have standing, but whether any person *could* have standing. If the alleged right on which the claim rests doesn't exist (as in *McConnell*), then no one—including these plaintiffs—have standing to sue for an alleged violation of that supposed right.

In short, the standing analysis requires the court to determine whether the allegedly violated right is, in fact, a cognizable right. Here, it's not, and Plaintiffs, therefore, lack standing.

3

**2.     *Pico* has little bearing on Plaintiffs' claims.**

Plaintiffs rely heavily on *Board of Education, Island Trees Union Free School District No. 26 v. Pico*, 457 U.S. 853 (1982) to support their claim that the First Amendment prohibits "viewpoint" discrimination in public library curation decisions. *See* Pls. Resp. at 12–14 (ECF No. 27). Plaintiffs argue that "[l]ower courts have been virtually unanimous in applying the principles announced in *Pico* despite its status as a plurality decision." *Id.* at 13. They are wrong. As soon as *Pico* was decided, commentators recognized that "[b]ecause a majority of justices did not concur in any one opinion, the authority of *Pico* is limited." Helen M. Quenemoen, *Board of Education v. Pico: The Supreme Court's Answer to School Library Censorship*, 44 OHIO STATE L.J. 1103, 1113 (1983). Numerous courts have agreed. Indeed, the First, Fifth, and Eleventh Circuits have all held that *Pico* lacks precedential value. Sean Maloney, *Political Advocacy Groups: The Puppet Masters Behind Public School Boards' Banning of Books*, 73 DEPAUL L. REV. 129, 143 (2023) ("These circuits are clear: *Pico* lacks precedential effect.").[3]

Further, Plaintiffs are wrong that *Pico* prohibits "viewpoint" discrimination in school (or public) library curation decisions. *Pico* says nothing of the sort. The *Pico* plurality opinion only says that school libraries may not weed books "in a narrowly partisan or political manner," 457 U.S. at 870 (plurality op.), which is a far cry from Plaintiffs' assertion that public libraries may not engage in any viewpoint discrimination. But more importantly, the Brennan plurality opinion in *Pico* was joined by only three justices, *so it has no status as law*. In cases which fail to garner at least five votes for a single rationale, the lower courts must follow the opinion of the Justice who "concurred in the judgment on the narrowest grounds." *Marks v. United States*, 430 U.S. 188, 193

---

[3] *See also* Euguene Volokh, *Does The First Amendment Bar Public Schools from Removing Public Library Books Based on Their Viewpoints?*, REASON (May 18, 2022, 8:01 a.m.), https://reason.com/volokh/2022/05/18/does-the-first-amendment-bar-public-schools-from-removing-library-books-based-on-their-viewpoints/ [perma.cc/P47R-D5N6].

(1977). In *Pico*, the controlling opinion belonged to Justice White, who concurred in the judgment only, refused to join any portion of Justice Brennan's plurality opinion, and expressly disclaimed reaching the First Amendment issues in the case. *Pico*, 457 U.S. at 883–84 (White, J., concurring in the judgment) ("The plurality seems compelled to go further and issue a dissertation on the extent to which the First Amendment limits the discretion of the school board to remove books from the school library. *I see no necessity for doing so at this point*.") (emphasis added).

To the extent that any portion of the Brennan plurality in *Pico* could be read as prohibiting "viewpoint" discrimination in public libraries, that opinion is not just non-controlling, it's fatally flawed. Libraries inevitably, unavoidably, and permissibly engage in *viewpoint discrimination* when making curation decisions, as they are expected to. *See United States v. Am. Library Ass'n Inc.*, 539 U.S. 194, 204 205 (2003) [hereafter "*ALA*"] (plurality op. of Rehnquist, C.J.) ("'The librarian's responsibility . . . is to separate out the gold from the garbage, not to preserve everything.'") (quoting W. Katz, *Collection Development: The Selection of Materials for Libraries* 6 (1980)).[4] There is nothing inherently wrong or illegal with a library refusing to shelve (or removing) books that, for example, espouse racist or sexist ideas, promote crackpot scientific theories, or contain blatant factual inaccuracies. But all these curation decisions evince, necessarily, viewpoint discrimination. A public library could not function if its librarians are prohibited from making content- or viewpoint-based collection decisions, or if it could be sued whenever a library patron suspects that a curation decision was influenced by the content or viewpoints expressed in a book.[5]

---

[4] So, too, *content discrimination* is inevitable when libraries make collection decisions. *See id.* at 205 ("Public library staffs necessarily consider content in making collection decisions and enjoy broad discretion in making them.").

