00IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
GREENVILLE DIVISION

| | | |
|---|---|---|
| O.R., by and through his parents, Cheryl Rogers and Greg Rogers, on behalf of himself and those similarly situated; | ) ) ) ) | No. 6:25-cv-02599-DCC |
| CHERYL ROGERS; | ) ) | |
| GREG ROGERS; | ) ) | |
| E.G., by and through her mother, Amber Galea, on behalf of herself and those similarly situated; | ) ) ) | |
| M.G., by and through her mother, Amber Galea; and | ) ) ) | |
| W.M., by and through his mother, Kersey Clark;, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | **ORDER** |
| GREENVILLE COUNTY, SOUTH CAROLINA; | ) ) | |
| BEVERLY JAMES, in her official capacity as Executive Director of the Greenville County Library System; and | ) ) ) ) | |
| KAREN ALLEN, in her official capacity as Youth Services Manager of the Greenville County Library System,, | ) ) ) ) | |
| Defendant. | ) ) | |

This matter is before the Court on Defendants' Motion to Dismiss. ECF No. 20. Plaintiffs filed a Response in Opposition, and Defendants filed a Reply. ECF Nos. 27, 33. Plaintiffs also filed two notices of supplemental authorities, to which Defendants filed one reply. ECF Nos. 37, 39, 38. For the reasons set forth below, Defendants' Motion is granted in part and denied in part.

## I. BACKGROUND[1]

This case arises out of Greenville County Library System's (the "Library") enactment of policies, both written and unwritten, that target books portraying Lesbian, Gay, Bisexual, Transgender, and Queer ("LGBTQ") individuals. *See* ECF No. 5. The Library is a public library system operated by Defendant Greenville County (the "County"). *Id.* at 4. The Library is controlled and managed by a board of trustees ("the Board") appointed by the Greenville County Council. *Id.* Defendant Beverly James ("James") is the Executive Director of Greenville Library, and Defendant Karen Allen ("Allen") is the Youth Services Manager of Greenville Library. *Id.* at 5. James and Allen are responsible for carrying out policies enacted by the Board. *Id.*

Plaintiffs are residents of the County and patrons of the Library. *Id.* at 3–4. Plaintiff O.R. is 17 years old and brings his claims by and through his parents, Plaintiffs Cheryl Rogers and Greg Rogers. *Id.* at 3. Plaintiff O.R. brings his equal protection claims on behalf of himself and those similarly situated—namely, all minor, transgender library patrons who lack adult library cards. *Id.* at 4. Plaintiffs E.G. and M.G. are, respectively,

---

[1] On a motion to dismiss, a plaintiff's well-pled allegations are accepted as true. Accordingly, this recitation of facts is taken from Plaintiffs' Amended Complaint.

11 and 12 years old and live with their mother, Amber Galea.  *Id.*  Plaintiff E.G. brings her equal protection claims on behalf of herself and those similarly situated—namely, all individuals with adult Greenville County library cards who identify as LGBTQ.  *Id.*  Plaintiff W.M. is 9 years old and brings his claims by and through his mother, Kersey Clark.  *Id.*

Over the last two years, the Library has systematically purged positive portrayals of transgender and non-conforming people through the use of both written and unwritten policies.  *Id.* at 2.  In 2024, the Library implemented two written policies (the "Written Policies"), which removed all material from the juvenile and young adult sections of the library that contain "illustrations, themes, or story lines [that] affirm, portray, or discuss changing the appearance of a minor's gender in ways inconsistent with the minor's biological sex" or with "illustrations, themes, or storylines that celebrate, portray, or affirm gender transitioning."  *Id.* at 10–21.  Pursuant to the Written Policies, these materials were moved to the "Parenting and Early Childhood" ("PEC") section from which minors with juvenile or young adult library cards cannot check out books.[2]  *Id.* at 13.  In enacting the Written Policies, Board members of the Library stated that "the presence of a transgender

---

[2]  On February 13, 2026, Defendants filed a Motion for Extension of Time to File Supplemental Exhibit to their Motion to Dismiss.  ECF No. 42.  Defendants seek to file the declaration of James, who avers that each of the 13 locations of the Library now have a PEC section.  ECF Nos. 42 at 2; 42-1 at 3.  Defendants clarify that this supplemental document is meant only to support their arguments related to standing, for which the Court may consider it at this stage of litigation as it goes to the Court's jurisdiction.  ECF No. 42 at 2–3.  Defendants indicate that Plaintiffs opposed the requested extension and submission of a supplemental exhibit.  *Id.* at 3.  However, Plaintiffs filed no response in opposition to Defendants' Motion.  Upon review of Defendants' Motion, the Court finds that consideration of the supplemental documentation for the sole purpose of determining Plaintiffs' standing is appropriate and has so considered it.  Accordingly, Defendants' Motion is granted, and Defendants are directed to file the attached document as a supplemental exhibit to their Motion to Dismiss.  The Court notes, however, that the information included in Defendants' supplemental exhibit did not materially alter or impact the Court's analysis of standing.

character in a book . . . is grounds for relocating it to the adult section," materials representing gender transition are "trash," and that the "idea" of "transgenderism" is a "dangerous thing" and part of "a radical agenda" that the Library has "every right . . . to take an ethical and moral stand" against. *Id*. at 13–15, 19–20. In implementing the Written Policies, the Library has removed many titles from the juvenile and young adult section that positively portrayed transgenderism, including *Julián is a Mermaid* by Jessica Love, *Ana on the Edge* by A.J. Sass, and *Red: A Crayon's Story* by Michael Hall. *Id.* at 2. Meanwhile, books that advocate against gender transition—such as the Christian-themed book, *God made Boys and Girls* by Marty Machowski—remain available in the juvenile section. *Id.*

The Library also enforces a widespread custom and practice of discriminating against the collection, retention, and display of library materials—including books for adults—that positively portray LGBTQ individuals (the "Unwritten Policy"). *Id.* at 21–25. Under the Unwritten Policy, Defendants have removed dozens of LGBTQ titles from the Library collection for both children and adults, disproportionately refused requests by Library patrons to order new LGBTQ materials, and granted over 50 requests from the Greenville County Republican Women's Club to remove LGBTQ materials. *Id.* at 3, 22–25. Defendants have also ordered librarians to remove book displays that feature LGBTQ materials, cancelled library events that involve LGBTQ individuals or themes, and removed promotional materials for a LGBTQ book club. *Id.* at 24–25.

Based on Defendants' conduct, Plaintiffs have asserted four causes of action: (1) Violation of the First Amendment based on the Written Policies ("Count One"); (2) Violation of the Fourteenth Amendment based on the Written Policies ("Count Two") ; (3)

4

Violation of the First Amendment based on the Library's widespread custom and practices pursuant to the Unwritten Policy ("Count Three"); and (4) Violation of the Fourteenth Amendment based on the Library's widespread custom and practices pursuant to the Unwritten Policy ("Count Four").  *Id.* at 31–36.  Defendants responded to Plaintiffs' Amended Complaint with a Motion to Dismiss, arguing that the Plaintiffs lack standing to assert their claims and that Plaintiffs have failed to state any plausible claims for relief. ECF No. 20.  Plaintiffs filed a Response in Opposition, and Defendants filed a Reply.  ECF Nos. 27, 33.  Plaintiffs have also filed two Notices of Supplemental Authority, to which Defendants replied only to the first Notice.  ECF Nos. 37, 38, 39.  On January 29, 2026, the Court held a hearing on Defendants' Motion to Dismiss.  ECF No. 41.  These Motions are now ripe for review.