[5] Plaintiffs cite *Davison v. Randall*, 912 F.3d 666, 685 (4th Cir. 2019) as if that case held that "The First Amendment prohibits 'viewpoint discrimination in curating a public library branch.'" Pls.

5

**3.    Public library shelves are not a nonpublic forum**.

Contrary to Plaintiffs' claim to the contrary, a public library's shelves are not a nonpublic (or public) forum. *See* Pls. Resp. 14 n.6 (ECF No. 27) (arguing that a public library is a nonpublic forum and therefore "cannot 'employ[] viewpoint-discriminatory criteria.'") (quoting *Shurtleff v. City of Boston*, 596 U.S. 243, 275–76 (2022) (Alito, J., concurring)) (alteration in original). Plaintiffs claim that "the *ALA* plurality appeared to apply the nonpublic forum doctrine in its evaluation of the Children's Internet Protection Act[.]" *Id.* at 15 n.7. They are wrong. The *ALA* plurality expressly concluded that "'forum analysis and heightened judicial scrutiny are incompatible . . . with the discretion that public libraries must have to fulfill their traditional missions." *Chiras v. Miller*, 432 F.3d 606, 614 (5th Cir. 2005) (quoting *ALA*, 539 U.S. at 205) (plurality opinion of Rehnquist, C.J.).

Although a portion of a library's physical campus may constitute a public or nonpublic forum—if, for example, the library makes a meeting space available for book clubs or other public gatherings—the library *shelves* themselves are not a forum of any sort. This fourth category— "not a forum at all"—has been recognized by the Supreme Court. *Arkansas Educ. Television Comm'n v. Forbes*, 523 U.S. 666, 678 (1998) ("Where the property is not a traditional public forum and the government has not chosen to create a designated public forum, the property is either a nonpublic forum *or not a forum at all*.") (emphasis added). Simply put, public library shelves are not open in any manner as a forum for public speech. Instead, as discussed *infra*, these shelves are solely a forum for *government speech*. A library's shelves do not have "speech limitations" applicable to the public writ large; rather these shelves and the placement and selection of which books they

---

Resp. at 12 (ECF 27). But that's not what *Davison* held; it's not even what *Davison* was about. *Davison* merely concluded that certain portions of a library official's official Facebook page, in which he had invited public commentary, constituted a forum in which private speakers could not be excluded based on their viewpoints.

contain constitute government speech. *See White Coat Waste Project v. Greater Richmond Transit Co.*, 35 F.4th 179, 196 (4th Cir. 2022) ("Speech limitations in these nonpublic forums must survive only a much more limited review—they only need to be reasonable and viewpoint-neutral.") (quotation and citation omitted).

Even if public library shelves constitute a nonpublic forum—which they don't—Plaintiffs' claims would still fail. This is so because no Plaintiff has alleged that they have been excluded from participation in the forum. Plaintiffs lack standing to contest the alleged exclusion of other voices from the claimed nonpublic forum. True, Plaintiffs' claim violation of an alleged right to receive content. But as discussed *supra*, there is no such thing as a right to receive content from the government and, to the extent nonpublic-forum analysis is applicable, Plaintiffs' nonpublic-forum argument fails.

**4.     Library curation is government speech.**

Whether library curation is government speech is a relatively novel question. True, several out-of-circuit federal district courts have rejected this argument.[6] *See* Pls. Resp. at 19 (ECF No. 27). But notably, seven of the seventeen active Fifth Circuit judges concluded that public library curation decisions constitute government speech. *Little v. Llano Cnty.*, 138 F.4th 834 (5th Cir. 2025) (en banc). (Duncan, J., plurality op.) Plaintiffs do not seriously contend with Judge Duncan's thorough and thoughtful analysis, nor with Defendants' government-speech argument. *See* Defs. Memo. in Supp. at 18–28 (ECF No. 20).