## II.  APPLICABLE LAW

### A.  Standing

Article III of the United States Constitution limits the jurisdiction of federal courts to deciding only actual "cases" and "controversies." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 559 (1992). The doctrine of standing sets apart those "cases" and "controversies" that are of the justiciable sort referenced in Article III. *Id.* at 560. "[T]o satisfy Article III's standing requirements, a plaintiff must show (1) it has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Friends of the Earth, Inc. v. Laidlaw Env't. Servs. (TOC), Inc.*, 528 U.S. 167, 180–81 (2000).

5

"To establish injury in fact, a plaintiff must show that he . . . suffered an invasion of a legally protected interest that is concrete and particularized and actual or imminent, not conjectural or hypothetical." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339 (2016) (internal quotation marks omitted). "For an injury to be particularized, it must affect the plaintiff in a personal and individual way." *Id.* (internal quotation marks omitted). For an injury to be concrete, the Supreme Court has "emphasized repeatedly" that it "must be concrete in both a qualitative and temporal sense. The complainant must allege an injury to himself that is distinct and palpable, as opposed to merely abstract." *Whitmore v. Arkansas*, 495 U.S. 149, 155 (1990) (alteration, internal quotation marks, and citation omitted).

## B.  Failure to State a Claim

Rule 12(b)(6) of the Federal Rules of Civil Procedure permits the dismissal of an action if the complaint fails "to state a claim upon which relief can be granted." Such a motion tests the legal sufficiency of the complaint and "does not resolve contests surrounding the facts, the merits of the claim, or the applicability of defenses . . . . Our inquiry then is limited to whether the allegations constitute 'a short and plain statement of the claim showing that the pleader is entitled to relief.'" *Republican Party of N.C. v. Martin*, 980 F.2d 943, 952 (4th Cir. 1992) (internal quotation marks and citation omitted). In a Rule 12(b)(6) motion, the court is obligated "to assume the truth of all facts alleged in the complaint and the existence of any fact that can be proved, consistent with the complaint's allegations." *E. Shore Mkts., Inc. v. J.D. Assocs. Ltd. P'ship*, 213 F.3d 175, 180 (4th Cir. 2000).  However, while the Court must accept the facts in the light most favorable to the

nonmoving party, it "need not accept as true unwarranted inferences, unreasonable conclusions, or arguments." *Id*.

To survive a motion to dismiss, the complaint must state "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Although the requirement of plausibility does not impose a probability requirement at this stage, the complaint must show more than a "sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A complaint has "facial plausibility" where the pleading "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*.

### III. DISCUSSION

**A. Standing**

As an initial matter, the Court addresses the jurisdictional issue of whether Plaintiffs have Article III standing. *Steel Co. v. Citizens for a Better Env't,* 523 U.S. 83, 88–102 (1998) (recognizing that standing to maintain a suit implicates the court's jurisdiction to entertain a suit and is thus a threshold question to be resolved before the merits); *see Garey v. James S. Farrin, P.C.*, 35 F.4th 917, 921 (4th Cir. 2022) ("Because standing is a threshold jurisdictional question, we address it first." (cleaned up) (citations omitted)).  As outlined above, to establish standing, a party must allege that it suffered a "concrete" harm, there must be "a fairly traceable connection between the plaintiff's injury and the complained-of conduct of the defendant[,]" and the harm must be redressable. *Steel Co.,* 523 U.S. at 103.  The Supreme Court has also cautioned that the "absence of a valid . . . cause of action" does not implicate the court's "power to adjudicate the case." *Id.* at 89.  Accordingly, the Fourth Circuit has emphasized a court should "take care not to conflate a standing inquiry with a merits inquiry."  *Beyond Sys., Inc. v. Kraft Foods, Inc.*,

7

777 F.3d 712, 715–16 (4th Cir. 2015).  Further, in analyzing standing, a plaintiff must establish standing as to "each claim" presented and "each form of relief" sought.  *Davis v. FEC*, 554 U.S. 724, 734 (2008) (internal quotation marks omitted).  Only one plaintiff must have standing for the case to proceed. *See Outdoor Amusement Bus. Ass'n, Inc. v. Dep't of Homeland Sec.*, 983 F.3d 671, 681 (4th Cir. 2020); *Bowsher v. Synar*, 478 U.S. 714, 721 (1986).  Accordingly, the Court addresses standing for each of the claims raised by Plaintiffs below.

1. First Amendment Claims

Plaintiffs assert two claims for violation of their First Amendment rights: one based on the Written Policies and another based on the Unwritten Policy.  ECF No. 5 at 31–33; 34–35.  Plaintiffs allege that they are all patrons of the Library and residents of Greenville County.  *Id.* at 4.  They also allege that the Library has removed books with LGBTQ themes from the juvenile and young adult sections of the Library and placed these books on separate shelves in the adult section of the Library, specifically the PEC section, pursuant to the Written Policies and that the Library also has an Unwritten Policy of removing books generally from all sections of the library that have positive LGBTQ themes as well as removing book displays and promotional material that feature LGBTQ themes and cancelling events that involve LGBTQ individuals or themes.  *Id.* at 2–3. Plaintiffs allege that the motivation for implementing these policies was based on viewpoint discrimination towards LGBTQ individuals.  *Id.* at 2, 10, 13, 16, 17, 19. Plaintiffs further allege that they intend to check out and access books with LGBTQ themes and Defendants' Written and Unwritten Policies make it difficult or impossible to do so.  *Id.* at 26–30.  Some Plaintiffs have identified specific book titles that they were interested in

8

checking out from the juvenile and young adult sections of the Library that have been impacted by the Written Policies. *Id*. at 28, 29.

Defendants argue these allegations are insufficient to confer standing on Plaintiffs as they have failed to alleged injury in fact. ECF No. 20 at 8–11. Defendants contend Plaintiffs' allegations are nothing more than "someday" intentions to check out books without any description of concrete plans to do so. *Id.* at 2. Defendants also argue that Plaintiffs do not allege that any book title has been made inaccessible by the Library's Written Policies as individuals may still walk to these books in the Library and check out titles that have been moved to the PEC section with an adult library card. *Id.* at 10. Defendants also assert that the Written Policies in question are aimed at children, who have fewer constitutional protections than adults and that the minor Plaintiffs have not suffered an Article III injury in light of the Library's recognition of and deference to the parents' right to supervise their children. *Id.* at 11. Additionally, to the extent Plaintiffs allege they feel the Written and Unwritten Policies are unfair, Defendants contend that feeling a policy is unfair is nothing more than a psychological injury insufficient to confer standing. *Id.* at 9, 12.