Under the Supreme Court's government-speech doctrine, whenever the government joins or assists others in propagating a message, it is engaged in government speech and may choose the speech that it will subsidize, and decline to subsidize speech to which it disapproves, without

---

[6] The issue of whether school library curation is government speech is currently pending before the Tenth Circuit in *Crookshanks v. Elizabeth School District*, Case No. 25-1105.

7

violating the First Amendment's general prohibition against viewpoint discrimination. *See, e.g.*, *Walker v. Texas Division, Sons of Confederate Veterans, Inc.*, 576 U.S. 200, 213 (2015) ("Texas offers [specialty license] plates that say 'Fight Terrorism.' But it need not issue plates promoting al Qaeda.") (citation omitted); *City of Pleasant Grove v. Summum*, 555 U.S. 460, 468 (2009) ("It is the very business of government to favor and disfavor points of view.") (citation and internal quotation marks omitted). This is true even when the government-supported speech is created or delivered by private citizens. It is the use of government resources to promote and convey these ideas—the act of curating private speech—that constitutes government speech in these instances.

Indeed, a library's curation decisions are no less "speech" than a social-media company's decisions regarding the third-party speech that it chooses to convey on its platforms. *See Moody v. NetChoice, LLC*, 603 U.S. 707, 731 (2024) ("An entity exercising editorial discretion in the selection and presentation of content is engaged in speech activity.") (quotations and citation omitted) (cleaned up). *Moody* held that "[d]eciding on the third-party speech that will be included in or excluded from a compilation—and then organizing and presenting the included items—is expressive activity of its own." *Id.* Plaintiffs' contention that *Moody* is inapplicable because it concerned "*private* speech," not government speech, is a distinction without a difference. Pls. Resp. at 20 (ECF No. 27). The salient point is that, when an entity compiles and curates the private speech of others into a collection for others to browse, that "editorial function itself is an aspect of speech." *Moody*, 603 U.S. at 731 (citation and quotation omitted). This is true whether a private corporation or a public library is doing the curating. In both instances, the curated collection is itself speech. And notably, the fact that the curated collection might be very large, encompassing many (even most) voices—consider the size and diversity of voices on a social media website—does not negate the fact that the curated collection is *speech*. *Id.* at 732 (the analysis does not change "just because a compiler includes most items and excludes just a few").

8

That's not to say that Plaintiffs are powerless to dispute the government's speech decisions. But the place to wage that fight is at the ballot box, not by expecting federal courts to act as über librarians to review and endorse the decisions of local library officials. Our Constitution relies "on the ballot box, not on rules against viewpoint discrimination, to check the government when it speaks." *Shurtleff*, 596 U.S. at 252.

Because the conduct at issue here—the acquisition, placement, and removal of library books—constitutes government speech, Plaintiffs' claims fail.

**5.    Plaintiffs have no answer to *Little's* thorough, thoughtful, and well-reasoned en banc decision.**

In Plaintiffs' desperation to avoid the powerful persuasive authority of the Fifth Circuit's recent en banc opinion in *Little v. Llano Cnty.*, 138 F.4th 834 (5th Cir. 2025), they resort to a self-contradicting (and incorrect) characterization of the Library Defendants' argument (and *Little's* holding). They mischaracterize the argument in two ways:

*First*, Plaintiffs wrongly claim that the Library Defendants' argument about the lack of a cognizable constitutional right to receive information from the government "contains no limiting principle whatsoever." Pls. Resp. at 16 (ECF No. 27). But that's not true, and Plaintiffs know it. They admit as much later in their Response, when they admit that *Little's* holding "le[ft] open the possibility that book removals 'can be challenged under other parts of the Constitution.'" *Id.* at 34 (quoting *Little*, 138 F.4th at 865 n.59). One of those avenues—one of the "limiting principle[s]" that Plaintiffs say doesn't exist—was illustrated two months ago in *Mahmoud v. Taylor*, 145 S. Ct. 2332, 2341–42 (2025). There, even the selection of classroom curriculum—a quintessential example of government speech to which the Free Speech Clause doesn't apply, *see, e.g.*, *Boring v. Buncombe Cnty. Bd. of Educ.*, 136 F.3d 364, 366 (4th Cir. 1998) (en banc)—was subject to the plaintiffs' Free Exercise rights. *See also Walls v. Sanders*, __ F.4th __, 2025 WL 1948450, at *4

9

(8th Cir. July 16, 2025) ("Government speech is not immune from all constitutional challenges . . . . The Establishment Clause, for example, limits government speech."). In short, Plaintiffs' supposed right to receive information from the government lacks any constitutional foundation. But, contrary to Plaintiffs' assertion, that conclusion doesn't wholly neuter the Constitution.