Plaintiffs contend that they have sufficiently alleged they have standing to bring their claims. ECF No. 27 at 8–14. According to Plaintiffs, the Written and Unwritten Policies burden all of Plaintiffs' ability to access restricted materials. *Id.* at 9. Plaintiffs assert that the Written and Unwritten Policies interfere with protected interests under the First and Fourteenth Amendments and they have alleged injury in fact based on the restriction on access to information. *Id*. Plaintiffs further assert that, while at least some have alleged an intent to access a specific book affected by the Written Policies, there is

9

no need to assert intent to access specific removed books to establish standing because, unlike in other cases, Defendants are not attempting to remove specific books but an entire class of ideas and perspectives. *Id.* at 11–13. According to Plaintiffs, their injuries result from restrictions to their Library access and is not a future injury but ongoing and will continue until their access is restored. *Id.* at 13. Plaintiffs further argue that Defendants' attempt to reduce Plaintiffs' injuries to mere psychological distress is unavailing, especially where feelings of marginalization have been recognized as cognizable forms of injury under the First Amendment. *Id.* at 13–14.

a. *Standing Exists as to Count One: The Written Policies*

As to the Written Policies, Plaintiffs allege at least one Plaintiff has attempted to check out a book from the Library but was unable to because of the Written Policies. Specifically, Plaintiffs E.G., M.G., and W.M. allege that they intended to check out specific titles that have been moved pursuant to the Written Policies, which restricts their First Amendment right to receive information. *Id.* at 28, 29. Courts have found that similar factual allegations satisfy the injury-in-fact requirement for standing. *See, e.g., E.K. by & through Keeley v. Dep't of Def. Educ. Activity,* 807 F. Supp. 3d 517, 532 (E.D. Va. 2025) (finding at least one plaintiff had suffered an injury in fact from book removals where she had attempted to check out three specific books that had been removed); *PEN Am. Cntr., Inc. v. Escambia Cnty. Sch. Bd.*, 711 F. Supp. 3d 1325, 1329–30 (N.D. Fla. 2024) (holding that student-plaintiffs had established standing on a First Amendment challenge to book removals where "the children intended to check out specific removed and restricted books during the upcoming (now, ongoing) school year, but they are unable to do so"); *ACLU of Florida, Inc. v. Miami-Dade Cnty. Sch. Bd.*, 557 F.3d 1177, 1194–95 (11th Cir. 2009)

10

(finding that a student had established an injury for standing purposes when he alleged that the school's policy of removing books prevented him from checking out a particular book that he intended to check out "after school resumed in six weeks").  The Court likewise finds Plaintiffs' allegations are sufficient to establish that Plaintiffs have suffered a concrete and particularized harm based on Defendants' implementation of the Written Policies.

Defendants' arguments to the contrary are unpersuasive.  First, the minor Plaintiffs ability to browse the PEC section and check out books with parental consent does not address Plaintiffs allegations that the Written Policies are nevertheless restrictive, even if not tantamount to an outright prohibition.  State action that impedes a plaintiff's ability to access information is sufficient to establish a concrete injury to confer standing for a First Amendment claim.  *See, e.g.*, *Virden v. Crawford Cnty., Arkansas*, No. 2:23-CV-2071, 2023 WL 5944154, at *3 (W.D. Ark. Sept. 12, 2023) ("When a plaintiff shows that her ability to access information has been impeded by state action, however minimally, then that is a sufficiently concrete injury to confer standing for a First Amendment claim." (citations omitted)).  Second, Defendants' argument that Plaintiffs do not have standing because there is no right to receive information from the government overlooks both precedent in cases related to library services and the very purposes of the government services libraries generally are intended to fill.  As outlined above, multiple courts have recognized standing to challenge book removals in publicly funded libraries pursuant to the First Amendment.  Again, Defendants' argument overlooks the very purpose of libraries, and indeed, the alleged stated mission of the Library in this action—"[t]o champion literacy, inspire learning, and foster community connection," its vision is "[t]o be

Greenville County's first choice for exploration, discovery, and information," and it "remains dedicated to providing free access to materials, experiences, and resources to communities throughout Greenville County."[3]  ECF No. 5 at 6–7.

Finally, Defendants' arguments that the minor Plaintiffs' rights have not been restricted or impeded because the Written Policies allow their parents to determine what is appropriate and thus have not suffered an injury in fact overextends the law in this area. Indeed, a parent's right to raise their children is imbedded in the Constitution.  However, this does not mean that minors cannot suffer an injury in fact because a government entity enacts a regulation that restricts their access to certain speech.  Indeed, the Supreme Court has found similar regulations did create a cognizable injury that could be redressed by the courts.  *See, e.g., Brown v. Ent. Merchants Ass'n*, 564 U.S. 786 (2011) (finding that a regulation which only gave parents veto power over the government's own discretionary choice of what is best for their children violated the First Amendment).  In that case, the Supreme Court explained "minors are entitled to a significant measure of First Amendment protection, and only in relatively narrow and well-defined circumstances may government bar public dissemination of protected materials to them."  *Id*. at 794

---

[3] Defendants' arguments related to the right to receive information from the government raised in the 12(b)(6) portion of their brief relies heavily on the reasoning in *Little v. Llano Cnty.*, 138 F.4th 834, 837 (5th Cir. 2025).  ECF No. 20 at 2, 17.  The Court addresses Defendants' 12(b)(6) arguments more fully below.  As Defendants' argument concerning the right to receive information under the First Amendment relates to standing, however, the Court notes that in *Little*, the district court found that the plaintiffs had standing to bring their claim, and the Fifth Circuit, while acknowledging that standing was an issue before the district court, did not disturb the district court's standing finding on appeal.  *See Little*, 138 F.4th at 839; *Little v. Llano Cnty.*, No. 1:22-CV-424-RP, 2023 WL 2731089, at *5 (W.D. Tex. Mar. 30, 2023); *see also In re United Operating, LLC*, 540 F.3d 351, 354 (5th Cir. 2008) (explaining that the court of appeals is "obliged to ensure [standing] is satisfied regardless whether the parties address the matter").

(alteration in original) (quoting *Erznoznik v. City of Jacksonville*, 422 U.S. 205, 212–13 (1975)).