*Second*, Plaintiffs incorrectly argue that *Little's* holding—namely, that the Constitution contains no right to receive information from the government—is contrary to *Pico*. *See* Pls. Resp. at 16 (ECF No. 27) (arguing that *Little* would allow the "very conduct proscribed by a supermajority of *Pico*"). Wrong again. As expressly noted by the *Little* majority, a majority of Justices in *Pico* agreed that there is no right to receive information from the government. *Little*, 138 F.4th at 844 n.15. Consistent with *Little* and the Defendants' memorandum in support of motion to dismiss analyzing *Little*, this Court should reject Plaintiffs' assertion of a right to receive content from the government. No such right exists.

**6.     Plaintiffs have not plausibly alleged an Equal Protection violation.**

Plaintiffs' Equal Protection claims fail, for multiple reasons. As an initial matter, contrary to Plaintiffs' contention to the contrary, the Collection Policy is plainly facially neutral. The Collection Policy does not prevent any child identifying as LGBTQ+ from accessing any book that a child who does not identify as LGBTQ+ could access, or vice versa. All similarly situated children who patronize the Greenville Library System are subject to the same limitations on what they can check out from the library. Because all minors are treated the same under the policy (as are all adults), Plaintiffs have not stated an Equal Protection claim.

Further, Plaintiffs conflate the rights of natural persons with those of book characters. The law, however, is clear—a violation of the Equal Protection Clause is one that denies ***people*** equal treatment. *See, e.g.*, *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 202 (2023)("'[T]he broad and benign provisions of the Fourteenth Amendment'

10

apply '*to all persons*'") (emphasis added); *Shelley v. Kraemer*, 334 U.S. 1, 22 (1948) ("The rights created by the first section of the Fourteenth Amendment are, by its terms, guaranteed to the *individual*. The rights established are *personal rights*.") (emphasis added).

Plaintiffs' Response acknowledges that its equal protection claim can only survive a motion to dismiss if the Complaint alleges that "'*he* has been treated differently from *others*.'" Pls. Resp. at 23 (ECF No. 27) (quoting *Veney v. Wyche*, 293 F.3d 726, 730–31 (4th Cir. 2002) (quoting *Morrison v. Garraghty*, 239 F.3d 648, 654 (4th Cir. 2001)) (emphasis added). Plaintiffs do not make any plausible allegations that satisfy this test. At most, Plaintiffs have alleged that the Library's policies discriminate, if at all, against *materials*, not persons. *See id.* at 24 (alleging the policy "targets any '*materials*'"); *id.* ("explicitly targets '*materials*'"); *id.* ("forbids any such *materials* from being in [certain places]"); *id.* at 26 ("systematically suppressing *materials*"); *id.* ("segregating *materials*"); *id.* at 27 ("the Library has a longstanding practice of 'discriminating against . . . LGBTQ library *materials*'") (quoting Am. Compl. ¶ 97, ECF No. 5); *id.* at 28 n.12 ("The Written Policy explicitly targets *materials*"); *id.* at 29 (describing the alleged "Unwritten Policy of suppressing LGBTQ-related *materials*") (emphases added in all instances).

That's the end of the road for this claim. In the absence of government regulation of *persons*, Plaintiffs' Equal Protection claims fail. Plaintiffs admit this, too, in their Response, which concedes (in italics, no less) that a critical fact in the Supreme Court's opinion in *Skrmetti*, which rejected those plaintiffs' Equal Protection claim, was that the law challenged in that suit didn't regulate "'a class of *persons*.'" Pls. Resp. at 25 (ECF No. 27) (quoting *United States v. Skrmetti*, 145 S. Ct. 1816, 1834 n.3 (2025) (emphasis in Plaintiffs' Response). So, too, here.