Here, Plaintiffs allege that the Library has removed books from the juvenile and young adult sections where children and their parents would expect to find them and created a burden on the access of information.  At least one Plaintiff has identified specific books of interest to her that have been impacted by the Written Policies.  ECF No. 5 at 28, 29.  This is a sufficiently concrete burden on Plaintiffs' ability to access information to give them standing to bring this lawsuit.  Because at least one individual has standing as to this claim, the Court need not address standing of the other individual Plaintiffs.  The fact that Plaintiffs have adequately pled standing as to this claim does not necessarily mean that they will be able to prevail on the merits of their claims.  But Defendants' arguments about the alleged weaknesses in Plaintiffs claims of injuries blurs the lines between the whether Plaintiffs' claims of injury have merit and whether they have standing to bring their claims, which, as stated above, both the United States Supreme Court and the Fourth Circuit Court of Appeals strongly caution against.

b.  *Standing Does Not Exist as to Count Three: The Unwritten Policy*

Turning to the Unwritten Policy, Plaintiffs allege that pursuant to this Policy, Defendants have removed dozens of LGBTQ titles from the Library collection for both children and adults, disproportionately refused requests by Library patrons to order new LGBTQ materials, and granted over 50 requests from the Greenville County Republican Women's Club to remove LGBTQ materials. Defendants have also ordered librarians to remove book displays that feature LGBTQ materials, cancelled library events that involve LGBTQ individuals or themes, and removed promotional materials for a LGBTQ book

13

club.  Plaintiffs allege that "[u]pon information and belief, numerous additional LGBTQ-related juvenile and young adult titles have been removed from the Library system since October 2023," and provide a list of multiple titles that have allegedly been removed pursuant to the Unwritten Policy.  ECF No. 5 at 23.  Specifically, Plaintiffs allege that Plaintiffs Cheryl and Greg wish to be able to access the full array of LGBTQ-related books, including titles the Library has removed from its shelves.  *Id.* at 27.  Plaintiffs have identified 36 adult LGBTQ-related titles and 23 juvenile and young adult titles that have been removed entirely from the Library allegedly pursuant to the Unwritten Policy.  *Id.* at 5–6.

Defendants' alleged actions could potentially cause injury to someone, but Plaintiffs fail to make any allegations to tie these potentially injurious actions to their own particularized and concrete injuries.  Unlike their allegations regarding the Written Policies, Plaintiffs have not identified any specific books that they intended to check out that have been removed or denied procurement thereof pursuant to the Unwritten Policy nor do Plaintiffs allege that they wished to attend events or clubs that have been impacted by the Library's Unwritten Policy.  *See id.*  While Plaintiffs argue that their injuries are caused by the systematic removal of books that reflect an entire class of ideas and perspectives, they make no allegation that all books pertaining to LGBTQ individuals have been removed from the Library.  Indeed, at the hearing, Plaintiffs conceded that books with positive LGBTQ themes were still available for check out at the Library.  Again, this is unlike Plaintiffs' allegations concerning the Written Policies where all positive portrayals of transgender individuals were moved to a separate section of the Library.

14

Here, Plaintiffs only specific allegations of injury related to the Unwritten Policy are that Plaintiffs Cheryl and Greg would like to access LGBTQ-related books, including generally those that the Library has removed. *Id.* at 27. These allegations are far too remote and speculative to sufficiently allege an injury. *See, e.g.*, *Lujan,* 504 U.S. at 560 (explaining that to establish injury in fact, a plaintiff must show that he or she suffered "an invasion of a legally protected interest" that is "concrete and particularized" and "actual or imminent, not conjectural or hypothetical"); *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 342 (2006) ("A plaintiff must allege personal injury fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief."); *Valley Forge Christian Coll. v. Americans United for Separation of Church & State, Inc.*, 454 U.S. 464, 472 (1982) (explaining that standing requires that the plaintiff "'personally has suffered some actual or threatened injury'"). The Court finds that Plaintiffs have failed to allege with sufficient particularity an injury in fact based on these Policies. Accordingly, Plaintiffs' First Amendment claim based on the Unwritten Policy is dismissed for lack of standing.

2. Equal Protection Claims

Plaintiffs assert two causes of action based on the Equal Protection Clause of the Fourteenth Amendment: again, one based on the Written Policies and one based on the Unwritten Policy. ECF No. 5 at 33–34, 35–36. The Constitution instructs all who act for the government that they may not "deny to any person . . . the equal protection of the laws." U.S. Const. amend. XIV, § 1. "When the government erects a barrier that makes it more difficult for members of one group to obtain a benefit than it is for members of another group, . . . [t]he 'injury in fact' in an equal protection case of this variety is the

15

denial of equal treatment resulting from the imposition of the barrier." *Ne. Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville, Fla.*, 508 U.S. 656, 666 (1993). Plaintiffs allege that the Written and Unwritten Policies discriminates against Library patrons, like Plaintiffs O.R. and E.G., on the basis of their transgender or LGBTQ status. ECF No. 5 at 33, 35. Defendants argue that Plaintiffs have failed to allege an injury in fact based on a denial of equal treatment because the barrier imposed by the Written and Unwritten Policies applies equally to all patrons. ECF No. 20 at 13. Plaintiffs argue that the barrier imposed by Written and Unwritten Policies have thwarted their attempts to receive the benefits of the Library, and this barrier that makes it harder for members of one group—members of the LGBTQ community—to obtain a benefit than it is for members of another group—non-members of the LGBTQ community. ECF No. 27 at 10, 14.

The Court finds that Plaintiffs have made sufficient allegations to show they have suffered an injury in fact caused by both the Written Policies and the Unwritten Policies. As relevant to these claims, Plaintiffs O.R. and E.G. allege they are members of a protected class of individuals, as a transgender boy and a queer-identifying girl. ECF No. 5 at 30–31. O.R. and E.G. are both minor patrons of the Library and residents of the County. O.R. does not have access to the adult section of the Library and so may not check out books from the PEC section on his own behalf, and thus O.R. may not check out books with positive portrayals of transgender characters pursuant to the Written Policies. However, under the Written Policies, O.R. may check out books that advocate against transgenderism, such as *God Made Boys and Girls*, that are still available to him for check out in the juvenile section. Similarly, E.G., who has an adult library card and

16

may check out books on her own from the PEC section, at the age of 12 is unable to find and check out books positively reflecting LGBTQ characters like her in the section of the Library targeting her age group but can find books in the section targeting her age group that negatively portray characters like her.  O.R. and E.G. also allege that the Unwritten Policy has caused stigmatic harm when the Library removed books containing LGTBQ themes or characters, refused requests for new materials, cancelled LGBTQ events or clubs, and prohibited promotions of LGBTQ events or clubs.  *Id.* at 30, 31.

Defendants' argument that the Written and Unwritten Policies equally affect all patrons, regardless of transgender status, ignores those equal protection cases based on facially neutral laws.  It is, by definition, the case that a facially neutral law will, "on its face," treat all citizens "in an identical manner."  *Hunter v. Erickson*, 393 U.S. 385, 391 (1969).  The Equal Protection Clause also provides protection from facially neutral laws where "the reality is that the law's impact falls on the minority."  *Id.*  In the instant case, Plaintiffs allege that Defendants' Written and Unwritten Policies result in just that.  According to Plaintiffs, it is transgender and LGBTQ individuals who will find that books relating to their lived experiences have been segregated or removed altogether from the Library.  Indeed, taking all inferences in Plaintiffs' favor, under the Written Policies, Defendants have removed only the *positive* portrayals of transgender characters from the juvenile and young adult sections of the Library and left arguably stigmatizing negative portrayals of transgenderism.  Courts have found such stigmatization by a government entity could constitute an injury in fact under the Equal Protection Clause.  *See, e.g. Heckler v. Mathews*, 465 U.S. 728, 739–40, 104 S. Ct. 1387, 1395, 79 L. Ed. 2d 646 (1984) ("[W]e have repeatedly emphasized, discrimination itself, by perpetuating 'archaic

17

and stereotypic notions' or by stigmatizing members of the disfavored group as 'innately inferior' and therefore as less worthy participants in the political community, can cause serious non-economic injuries to those persons who are personally denied equal treatment solely because of their membership in a disfavored group." (citing *Mississippi University for Women v. Hogan,* 458 U.S. 718, 725 (1982)).  Likewise, Plaintiffs allege they have suffered similar stigmatization from the Unwritten Policy.  While Plaintiffs' claims of injury based on the Unwritten Policy are somewhat thin, at this stage of litigation and accepting Plaintiffs' allegations as true and making all inferences in their favor, the Court finds they have sufficiently alleged an injury in fact to confer standing.  At this stage of litigation, the Court finds Plaintiffs' allegations are sufficient to allege that the Written and Unwritten Policies resulted in the denial of equal treatment and are accordingly sufficient to allege injury caused by the denial of the equal protection of the laws.