Having claimed that Library policies discriminate against *materials*, Plaintiffs then make a necessary (but unconvincing) leap of logic: "Defendants' discrimination against books with transgender *characters* is also necessarily discrimination against transgender people using the

11

*library.*" *Id.* at 25 (emphasis in original). Plaintiffs broad and bold claim—unsupported by any citation to case law—should be rejected. Plaintiffs' theory posits that the government has an obligation not just to ***not discriminate*** against a person but to take affirmative steps to ***positively portray and affirm*** that person's chosen identity. *See id.* (arguing that the Written Policy impedes transgender minor library patrons from finding books "celebrat[ing], portray[ing], or affirm[ing]" their identity or experience) (alteration in original); *id.* at 28 (stating that the Unwritten Policy "makes it significantly more difficult for LGBTQ library patrons to be able to browse and freely obtain materials that reflect their identities and experiences as compared to non-LGBTQ patrons seeking to do the same").

Plaintiffs' novel theory should be rejected. To the Library Defendants' knowledge, no court has ever adopted that theory. This Court shouldn't be the first. The alleged right to receive content with a positive portrayal of one's identity at government expense simply does not exist. Equal Protection jurisprudence forbids government discrimination. It does not create an affirmative right to positive portrayal. In essence, Plaintiffs' Equal Protection claims are First Amendment right-to-receive-content claims in Equal Protection clothing. But as discussed, *supra*, Plaintiffs' have no right to receive specific content from the government. Accordingly, Plaintiffs' Equal Protection claims fail as a matter of law.

**7.**     ***Mahmoud*, *Skrmetti*, and *Free Speech Coalition v. Paxton* are instructive.**

Plaintiffs give short shrift to several recent, important Supreme Court decisions with direct implications here. *First*, in *Mahmoud v. Taylor*, the Court considered a Maryland school board's inclusion of "LGBTQ+ inclusive" storybooks in its elementary school curriculum "designed to 'disrupt' children's thinking about sexuality and gender." *Mahmoud v. Taylor*, 145 S. Ct. 2332, 2341–42 (2025). The Court acknowledged that it has "long recognized the rights of parents to direct 'the religious upbringing' of their children," *Mahmoud*, 145 S. Ct. at 2350 (quoting *Espinoza*

12

*v. Montana Dept. of Revenue*, 591 U.S. 464, 486 (2020) (quoting *Wisconsin v. Yoder*, 406 U.S. 205, 213–214 (1972)), and concluded that the school board's "introduction of the 'LGBTQ+-inclusive' storybooks, along with its decision to withhold opt outs, places an unconstitutional burden on the parents' rights to the free exercise of their religion." *Id.* at 2363.[7] Plaintiffs here may not like the fact that parents have a constitutional right to direct the religious upbringing of their children (including in matters about sexuality and gender), or that the Defendants through the Collection Policy seek to affirm and protect this fundamental parental right, but that does not change the fact that this parental right exists. Defendants should be credited with respecting the boundaries of the Constitution and proactively affirming the primacy of a parent's role (and right) to direct the upbringing of their children (including in matters about sexuality and gender), not forced to defend themselves in litigation over their Collection Policy.

*Second*, in *United States v. Skrmetti*, the Supreme Court analyzed a Tennessee law limiting all minors in accessing certain medical treatments for "gender dysphoria, gender identity disorder, or gender incongruence." 145 S. Ct. 1816, 1829 (2025). Like the Collection Policy at issue here, the Tennessee law involved issues of gender identity and gender transitioning. But like the Collection Policy, the Tennessee law didn't classify based on sex or any other suspect class. Instead, it classified based on age and medical use, and such classifications are only subject to rational basis review. *Id.* Likewise, the Collection Policy here classifies based only on age. All similarly situated children (and adults) who patronize the Greenville Library System are subject to the same limitations on what they can check out from the library. A person identifying as LGBTQ+

---

[7] Justice Thomas rightly noted that "[n]ot only are 'sexual orientation and gender identity' sensitive political topics, … but education about these subjects is uniquely likely to interfere with children's religious development," because these "subjects relate to the very architecture of many faiths." *Mahmoud v. Taylor*, 145 S. Ct. 2332, 2380 n.7 (2025) (Thomas, J., concurring) (internal quotations and citations omitted).