**B.  Failure to State a Claim**

Defendants also assert that Plaintiffs have failed to state a claim upon which relief can be granted.  The Court addresses each of Plaintiffs' claims below.

1. Count One: First Amendment Claim

Defendants contend that Plaintiffs have failed to state a claim for violation of their First Amendment rights based on the Written Policies.  ECF No. 20 at 24–37.  While Defendants concede the First Amendment limits the government's power to prevent a person from receiving another's speech, they argue it also does not obligate the government to provide access to that speech either.  *Id.* at 24–27.  Defendants further contend that the Library's selection and placement of materials in their facilities constitutes government speech, which the First Amendment does not regulate.  *Id.* at 27–

18

34. Defendants assert the Written Policies are viewpoint neutral because they apply to all books geared towards 0- to 12- and 13- to 17-year-olds that deal with gender transitioning. *Id.* at 34–37.

Plaintiffs argue that Defendants' Written Policies selectively punish or suppress speech and that the First Amendment prohibits removal or restriction of library materials based on viewpoint discrimination. ECF No. 27 at 14–25. Plaintiffs assert that their allegations are sufficient to state a claim because the First Amendment prohibits government actors, like Defendants, from removing books from library shelves because they dislike the ideas contained in those books. *Id*. at 15–20. Plaintiffs argue that even though the government may make content-based distinctions to ensure speech is compatible and reasonable in light of the purpose of that forum when it creates a nonpublic forum, any restrictions must still be viewpoint neutral. *Id.* at 17. According to Plaintiffs, the Written Policies are not viewpoint neutral and instead are aimed at suppression of ideas, which would distort the usual function of the Library and be inconsistent with its purpose. *Id.* at 20–22. Specifically, Plaintiffs contend their allegations that the Written Policies were adopted with goal of taking an ethical and moral stance against the so-called "dangerous" and "radical" agenda of transgenderism are a paradigmatic example of unconstitutional viewpoint discrimination. *Id.* at 20. Plaintiffs further argue that the Library's curation actions are not government speech and that Defendants, as government actors, are bound by the First Amendment and not protected by it. *Id.* at 22–25. Plaintiffs assert that invocation of parental rights does not justify the

19

Written Policies because rather than enforcing parental authority they impose government authority subject only to a parental veto. *Id.* at 25.

a. *Government Speech*

First, concerning the Library's curation decisions pursuant to the Written Policies, the Court is not convinced that Defendants' decisions regarding the shelving of books at their facilities constitute government speech. Ordinarily, the First Amendment's Free Speech Clause "restricts government regulation of private speech." *Pleasant Grove City v. Summum*, 555 U.S. 460, 467 (2009). However, the "government speech doctrine" creates a rare and limited exception where when the government speaks, "it naturally chooses what to say and what not to say" without the restrictions of viewpoint neutrality under the First Amendment. *Shurtleff v. City of Boston*, 596 U.S. 243, 251 (2022); *see also Pleasant Grove*, 555 U.S. at 467 ("The Free Speech Clause restricts government regulation of private speech; it does not regulate government speech.") (citations omitted). In *Shurtleff*, the Supreme Court laid out a "holistic inquiry designed to determine whether the government intends to speak for itself or to regulate private expression." 596 U.S. at 252. This inquiry considers evidence of "the history of the expression at issue; the public's likely perception as to who (the government or a private person) is speaking; and the extent to which the government has actively shaped or controlled the expression." *Id.* As noted by other courts, these factors "are fact-intensive and generally not amenable to resolution at the motion to dismiss stage." *See, e.g.*, *PEN Am*, 711 F. Supp. 3d at 1331; *Penguin Random House LLC v. Gibson*, No. 6:24-CV-1573, 2025 WL 902041, at

20

*8 (M.D. Fla. Feb. 28, 2025); *Gundy v. City of Jacksonville Fla.*, 50 F.4th 60, 76 (11th Cir. 2022).

Based on alleged purpose of the Library, and "the fact that the traditional purpose of a library is to provide information on a broad range of subjects and viewpoints," the Court is not convinced that the contents of the Library constitute the government's endorsement of the views expressed in the books in its circulation. *PEN Am.*, 711 F. Supp. 3d at 1331. The controlling case law regarding the government speech doctrine cited by Defendants is readily distinguishable. *See, e.g.*; *Pleasant Grove*, 555 U.S. at 472–74 (finding that the city's decisions in curating monuments for display in a public park constituted government speech); *ACLU of N. Carolina v. Tennyson*, 815 F.3d 183 (4th Cir. 2016) (finding that the state's decision to approve and offer a "Choose Life" license plate while rejecting a pro-choice plate amounted to government speech). Because a library collection is a varied collection of numerous ideas, some of which are readily contradictory, the Court finds that it is materially different from government-sponsored speech such as license plates, art exhibits, and monuments on public property, where a single message is meant to be conveyed. Indeed, it is entirely plausible, based on the multitude of messages delivered through the variety of books in the Library, that the Library's curated collection should be viewed as private, not government, speech. As to those cases that find that a library engages in government speech through its curation decisions, there are as many cases that find it does not. *Compare, e.g.*, *People for the Ethical Treatment of Animals v. Gittens,* 414 F.3d 23, 28 (D.C. Cir. 2005) ("With respect to the public library, the government speaks through its selection of which books to put

21

on the shelves and which books to exclude."); *Bryant v. Gates,* 532 F.3d 888, 898 (D.C. Cir. 2008) (Kavanaugh, J., concurring) ("As the case law makes clear, 'government speech' can include not only the words of government officials but also 'compilation of the speech of third parties' by government entities such as libraries[.]"); *Little*, 138 F.4th at 865 (Duncan, J., plurality op.) (finding that a public library's collection decisions are government speech), *with PEN Am.,* 711 F. Supp. 3d at 1331 (declining to apply the government speech doctrine to a library collection because a library collection "is materially different from the speech embodied in government-sponsored parades, prayers, art exhibits, and monuments on public property"); *GLBT Youth in Iowa Schs. Task Force v. Reynolds*, 114 F.4th 660, 667–68 (8th Cir. 2024) (finding the government speech doctrine inapplicable to the placement and removal of books in public school libraries as "public school libraries do not share the characteristics of monuments in a park" because there is no coherent message spoken by library curation which amount to more than "babbling prodigiously and incoherently" and also considering the Supreme Court's directive to "exercise great caution before extending our government-speech precedents" (citing *Matal v. Tam*, 582 U.S. 218, 235 (2017)).