13

has access to the exact same library content as a straight or gender conforming person. Again, Plaintiffs' equal protection claim rises (and falls) based on their assertion that LGBTQ+ individuals have a tougher time locating library materials that positively portray their identities than do straight and gender conforming individuals. But again, there is no right to receive this positive-portrayal content from the government. *See Pico*, 457 U.S. at 888 ("[T]he right to receive information and ideas does not carry with it the concomitant right to have those ideas affirmatively provided at a particular place by the government.") (Burger, C.J., dissenting).

*Third*, in *Free Speech Coal., Inc. v. Paxton*, 145 S. Ct. 2291 (2025) ("*FSC*"), the Court reiterated that a minor's First Amendment rights are not co-extensive with an adult's rights. *Id.* at 2303–04. Specifically, "States can impose greater limits on children's access to sexually explicit speech than they can on adults' access." *Id.* A minor's speech rights are also limited in certain environments, such as in a public school. *See, e.g.*, *Bethel Sch. Dist. No. 403 v. Fraser*, 478 U.S. 675 (1986); *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260 (1988). Indeed, the "Supreme Court has recognized that a balance must be struck between the student's rights and the school's role in fostering what the Court in *Fraser* termed 'socially appropriate behavior.'" *S.G. ex rel. A.G. v. Sayreville Bd. of Educ.*, 333 F.3d 417, 422 (3d Cir. 2003) (quoting *Fraser*, 478 U.S. at 681). And the younger the student, the less First Amendment rights they have. *Walker-Serrano ex rel. Walker v. Leonard*, 325 F.3d 412, 416–17 (3d Cir. 2003) ("There can be little doubt that speech appropriate for eighteen-year-old high school students is not necessarily acceptable for seven-year-old grammar school students.); *Cf. Peck v. Upshur County Bd. of Ed.*, 155 F.3d 274, 288 n.\* (4th Cir. 1998) ("In elementary schools, the concerns animating the coercion principle are at their strongest because of the impressionability of young elementary-age children.").

Although *FSC* is not directly implicated here, its general premise (that a minor's First Amendment rights are not co-extensive with an adults) coupled with the reaffirmation in *Mahmoud*

14

that parents have a constitutional right to direct the religious upbringing of their children, is instructive. Far from violating a minor's First Amendment rights (or an adult's for that matter), the Collection Policy at issue here recognizes (a) that content appropriate for an adult might not be appropriate for a minor, and (b) determining whether certain content dealing with controversial topics of sexuality and gender is appropriate for a given child is best left in the hands of parents.

## CONCLUSION

For the foregoing reasons, and those asserted in the Library Defendants' Memorandum in Support of its Motion to Dismiss (ECF No. 20), Defendants respectfully ask the Court to grant their Motion and dismiss Plaintiffs' claims.

Respectfully submitted,

NELSON MULLINS RILEY & SCARBOROUGH LLP

By: /s/ Miles E. Coleman
    Miles E. Coleman (Fed. ID No. 11594)
    E-Mail: miles.coleman@nelsonmullins.com
    2 W. Washington Street / Suite 400
    Greenville, SC 29601
    (864) 373-2300

WILSON JONES CARTER & BAXLEY

    Charles F. Turner, Jr. (Fed. ID No. 05849)
    J. Nathan Ozmint (Fed. ID No. 14360)
    John P. "Jack" Riordan (Fed. ID No. 07314)
    325 Rocky Slope Rd., Suite 201
    Greenville, South Carolina 29607
    (864) 672-3711
    cfturner@wjcblaw.com
    jpriordan@wjcblaw.com
    jnozmint@wjcblaw.com

*Attorneys for Greenville County Library System; Beverly James, in her official capacity as Executive Director of the Greenville County Library System; and Karen Allen, in her official capacity as Youth Services Manager of the Greenville County Library System*

Greenville, South Carolina
August 15, 2025