Given this contradictory persuasive precedent, the readily distinguishable factual background in the controlling precedent, the Supreme Court's directive to apply caution in extending the government speech doctrine, and the procedural posture of this action, the Court declines to find the government speech doctrine extends to library curation at this juncture. Having found that, based on Plaintiffs' allegations, the Written Policies are not immune from First Amendment scrutiny under the government speech doctrine, the

Court turns its attention to whether Plaintiffs have plausibly alleged a First Amendment claim against Defendants.

b.  *First Amendment Claim*

As an initial matter, the Parties disagree on whether the right asserted by Plaintiffs exists under the First Amendment.  *See* ECF Nos. 20 at 24–27; 27 at 15–22.  Defendants assert that Plaintiffs have no "right to receive" information from the Library, and the government cannot be compelled to provide certain information to the public under the First Amendment.  ECF No. 20 at 24–27.  Based on Defendants' arguments, it is their position that they acted within constitutional bounds when they imposed the Written Policies, which removed books containing positive portrayals of transgenderism from the juvenile and young adult sections and placed them in the PEC section, which indisputably has restrictions that inhibit checking out books from this section by minors without an adult library card.  *Id*.  Plaintiffs argue that Defendants' conduct is exactly the type of viewpoint discrimination proscribed by the First Amendment.  ECF No. 27 at 15, 22.  Thus, the issue before the Court is whether a public library may, without violating the First Amendment, enforce a policy that results in moving books based on their content to a separate, more restrictive section of the library.

First and foremost, the right under the First Amendment not only to share information but also to receive it has been recognized in certain contexts.  *See, e.g.*, *Stanley v. Georgia*, 394 U.S. 557, 564 (1969) ("[T]he Constitution protects the right to receive information and ideas."); *Kleindienst v. Mandel*, 408 U.S. 753, 762–63 (1972) (citing cases).  Here, the question is whether this right exists in the context of a public

23

library.  The Parties disagree as to whether one of the singular Supreme Court cases on point, *Board of Education, Island Trees Union Free School District No. 26 v. Pico*, 457 U.S. 853 (1982), is of value in the Court's analysis of whether Plaintiffs' alleged First Amendment right exists given that it is a plurality decision.  Defendants cite several circuit court decisions where other courts have found that *Pico* has minimal value in aiding with the lower court's decision on First Amendment issues.  ECF No. 20 at 35.  At oral argument, the Court acknowledged that "*Pico* is kind of like Forrest Gump's box of chocolates. It just depends on which opinion you reach into as to what you get."  ECF No. 43 at 6.  However, the Fourth Circuit has never made a finding that *Pico* was of no value, and other district courts within this circuit have repeatedly relied on *Pico* for guidance, including in the context of public library curation decisions.  *See, e.g.*, *E.K.,* 807 F. Supp. at 539–44; *Cline v. Fox*, 319 F. Supp. 2d 685, 690–91 (N.D.W. Va. 2004); *Mainstream Loudoun v. Board of Trustees of the Loudoun County Library, et al.,* 2 F. Supp. 2d 783, 794–95 (E.D. Va. 1998).  Likewise, the Court finds *Pico* provides guidance for the scope of First Amendment rights in this context.

In *Pico*, the Supreme Court was tasked with reviewing the decision of a local board of education to remove certain books from school libraries based on the board's belief that the books were "anti-American, anti-Christian, anti-Sem[i]tic, and just plain filthy." 457 U.S. at 856 (alteration original).  The Second Circuit had reversed the district court's grant of summary judgment to the school board on plaintiff's First Amendment claim.  A divided Supreme Court voted to affirm the appellate court's decision to remand the case for a determination of the school board's motives, but no majority opinion was issued.

24

Justice Brennan, joined by three Justices, issued the plurality opinion, which held that the First Amendment necessarily limits the government's right to remove materials on the basis of their content from a school library. *See id.* at 864–69 (plurality op.). Justice Brennan reasoned that the right to receive information is inherent in the right to speak and that "the State may not, consistently with the spirit of the First Amendment, contract the spectrum of available knowledge." *Id.* at 866 (quoting *Griswold v. Connecticut,* 381 U.S. 479, 482 (1965); *Stanley,* 394 U.S. at 564). Accordingly, Justice Brennan extended the so-called "right to receive information" to a limited extent to the context of public school libraries and held that the school board members could not remove books "simply because they dislike the ideas contained [in them]," thereby "prescrib[ing] what shall be orthodox in politics, nationalism, religion, or other matters of opinion." *Id.* 457 U.S. at 872 (quoting *W. Va. Bd. of Educ. v. Barnette,* 319 U.S. 624, 642 (1943)) (internal quotation marks omitted). Justice Brennan noted that the limit on this right to receive information in the context of public-school libraries was the great discretion entitled to public schools "to establish and apply their curriculum in such a way as to transmit community values" and thus public-school libraries may remove books for reasons of educational suitability, for example pervasive vulgarity. *Id.* at 863–64, 872. Thus, under Justice Brennan's plurality, the state actor's motivation in implementing the restrictive policy was key in determining whether its action violated the First Amendment. *Id.* at 871.

In his concurring opinion, Justice Blackmun agreed that schools could not impermissibly suppress books based on the ideas within them absent sufficiently compelling reasons, though he adopted a narrower view of the constitutional "right to

25

receive information." *Id.* at 877–78 (Blackmun, J., concurring). Justice Blackmun recognized though, even considering the dissent's discussion of the unique role of a school board as educators, that "surely difficult constitutional problems would arise if a State chose to exclude 'anti-American' books from its public libraries—even if those books remained available at local bookstores." *Id.* at 881. Justice White's concurrence, on the other hand, concurred only in the judgment and found it unnecessary to "issue a dissertation on . . . the First Amendment" absent further findings of fact from the district court. *Id.* at 883 (White, J., concurring).

Chief Justice Burger, in his dissent, agreed that "students do not 'shed their constitutional rights to freedom of speech or expression at the schoolhouse gate,'" but rejected the idea "of a 'right' to have the government provide continuing access to certain books" and that "school in particular ought not be made slavish courier of the material of third parties," especially where these "[b]ooks may be acquired from bookstores, *public libraries*, or other alternative sources unconnected with the unique environment of the local public schools." *Id.* at 886–92 (Burger, J., dissenting) (emphasis added). Finally, Justice Rehnquist, in dissent, found that past decisions by the Supreme Court recognizing the right to receive information under the First Amendment were unlike this case "where the removed books are readily available to students and non-students alike at the corner bookstore or the public library." *Id.* at 912. Justice Rehnquist recognized the unique nature of libraires in public schools, which unlike university or public libraries, "are not designed for freewheeling inquiry" but instead "are tailored, as the public[-]school curriculum is tailored to the teaching of basic skills and ideas." *Id.* at 915.

26

As recognized by Justices in both the plurality, concurrences, and dissents of *Pico*, public libraries offer a slightly different context for First Amendment analysis, as opposed to public-school libraries. In the context of *Pico*'s applicability to public libraries, the Court finds *Mainstream Loudoun v. Board. of Trustees of Loudoun County Library*, 2 F. Supp. 2d 783 (E.D. Va. 1998), to be instructive. In *Mainstream*, the district court was tasked with determining whether the public library's policy restricting internet access to adult-oriented websites violated the First Amendment. *Id.* at 787. The library board moved to dismiss the action and argued that "any limitation on their discretion to remove materials would force them to act as an unwilling conduit of information, and urge this [c]ourt to adopt the position of the *Pico* dissent," by Justice Burger that "the right to receive information and ideas does not carry with it the concomitant right to have those ideas affirmatively provided at a particular place by the government." *Id.* at 794. The district court explained that adopting this position would "require this Court to ignore the *Pico* plurality's decision to remand the case" and also to ignore the context of the *Pico* decision in the public school library context, wherein "all the Justices, including the dissenters, recognized that any discretion accorded to school libraries was uniquely tied to the public school's role as educator." *Id.*

The district court explained further that "neither the dissent nor the plurality of *Pico* can be said to support defendants' argument that public libraries enjoy unfettered discretion to remove materials from their collections." *Id.* The district court concluded that, to the extent that *Pico* was applicable, it stood "for the proposition that the First Amendment applies to, and limits, the discretion of a public library to place content-based

27

restrictions on access to constitutionally protected materials within its collection." *Id.* at

794. Thus, "[c]onsistent with the mandate of the First Amendment, a public library, 'like

other enterprises operated by the State, may not be run in such a manner as to 'prescribe

what shall be orthodox in politics, nationalism, religion, or other matters of opinion.'" *Id.* at

794–95 (quoting 876 (Blackmun, J., concurring)).

Plaintiffs plausibly allege that the Written Policies do not pass constitutional muster

under this standard. As outlined above, Plaintiffs allege the Written Policies resulted in a

restriction of access to books with positive portrayals of transgenderism because minors

cannot freely check out books from the PEC section of the Library. Plaintiffs further put

forth multiple allegations that plausibly support that this restriction on access to materials

was based on Defendants' ideological objections to the books, including Defendants'

alleged statements in enacting the Written Policies. Based on these allegations, there is

a plausible inference that the decision to enact the Written Policies was based on

Defendants' ideological objections to the books' content or disagreement with their

messages or themes rather than a viewpoint neutral reason.[4] The Court's decision does

---

[4] These allegations sufficiently support the inference that the Written Policies were enacted as a form of viewpoint discrimination against positive speech about LGBTQ individuals and transgenderism. The Fourth Circuit has explained that, in all types of forums, "a policy . . . that does not provide sufficient criteria to prevent viewpoint discrimination . . . generally will not survive constitutional scrutiny" and further that "viewpoint neutrality requires not just that a government refrain from explicit viewpoint discrimination, but also that it provide adequate safeguards to *protect* against the improper exclusion of viewpoints." *Child Evangelism Fellowship of MD, Inc. v. Montgomery Cnty. Pub. Schs.*, 457 F.3d 376, 387, 384 (4th Cir. 2006) (emphasis in original) (citations omitted). Accordingly, because it is plausible, drawing all inferences in Plaintiffs' favor, that Defendants' alleged conduct would not survive under any level of scrutiny, the Court does not engage in a full forum analysis at this time.

not compel Defendants to provide certain information to Plaintiffs.  Rather it enforces limited First Amendment protections because Defendants "[h]av[e] chosen to provide access" to the speech in these books and they "may not thereafter selectively restrict certain categories of . . . speech because it disfavors their content."  *Id.* at 795–96; *see also Lamont v. Postmaster Gen. of U. S.,* 381 U.S. 301, 310 (1965) (Brennan, J., concurring) ("If the Government wishes to withdraw a subsidy or a privilege, it must do so by means and on terms which do not endanger First Amendment rights.").

Defendants' arguments that Plaintiffs have failed to state a claim because minors do not have the same protections under the Constitution as adults are also unconvincing. As outlined above, even considering parents' constitutional right to raise their children, minors are still entitled to broad First Amendment protection.  *Brown*, 564 U.S. at 794 (quoting *Erznoznik*, 422 U.S. at 212–13).  "Speech that is neither obscene as to youths nor subject to some other legitimate proscription cannot be suppressed solely to protect the young from ideas or images that a legislative body thinks unsuitable for them."  *Id.* at 795 (quoting *Erznoznik*, 422 U.S. at 213–14).  While Defendants without a doubt have the authority to enforce a prohibition that a parent puts in place to prevent their child from accessing information, the Supreme Court found this authority to enforce does not equate to authority to block minors' access to constitutionally protected speech until their parents give their consent.  *See id.*  Plaintiffs have alleged that the Written Policies create the same parental veto-only block of constitutionally protected speech.  Accordingly, the Court finds that Plaintiffs' allegations are sufficient to state a First Amendment claim

based on the Written Policies and Defendants' Motion to Dismiss is denied as to this claim.

2. Counts Two and Four: Equal Protection Claims

Plaintiffs assert two claims for equal protection: one based on the Written Policies and one based on the Unwritten Policy. ECF No. 5 at 33–34, 35–36. Defendants argue that both of these claims should be dismissed. ECF No. 20 at 37–41. According to Defendants, Plaintiffs' equal protection claims are nothing more than reframing of his First Amendment claims because they allege that Plaintiffs are subject to unequal treatment because they are preventing them from accessing certain library materials, which is effectively the same as Plaintiffs' right to receive information argument under their First Amendment claims. *Id.* at 37–38. Defendants further contend that Plaintiffs have failed to state a claim because they have not sufficiently alleged how the Written and Unwritten Policies discriminate based on the sex or LGBTQ status of patrons. *Id.* at 38–41. Plaintiffs argue that they have sufficiently alleged that the Written and Unwritten Policies led to different treatment for LGBTQ Plaintiffs, as well as the classes they seek to represent, because the Written and Unwritten Policies create a system where transgender and LGBTQ patrons are uniquely banished to a separate section of the Library to attempt to find stories that represent their experiences. ECF No. 27 at 26–36. Plaintiffs further argue that the Written and Unwritten Policies intentionally inflict stigma upon LGBTQ patrons by segregating these materials and that the equal application reasoning has repeatedly been rejected by other courts. *See id.*

30

The Equal Protection Clause of the Fourteenth Amendment provides that "[n]o State shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1.  "The equal protection requirement 'does not take from the States all power of classification,' but 'keeps governmental decisionmakers from treating differently persons who are in all relevant respects alike.'" *Veney v. Wyche*, 293 F.3d 726, 730 (4th Cir. 2002) (quoting *Personnel Adm'r v. Feeney,* 442 U.S. 256, 271 (1979); *Nordlinger v. Hahn,* 505 U.S. 1, 10 (1992)). To succeed on an equal protection claim, Plaintiffs "must first demonstrate that [they] ha[ve] been treated differently from others with whom [they are] similarly situated and that the unequal treatment was the result of intentional or purposeful discrimination."  *Morrison v. Garraghty,* 239 F.3d 648, 654 (4th Cir. 2001).  If Plaintiffs make this showing, "the court proceeds to determine whether the disparity in treatment can be justified under the requisite level of scrutiny."  *Id.*

First, as to Defendants' argument that Plaintiffs' equal protection claims are nothing more than a repackaging of their First Amendment claims, the Court disagrees. Plaintiffs allege they are members of an identifiable group, specifically LGBTQ-identifying Library patrons, and that this membership forms the basis of their equal protection claims. Plaintiffs allege that the Written and Unwritten Policies inflict equal protection injuries based on the impediment on their "ability to access library materials positively reflecting themselves and their families," and also the "dignitary harm and unconstitutional stigma" of their LGBTQ "identities and experiences" being treated as "unacceptable and unworthy of inclusion in public space."  ECF No. 5 at 33, 35.  These allegations, while related to Plaintiffs' First Amendment claims, are distinguishable because they discuss the Written

31

and Unwritten Policies' impact on an identified group of the Library's patrons.  Unlike the cases cited by Defendants, Plaintiffs have alleged more than just disparate treatment through discrimination against their viewpoint.  Accordingly, the Court finds that Plaintiffs have sufficiently alleged an equal protection claim that is separate from their First Amendment claim.

Turning to the sufficiency of Plaintiffs' allegations, the Court finds Plaintiffs' allegations are sufficient to show "[they] been treated differently from others with whom [they are] similarly situated and that the unequal treatment was the result of intentional or purposeful discrimination."  *Morrison,* 239 F.3d at 654.  Here, Plaintiffs have alleged that they are members of a recognized class—LGBTQ-identifying Library patrons—and that Defendants' Policies explicitly classify books that positively reflecting this protected status for removal and segregation, resulting in unequal treatment of the Plaintiffs and a powerful stigma against them.  Specifically—and significantly—Plaintiffs allege that books that negatively portray their protected status remain readily available and unaffected by Defendants' Policies.  Furthermore, Plaintiffs have included allegations of comments by the Board which plausibly suggest that the motivation for implementing these Policies was based in animus related to Plaintiffs' protected status rather than a compelling government interest.  Moreover, the alleged language of the Written Policies specifically targets positive portrayals of transgender individuals.

At this early stage of the litigation, the Court must assume the facts alleged in the Amended Complaint to be true and draw all reasonable inferences in Plaintiffs' favor. *See Iqbal*, 556 U.S. at 678.  In doing so, the Court finds that Plaintiffs have alleged sufficient

32

facts to suggest that Defendants' Policies result in transgender-based disparate treatment because they allow for books that negatively portray Plaintiffs' protected class to remain readily available while restricting access to positive portrayals. *Cleburne* 473 U.S.at 448 ("Private biases may be outside the reach of the law, but the law cannot, directly or indirectly, give them effect." (quoting *Palmore v. Sidoti*, 466 U.S. 429, 433 (1984)); *C & H Co. v. Richardson*, 78 F. App'x 894, 902 (4th Cir. 2003) (explaining that discriminatory purpose implies that the decisionmaker in enacting the policy "selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' [their] adverse effects upon an identifiable group" (quoting *Personnel Adm'r v. Feeney,* 442 U.S. 256, 279 (1979)).

Turning to the second inquiry, whether the disparity in treatment can be justified under the requisite level of scrutiny, the Court also finds Plaintiffs' allegations are sufficient at this stage of litigation. Under controlling law, classifications based on sex— including status as LGBTQ and transgender—are subject to intermediate, or "quasi-suspect," scrutiny. *Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 607–08 (4th Cir. 2020); *Obergefell v. Hodges*, 576 U.S. 644, 674 (2015). Governmental action that discriminates on the basis of sex, transgender status, or gender identity must be found unconstitutional "unless [it is] substantially related to a sufficiently important governmental interest." *Grimm*, 972 F.3d at 608 (quoting *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 441 (1985)). "To survive intermediate scrutiny, the state must provide an 'exceedingly persuasive justification' for its classification." *Id.* (citation omitted). The alleged results and motivations of the Policies as outlined above are more than sufficient

"to establish that the principal purpose and the necessary effect of this law are to demean those persons who" identify as transgender and LGBTQ. *United States v. Windsor*, 570 U.S. 744, 774 (2013).   In short, Plaintiffs allegations suggest that Defendants' implementation of the Written and Unwritten Policies was not substantially related to a sufficiently important governmental interest.   However, the Court notes that even if the more deferential standard of rational basis were to apply, Plaintiffs have still alleged sufficient facts to proceed with their claims at this stage in litigation.[5]   Based on Plaintiffs' allegations, Defendants did not have a rational basis for their alleged discriminatory conduct, because, as discussed above, the Written Policies took the constitutionally protected decisions on how to raise children away from parents instead of merely supporting it and no basis has been provided for the implementation of the Unwritten Policy.   Accordingly, Defendants' Motion to Dismiss is denied as to Plaintiffs' equal protection claims.

    3. <u>Qualified Immunity</u>

Defendants argue that Defendants James and Allen are entitled to qualified immunity to the extent that Plaintiffs seek civil liability or an award of monetary damages against them.   *See* ECF No. 20 at 42.   Plaintiffs contend that Defendants' assertion of qualified immunity is immaterial because qualified immunity does not apply to claims for prospective relief, which is the only kind of relief Plaintiffs seek in this action.   ECF No. 27 at 38.   In their Reply, Defendants do not address whether qualified immunity applies to

---

[5] The Court applies rational-basis review when a government imposed a regulation does not involve a suspect class and will uphold the law if it rationally relates to a legitimate government objective. *Cleburne*, 473 U.S. at 440.

Plaintiffs' requested relief, and it appears they have abandoned their qualified immunity arguments. *See* ECF No. 33.

Under the doctrine of qualified immunity, "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). However, "qualified immunity does not apply against . . . prospective relief." *Henderson v. Harmon*, 102 F.4th 242, 251 n.6 (4th Cir. 2024) (citation omitted). Qualified immunity also does not prevent an award of attorneys' fees pursuant to 42 U.S.C. § 1988 against public officials acting in their official capacity. *See Pulliam v. Allen,* 466 U.S. 522, 543–44 (1984). Here, Plaintiffs' requested relief is prospective, and Defendants' qualified immunity defense is accordingly inapplicable. ECF No. 5 at 36–37.[6]

## IV. CONCLUSION

For the reasons set forth above, Defendants' Motion to Dismiss [20] is **GRANTED IN PART** and **DENIED IN PART** as set out above.

IT IS SO ORDERED.

<u>s/ Donald C. Coggins, Jr.</u>
United States District Judge

March 19, 2025
Spartanburg, South Carolina

---

[6] Defendants also raise the merits of Plaintiffs' request for class certification. *See* ECF No. 20 at 43–44. As Defendants recognize, however, Plaintiffs' class allegations and request for class certification are not yet before the Court. *See id*. Accordingly, the Court declines to address the merits of Plaintiffs' class certification allegations at this time.